IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Ft. Lauderdale Division

Case No. 19-61370-CIV-SMITH/VALLE

| | | |
|---|---|---|
| HARVEY J. KESNER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | <u>Case No. 0:19-cv-61370-RS</u> |
| | ) | |
| | ) | **TRIAL BY JURY** |
| DOW JONES & COMPANY, INC. | ) | **IS DEMANDED** |
| d/b/a BARRON'S | ) | |
| WILLIAM "BILL" ALPERT | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| TERI BUHL | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>AMENDED COMPLAINT</u>

Plaintiff, Harvey J. Kesner ("Kesner" or "Plaintiff"), by counsel, pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure (the "Rules"), files the following Amended Complaint against Defendants, Dow Jones & Company, Inc. d/b/a Barron's ("Barrons"), William "Bill" Alpert ("Alpert"), and Teri Buhl ("Buhl"), jointly and severally.

Plaintiff seeks (a) compensatory damages and punitive damages in a sum not less than **$25,000,000.00**, (b) prejudgment interest on the principal sum awarded by the Jury from October 4, 2018 to the date of Judgment at the rate of 6.89 percent per year, (c) reasonable attorney's fees, and (d) costs – arising out of the Defendants' defamation,

commercial disparagement, deceptive acts and unfair practices in trade or commerce, tortious interference with contract and business expectancies, and common law conspiracy.

## I.  INTRODUCTION

1.    This case is about an ongoing coordinated campaign by the Defendants to destroy the 36-year, previously untarnished, legal career of a successful corporate and securities attorney who lives in South Florida – an attorney who the Defendants knew serviced a large number of clients and companies based in Florida.   It was the Defendants' intent, through concerted acts of defamation and commercial disparagement directed at Plaintiff and Plaintiff's practice in Florida, to permanently harm Plaintiff's reputation, rendering him unemployable.

2.    Over a year after the Securities and Exchange Commission ("SEC") brought an action against certain persons, but ***NOT*** the Plaintiff, and in spite of the pendency of this action, the Defendants continue to publish scandalous statements about Plaintiff.   The Defendants continue to assert that Plaintiff orchestrated a scheme to defraud and that he acted dishonestly, unethically, and that he is not fit to practice law.   In flagrant disregard for the truth, the Defendants continue to publish false statements that disparage Plaintiff's professional reputation, integrity and standing in the Florida community in which Plaintiff lives and works.   The Defendants continue to proclaim that numerous government efforts to investigate and charge a broad swath of individuals and companies are somehow all tied to Plaintiff.   The Defendants falsely proclaim that Plaintiff is the central figure in the cases.   He is not.   Never was.

3.      The Defendants recklessly disregard and run roughshod over matters of public record.  They maliciously attack Plaintiff for the sole purpose of garnering money, assisting their benefactors, increasing internet traffic to their sites, advancing sales of their publications, selling advertising, and increasing their own reputations in the nebulous world of short sellers and pump-and-dump artists with whom they, directly or indirectly, are engaged in the manipulation of stocks for financial gain.  The Defendants worked together[1] to generate false and misleading information, harm investors and profit through the creation of sensational, click-bait headlines and deceitful "reveals" designed to panic investors in public companies, resulting in panic selling that reduces stock prices, so that they can profit (financially and reputationally) on the false stories.

4.      Plaintiff is but one (of dozens) of lawyers that represented companies that were in the sights of the SEC during a multi-year, multi-company investigation. Defendants chose to target Plaintiff.  The Defendants used the mere fact that Plaintiff was counsel to publish stories, such as "**SEC Charges Against Phillip Frost Might Just Be the Tip of the Iceberg**" and "**The Lawyer at the Center of SEC Pump and Dump Case**", during 2018.

5.      In addition to Plaintiff, Defendants' articles and blogs focus attention on other Floridians.  Dr. Phillip Frost ("Dr. Frost") is a Miami billionaire whose charitable works include hundreds of millions of dollars to support charitable, educational and scientific endeavors, including the namesake of the Phillip and Patricia Frost Museum of

---

[1]      [*See, e.g.*, https://www.barrons.com/articles/sec-charges-phillip-frost-1536608366 ("The remarkable penny stock successes of Frost, Honig, and Brauser have also been the subject of dogged investigation by independent journalist Teri Buhl, who self-publishes her work and had to defend against two lawsuits … over her stories, including a libel suit.")].

Science.   South Florida Business Journal reported that Dr. Frost is Florida's most charitable donor, having donated $170 million to charity in 2017, including $100 million donation to the University of Miami's applied sciences and engineering programs and $33 million to the Phillip and Patricia Frost School of Music at the University of Miami. Dr. Frost served as the chairman and CEO of Miami, Florida, Ivax Pharmaceuticals prior to its sale to a large Israeli consortium.

6.     For a year, the Defendants have asserted (without any evidentiary support) that alleged ties to alleged illegal and unethical acts by others will lead to fines, charges and penalties against Plaintiff.   The Defendants besmirch Plaintiff's reputation by associating him, wrongly, with the unproven charges against persons and companies involved in the ongoing SEC lawsuit that does not name Plaintiff.   The Defendants falsely proclaim that Plaintiff has acted illegally himself, and also facilitated illegal acts through his legal representation, through identification of businesses he has supported (damaging their reputations as well), through mere association with third parties (who have been defamed as well) and other professionals, stating or implying that it is just a matter of time before Plaintiff is caught.   The Defendants act as if they possess superior knowledge of "leaked" government information from investigators and prosecutors. They possess no such information because none exists.

7.     The Defendants' smear campaign has all but destroyed any prospects for Plaintiff to provide legal services to clients and continue his life's work.   The Defendants have reduced to shambles a highly successful law practice.   The Defendants caused innumerable third-parties who are necessary to Plaintiff's practice to shun Plaintiff. Plaintiff's calls to former clients, investment bankers, accountants, auditors, brokers,

financial printers and others – readily answered in the past – now go unreturned.  Without the ability to interact with these persons, it is impossible to represent clients raising capital, perform securities law work, or pursue regulatory actions.  Plaintiff previously maintained extraordinary relationships and was sought out by companies and these financial service providers for his skills, contacts, and expertise.  The Defendants' acts caused a loss of relationships, referrals and terminations.  Even his law firm colleagues, partners, associates and administrators with whom he worked for 10 years, have refused to work with him after reading Defendants' "hit pieces".  New and old prospects and colleagues avoid his calls for fear they, too, will be the next one named in a salacious story, as occurred in August 2019, when Buhl insisted Plaintiff "has made statements in other court filings and in press reports that he does not think he is under SEC investigation.  The new court filing could show otherwise" – an article in which Buhl included several other partner names to her story.

II.   **THE BARRONS ARTICLE AND THE BUHL BLOGS**

8.      On October 4, 2018, Barrons published a bombshell online article that tied Plaintiff to numerous defendants in an SEC investigation of three public companies and over 20 defendants.   The article prominently displayed the following false and defamatory headline:

MARKETS   FEATURE

# The Lawyer at the Center of SEC Pump-and-Dump Case

By Bill Alpert   October 4, 2018

[https://www.barrons.com/articles/the-lawyer-at-the-center-of-sec-pump-and-dump-case-1538675403 (the "Barrons Article")].

9.     The "Lawyer" targeted in the Barrons Article is Plaintiff, who, as the Defendants well-know, has resided in Florida since 2016.  In spite of the filing and pendency of this action, the Defendants have prominently and repeatedly directed false and defamatory statements to the State of Florida, commenting on the laws of the State of Florida.  For instance, even though they knew that the "SEC Pump-and-Dump Case" was filed two full years *after* Plaintiff became a permanent resident of Florida, the Defendants repeatedly state that Plaintiff moved to Florida to avoid "*an SEC fine*".  Buhl, in her August 29, 2018 blog, stated "[Kesner] has also made an apparent move to claim Florida as his home state.  Florida often becomes a home for people with judgments or government fines lobed [sic] on them because it is a 'homestead state'.  This means in the case of bankruptcy or say an SEC fine they can't come and take your home." [https://www.teribuhl.com/2018/08/29/kesners-out-why-is-barry-honigs-securities-lawyer-retiring/].  Buhl again directed her attention to Florida in a May 2019 blog, in which she wrote "Kesner recently moved his main residence to South Florida which is a homestead state.  Meaning your home can't be seized if you have judgments or government fines against you.  Kesner had previously lived in New Jersey for decades." [https://www.teribuhl.com/2019/05/14/judge-says-honigs-attorney-harvey-kesner-can-be-sued-for-fraud-and-malpractice-mbvx/].     Buhl made these representations, falsely implying that Kesner knew he had engaged in wrongdoing and deliberately fled and sought sanctuary in Florida, even though Buhl knew that Kesner was not one of the 20 parties named by the SEC either in its original complaint or in its expanded amended

complaint filed in the United States District Court for the Southern District of New York a year later after the SEC reportedly reviewed up to 1.2 million documents.

10.     On September 5, 2018, Buhl updated and republished her August 2018 blog, further falsely stating that "Harvey Kesner's law firm has removed his name from the firm today.  According to a member of the law firm this [sic] a clear signal that his fellow partners don't want to be associated with him … These actions could signal an SEC charge or settlement coming in the near future for ***both men***." [Emphasis added].

11.     Buhl did not stop there.  In a May 14, 2019 blog, Buhl stated that "Attorney Kesner was profiled last year in a Barron's article for his questionable role with MabVax … I broke the news he was leaving the law firm that bore his name as partner.  People inside the firm were talking about Kesner being forced out … rushed to remove any resemble [sic] of ties to attorney Kesner taking down his profile and press releases touting his legal work.  They also quickly changed the name of the firm removing Kesner's name."

12.     Buhl left no stone unturned in her campaign to destroy Plaintiff who, in the past, had assisted an SEC defendant pursuing Buhl for defamation.  In multiple blogs, Buhl wrote that "the SEC is looking at Kesner also or he is working as a confidential witness for the government".

13.     Buhl's baseless suggestion that Plaintiff may be a voluntary cooperating witness in a federal investigation of his clients involving public companies and investors is highly defamatory.  It is enough to ruin a career.  An attorney, whose confidences are held to the highest of standards with few exceptions, is expected to keep confidences.  Confidentiality is a right held to be sacrosanct by bar rules and the courts.

Confidentiality is the cornerstone of a lawyer's integrity.  Every client has the irrefutable right to seek confidential advice of counsel under the protections afforded by attorney-client privilege.  Buhl implied or insinuated that the reason Plaintiff would have been left out of the SEC Action was that Plaintiff breached or was willing to breach the duty of confidence to his clients by assisting the SEC in prosecuting his own clients.  By casting Plaintiff as an attorney who would turn in his clients, Buhl has soiled Plaintiff's reputation for confidentiality beyond repair without any factual support.  In truth, at no time has Plaintiff been approached by any regulatory authority to serve as or act as a confidential informant or witness of any kind in the SEC investigation.

14.     On August 20, 2019, Buhl prominently (and without consent) displayed Plaintiff's photograph in his law office in a blog entitled, "**SEC looking at New Names in Barry Honig Pump and Dump Scheme**". [https://www.teribuhl.com/2019/08/20/sec-looking-at-new-names-in-barry-honig-pump-and-dump-scheme-mgt-mbvx/].     In  this blog, Buhl's big reveal was that the SEC had subpoenaed (from a defendant in the SEC Action) documents and communications with multiple persons, including three (3) attorneys with Plaintiff's old law firm, who over a decade had worked with Plaintiff on multiple assignments.  Buhl noted that the SEC had had to file a motion to compel against one entity, MGT Capital.  Kesner has never served as counsel for MGT.  Buhl falsely stated that the motion to compel was evidence that the SEC intended or was taking action against Plaintiff, and reported it as so.  Buhl singled out Plaintiff out of 20 names and stated that "Kesner has made statements in other court filings and in press reports that he does not think he is under SEC investigation."  Buhl then knowingly misrepresented that the SEC's motion to compel "could show otherwise."  No reading of

the SEC's motion to compel – a pubic record available to Buhl and which she reviewed – could possibly support Buhl's misstatements about Plaintiff.

15.     Nary a single article published by Buhl on dozens of companies that Plaintiff has represented over his career was left off Buhl's hit list. The Defendants have inserted Plaintiff into the SEC action where the SEC has not. The Defendants put Plaintiff at the "center", spanning 10 years and dozens of companies, in spite of the sole undeniable fact that Plaintiff was unnamed by the SEC.

16.     The Defendants' defamation fits in a larger context. Alpert and Buhl are paid stock promoters. They have turned Barron's, a previously well regarded news organization known for fair and balanced reporting, into a tool for illegal short selling. Buhl and Alpert masquerade as reporters, while working on behalf of short sellers in the dark underbelly of finance. The Defendants and the third parties with whom they collaborate publish false, negative, incomplete, or misleading information on publicly-traded companies to destroy the stock of these companies. Plaintiff was counsel in but a handful of those names, yet Defendants continue, even after the filing of the original complaint against them, to include Plaintiff as a guilty party for case after case, concocting some false information released publicly in a blog or story after they determine to attack each of those publicly-traded companies. The Defendants and their benefactors profit by selling stock "short" or at deep discount following a rapid "stock-drop" – a drop in prices created by their disinformation campaign. All the hallmarks of an illegal "short and distort" attack are present in the actions of Defendants for their coconspirators to profit to the tune of many millions of dollars. Not only have the short sellers profited by distorting facts in the three companies the SEC has pursued, but they

have also, with the assistance of Defendants, attacked a multitude of other companies in many cases alleging that Plaintiff's association is all the proof needed to conclude that company has lied and committed fraud, in each case further disparaging Plaintiff.

17.     After the Defendants and their benefactors move on a company, they fall in league with class action plaintiffs who bring "stock-drop" suits that further depress stock prices.  Defendants entice regulators with selectively fed information in order to integrate their schemes with what appear to be valid investigations by regulators and plaintiff lawyers heralded in press releases often representing investors who hold a nominal amount of stock.  Subpoenas are issued by regulators, fulfilling their goal, which the Defendants then "report" on.  This scenario "validates" the narrative created by the Defendants in the first place.  As here, the Defendants generate interest and traffic to their websites, blogs, tweets and publications for income generated on the information they put into the marketplace.

18.     As a result of her activities, Buhl has been called one of the "**25 Most Dangerous People in Financial Media**" according to Huffington Post[2] and Alpert has been called a "racist American reporter … who believe[s] the lies" and "who ha[s] taken bribes from short-sellers for years."[3]  Alpert has been accused previously of acting illegally in connection with the Chinese companies he reported on for short-sellers and criminal enterprises, serving up paid investor relations masquerading as news.  He has

---

[2]     [https://thereformedbroker.com/2012/06/18/who-are-the-most-dangerous-people-in-financial-media/].

[3]     [https://www.theblot.com/jon-carnes-crime-family-2-years-prison-crime-implicated-barrons-racists-leslie-norton-bill-alpert/] (The Jon Carnes stock frauds implicated Barrons tabloid writers Leslie Norton and Bill Alpert – who had been bribed by stock short sellers to publish false articles on public companies)].

been referred to as a "dupe" for shortsellers in Chinese pump-and-dump schemes in webposts: "Leslie Norton and Bill Alpert are the notorious pair of 'Barron's Dumb and Dumber' tabloid writers paid by illegal stock short sellers in exchange for false articles".

19.     Publishing false and misleading information in order to profit from the sale of securities is fraud, violates federal and state securities laws, and violates innumerable criminal statutes.  However, most securities laws are tailored to the false and misleading statements filed by executives with the SEC in public reports, so that is where the regulatory resources are mostly spent, not on catching nebulous networks of writers and bloggers whose sole goal is to harm companies, so that short-sellers may benefit. Executives are terminated, board members resign, bankers, lawyers and auditors are sued – all because Defendants pick a vulnerable company and engage in a smear campaign. This is the business that Barrons has become engaged in and that Buhl and Alpert are the masterminds of.  Many of the companies targeted by Alpert and Buhl are at home in Florida.

### III.  THE DEFAMATORY GIST

20.     The defamatory gist of the Barrons Article and the Buhl Blogs is that Kesner is involved in securities fraud.  Directly and by implication, Barrons and Alpert accused Kesner of being at the "Center" of a multi-year "pump-and-dump" scheme involving 3 companies and 20 defendants.  Barrons and Alpert falsely accused Kesner of failing in his "gatekeeper" role as a securities lawyer to "protect the investing public".[4]

---

[4]     The Barrons Article also falsely represents that Kesner was "terminated" from the Dallas law firm, Haynes and Boone.  In fact, Kesner brought a lawsuit against the firm for violating the terms of its partnership agreement and for non-payment of compensation.  The matter was settled.

21.     The qualities disparaged by Barrons, Alpert and Buhl – Plaintiff's veracity, honesty, integrity, ethics, confidentiality, and performance as a securities attorney – are peculiarly valuable to Kesner and are absolutely necessary in the practice and profession of any securities lawyer.  The Barrons Article and the Buhl Blogs ascribe to Plaintiff conduct, characteristics and conditions that would adversely affect his fitness to represent clients and to conduct the business of a securities attorney.  Barrons, Alpert and Buhl's false and defamatory statements injured Plaintiff in his business and profession as a securities attorney, causing Plaintiff to lose clients, lose standing in his profession, suffer a permanent disruption in his successful practice, and experience a high degree of pain, mental suffering and distress.

22.     Barrons, Alpert and Buhl acted with actual malice and reckless disregard for the truth.  They knew from reading the complaint filed in the "SEC Pump-and-Dump Case" that Plaintiff was not involved in the securities fraud alleged to have been committed.  In spite of their actual knowledge, Barrons and Alpert published a story and Buhl published blogs that accused Plaintiff of being at the very "Center", essentially orchestrating the "Pump-and-Dump".

23.     In addition to the millions who viewed the Barrons Article on www.barrons.com, the Barrons Article was a featured story on Apple News, where it was republished to tens of millions more.  Alpert also tweeted (republished) the Barrons Article to a new target audience – his 870 Twitter followers:





[https://twitter.com/blalpert/status/1047911867706957825].   The Barrons Article was viewed and tweeted (published) thousands more times by third parties.   For instance, John Lothian, CEO of John J. Lothian & Co., publisher of http://johnlothiannews.com/, tweeted the Barrons Article to his 9,229 followers as follows:

[https://twitter.com/JohnLothian/status/1047914954714701825].   Others followed suit, *e.g.*:

> https://twitter.com/Guruleaks1/status/1047916142726205442 (GuruLeaks);
>
> https://twitter.com/YoungPuggaroni/status/1047909008593947648 (SmartMoneyPug);
>
> https://investorshub.advfn.com/boards/read_msg.aspx?message_id=145762634.

24.     Buhl describes what she does as "Smashmouth Investigative Journalism".[5] She has been out to get Kesner for several years.  Acting in concert with Alpert, she republished the Barrons Article.  https://www.teribuhl.com/2019/04/11/hudson-bay-capital-tied-to-barry-honig-pump-and-dump-ring-mabvax-mbvx/  ("Bill Alpert of Barron's wrote a well read and detailed story about the lawsuit called *The Lawyer at the Center of the SEC Pump and Dump Case'"*)].  Between 2018 and the present, Buhl has targeted Kesner in a barrage of repeated defamation, both on her website, http://www.teribuhl.com/ and via her Twitter account, https://twitter.com/buhlreports (@buhlreports).[6]  On September 5, 2018, Buhl falsely stated in a blog on her website that the removal of Kesner's name from law firm Sichenzia Ross Ference "could signal an SEC charge or settlement coming in the near future".  Buhl also falsely implied that Kesner moved to Florida because of "judgments or government fines" or with the expectation of receiving an "SEC fine".  Buhl further insinuated that Kesner was involved in the sale of unregistered securities.  She blogged the following: "I believe there could be issues of unregistered shares being sold or restricted shares being released when they should be held in restriction.  It's hard to get restricted stock to the DTC for free trading unless you have a friendly transfer agent not doing due diligence on if the shares are legal to trade in the first place."  [http://www.teribuhl.com/2018/08/29/kesners-out-why-is-barry-honigs-securities-lawyer-retiring/;

---

[5]     "Smashmouth" means "characterized by brute force without finesse".  [https://www.merriam-webster.com/dictionary/smashmouth].

[6]     Buhl operates a second Twitter account, @tbuhl.  This account's tweets are protected.  Upon information and belief, Buhl repeated her false and defamatory statements to the 1,642 followers of @tbuhl.

https://twitter.com/ClarityToast/status/1034879799691489284].   On October 31, 2018,

after publication of the Barron Article, Buhl published the following false statements

about Kesner in a blog on her website:

> "His [Barry Honig's] crew of alleged bad actors – Team Honig – has been
> chronicled for years here at *TERIBUHL.com* and by Chris Carey at *Sharesleuth*
> and Bill Albert at *Barron's*.  It consists of biotech billionaire and philanthropist
> Philip Frost, his fellow co-investing partners Michael Brauser/John
> O'Rourke/Marc Groussman, John Ford – the promoter who wrote favorable
> analysis on stocks, priming them for the 'pump' of Honig's 'pump and dump' –
> and Harvey Kesner, a deal lawyer from SIRF LLP linked to a number of Honig's
> investments."

[https://www.teribuhl.com/2018/10/31/honig-deals-lead-to-finra-investigation-of-laidlaw-

co/].   On March 26, 2019, Buhl falsely published in a blog on her website that Kesner

was "pushed out of his law firm as a named partner last year".  She labeled Kesner a "bad

actor".  [http://www.teribuhl.com/2019/03/26/honigs-puppet-ceo-elliot-maza-settles-with-

the-sec/].   On March 27, 2019, Buhl falsely accused Kesner of engaging in "illegal back

room deals and intimidation" of "BioZone":

Continued on Next Page



**buhlreports**
@buhlreports

The illegal back room deals and intimidation Honig and attorney Harvey Kesner did with BioZone (company A in SEC lawsuit) were egregious and the SEC sat back and watched it happen



Honig's Puppet CEO Elliot Maza settles with the SEC
UPDATE 3.29.19: BioZone executive Brian Keller has also settled with the SEC. Judge Ramos approved the settlement today which bars Keller from participatin...
🔗 teribuhl.com

9:40 AM · Mar 27, 2019 · TweetDeck

[https://twitter.com/buhlreports/status/1110899384504467457 (tweeted by ScamPumpers on March 27, 2019) https://twitter.com/ScamPumpers/status/1111011499735162880)].

On April 11, 2019, Buhl repeated the misrepresentation that "attorney Kesner was removed from the New York Law firm that bore his name Sichenzia, Ross, Ference, Kesner LLP".  Buhl further insinuated that Kesner was part of "Team Honig" – a pump-and-dump "ring" – and that Kesner had engaged in wrongdoing for which he could be

disbarred.  She falsely stated that "Kesner has disappeared from the microcap stock scene since the SEC brought their enforcement action but has not been bared [sic] as an attorney.  It's unclear if he is a confidential informant for the government or if charges will be brought against him in the future." [http://www.teribuhl.com/2019/04/11/hudson-bay-capital-tied-to-barry-honig-pump-and-dump-ring-mabvax-mbvx/].

25.     The filing of this action did not deter Buhl.  She tripled-down on her vicious defamation of Plaintiff.  Her blogs and tweets were very personal.  She directly them at Plaintiff in Florida.  She was sending a message.  On June 7, 2019, Buhl published a blog with the headline, "**New Emails show attorney Harvey Kesner aided Defrancesco in Questionable Cannabis stock Deal**".  Buhl falsely accused Kesner of aiding and abetting fraudulent transfers of assets in violation of SEC disclosure rules. Buhl also falsely stated that "[w]hen the U.S. broker dealer saw attorney Harvey Kesner was pushing to get the shares through the U.S. clearing system call [sic] the DTC the transaction's legitimacy was challenged." [https://www.teribuhl.com/2019/06/07/new-emails-show-attorney-harvey-kesner-aided-defrancesco-in-questionable-cannabis-stock-deal-apha-solcf/].[7]  On July 25, 2019, Buhl tweeted that she had "suffered a DDOS attack … on the heels of … Harvey Kesner suing me 4 reporting on him", falsely implying that Plaintiff had unethically retaliated against Buhl for "reporting" on Plaintiff. [https://twitter.com/buhlreports/status/1154440107237228546].   On August 20, 2019, Buhl tweeted that the SEC was "trying to force $MGT CEO to turn over possible evidence on attorney Harvey Kesner's role in Honig P&D scheme along with Hudson Bay partners, Iroquois Capital Richard Abbe and stock promoter Drew Ciccarelli."

---

[7]     Buhl's blogs were republished by third-parties thousands of times. [https://twitter.com/CannabisBizNews/status/1152421484293513218].

Buhl's statement is completely false:  the SEC was not trying to obtain evidence on Plaintiff's "role" in any "P&D scheme" because, in truth, he had no such role.  Nor was Plaintiff involved in any scheme of any kind with Hudson Bay partners, Iroquois Capital, or anyone else.  [https://twitter.com/buhlreports/status/1163890183755960320].     On August 21, 2019, Buhl tweeted that the SEC was "seeking info … in the … P&D case … [on]  Harvey  Kesner."   [https://twitter.com/buhlreports/status/1164164956654362624]. The  repeated  baseless  statements  provide  evidence  of  Buhl's  actual  malice  towards Plaintiff.

26.     At  the  time  she  published  her  various  false  and  defamatory  blogs  and tweets, Buhl had no evidence and no good faith basis for her scandalous and sensational statements about Kesner.  Her statements implied a knowledge of facts, when in reality she had no such knowledge.  Her statements were patently deceitful.

27.     Buhl  is  well  known  around  courthouses.   She  has  a  reputation  for  being untruthful.  She has been sued for defamation numerous times, including by Plaintiff's clients.  She was arrested for interference with a police investigation, 2nd degree breach of peace, 2nd degree harassment, and has been jailed in a criminal case by a Connecticut Judge for cyberbullying, endangering of a minor for her "reporting" in violation of a direct court order barring her from doing so.  Buhl has a habit of making false claims about Plaintiff's clients.  For instance, she published, then withdrew, reports that a respected banker was funneled bags of cash using secret code words.  She failed to investigate the story, but, admitting sources were providing her faked emails, she nonetheless republished concerning one of Plaintiff's clients.  Buhl admits in blogs that she uses more "colorful" reporting when writing for her blog versus her writing for

Growth Capitalist.  This is a blanket admission that she is not reporting with any oversight or editorial review, but making up her own "news".  A warrant for her arrest was issued in the state of Rhode Island, and current court records show her obligations for check fraud there remain unsatisfied.

28.    In order to fund her "Smashmouth" character assassinations, Buhl actively solicits donations from her benefactors via PayPal and via debit card and credit card.  A link on Buhl's website allows her benefactors to "Donate with PayPal". https://www.paypal.com/donate/?token=Svu1TWTEPhwQJKAXy4nJCuWa9gFMWZUc vZ82y3dPO6D9oi7Gn46br0bNVGW-qd-dmJbH30&country.x=US&locale.x=US].

Some of the news reports on Buhl's website are paid for via crowdfunding at www.piratemyfilm.com.

29.    Buhl also publishes on a paid-for forum called Growth Capitalist Investor and Growthcapitalist.com (MarketNexus Media).  In April 2013, Growth Capitalist wrote to Judge Wenzel in reference to the character and integrity of Teri Buhl regarding her "highest display of journalistic and professional ethics".  The character reference did not keep Buhl out of jail.  Buhl upon being sentenced stated "I witnessed the judge reverse engineer evidence to try and build his case."  In truth, Buhl is not a reporter.  She is a self-interested purveyor of malice for financial gain.  Barrons and Alpert, upon information and belief, adopted Buhl as their sole "source" for their false reporting.  They repeat her themes and theories without verification of even the most mundane facts. Upon information and belief, Buhl has hundreds of readers/subscribers in Florida and earns substantial income from her publication of false and defamatory statements about Floridians, including Kesner.

30.     Buhl     solicits     anonymous     "tips".     https://www.teribuhl.com/about/
("Anonymous tips can be sent to teribuhl@gmail.com").   Upon information and belief,
the unreliable sources (if any) employed by Buhl to defame Kesner were located in
Florida.

31.     In this case, Buhl relied on sources that she knew were openly biased
against Plaintiff.   She cited knowingly biased attorneys to support her theories and
malicious attacks, bragging that the lawyers assist her.   For instance, she cites the lawyer
for Daniel Fisher ("Fisher"), plaintiff in the BioZone civil matter, in support of her
attacks on Plaintiff.   Buhl also knew or should have known that Wesley Paul, Esquire,
was not an unbiased attorney reviewing her legal theories.[8]   Paul was also obligated not
to disparage and to maintain confidentiality under Fisher's settlement.   His client was
twice ordered to and withdrew all of his "whistleblower" allegations that Buhl relied
upon to report her initial stories.   Fisher, in the BioZone matter, acknowledged that the
materials reported on were merely the routine form acknowledgements sent by
government agencies when a "tip" is received.   Fisher had been actively seeking
magazines and other publications to report on his case against Dr. Frost and others who
bought his company.

32.     Buhl deliberately misquoted sources.   Fisher had "briefly" spoken with
Buhl on several occasions in 2016.   Fisher has sworn: "If I am a source for the
information in the Article, as it appears may be the case, I can state some of what the
Article contains is not of my personal knowledge, is inaccurate and/or not something I
said" and "after publication I phoned Buhl to tell her I was troubled by the content, and

---

[8]         [https://www.law360.com/articles/905770/fraud-claims-must-be-pulled-after-smears-in-pharma-co-row].

object that the Articles were not reviewed of approved by me which violated our agreement.  I told her that I would not have approved these articles.  If I had reviewed and edited the articles, the inaccuracies and any non-public information would have been corrected and/or deleted."  Fisher  continues "I did not 'come forward' or state to Ms. Buhl that the SEC told me it was investigating Kesner or that I was interviewed by the SEC about Kesner.  Any statement in the November Article that state the SEC was investigating Kesner would not be an accurate recitation of what I said … I also never said that the SEC probed me 'about' Kesner's role with Honig."

33.    On August 24, 2019, Buhl filed a sworn statement in this action that admits Plaintiff's core allegations and is directly at odds with Fisher's sworn statement. In her sworn statement, Buhl makes numerous false statements, including:

- Some of the confidential sources I have used in my reporting on Harvey Kesner and his clients have said Kesner threatened them with litigation if they spoke with me.

- SEC lawyers told my source [Fisher] they are investigating Attorney Harvey Kesner.

- In February 2017, a story I reported on Harvey Kesner was hacked and removed from www.teribuhl.com.  I lost valuable reporting and writing with this hack which I believe was done as a result of Harvey Kesner, or his clients that I reported on, hiring hackers.

34.    Alpert, Buhl and Barrons made a bet that they lost.  They bet that their false, malicious and reckless reporting would entice regulators to act against Plaintiff or his firm and to initiate an investigation that validated their false and malicious stories. However, they ignored their sources when told their stories were false.  They reported information contrary to the actual information provided by sources.  They got their information from each other and congratulated each other on their excellent "reporting".

They failed to fact check or perform any diligence whatsoever, ignoring the truth in furtherance of their preconceived storyline.  They acted in concert with malice and reckless disregard in their plot to advance their incomes by generating donations and payments from others, to expand their network of stock manipulators and plaintiff's lawyers to write for, to garner promotions from their employers and advance their standing and careers.  They are not reporters.  They are hired guns, paid to create negative pieces on specific companies for compensation. They are stock promoters and engage in conspiracies with stock manipulators on the sell side of the equation.

35.     Buhl confuses her relationships with short sellers memorialized in articles, tweets and blogs with "reporting" on matters of "public record".  She fails to understand that defamation is not free speech and real "reporters" have no right to defame anyone.

36.     "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty". *Rosenblatt v. Baer*, 383 U.S. 75, 92-93 (1966).  This is not a case about the First Amendment, or "freedom" of the press, or the quality of Barrons and Alpert's reporting on the "SEC Pump-and-Dump Case" – for no man or woman has the right to defame and disparage another.[9]   Rather, this is a case about intentional misconduct, actual malice and reckless disregard for the truth.

---

[9]     The Supreme Court of the United States has recognized "[t]ime and again" that "false factual statements possess no First Amendment value." *United States v. Alvarez*, 132 S.Ct. 2537, 2560 (2012).  Thus, any attempt by Barrons, Alpert and Buhl to hide behind the "First Amendment" is unavailing.

## IV.  PARTIES

37.     Plaintiff is a citizen of Florida.   He lives with his family in Fort Lauderdale.  He is 61 years-old.  He is a private individual.  Kesner graduated from the State University of New York (Binghamton) in 1979 with a Bachelor of Science in management.  He obtained his Juris Doctorate from American University, Washington College of Law, in 1982, and a Master's Degree in Business Administration-Finance from American University in Washington, D.C. in 1984.  Kesner has served as a director and officer of many corporations.  He is a member of the Bar of the State of New York and is licensed to practice before all State and Federal Courts in New York.   Kesner began his long career as an attorney/examiner for the United States Securities and Exchange Commission ("SEC").  Kesner reviewed registrations, filings and reports under the federal securities laws, public offerings, mergers, proxy solicitations and contests primarily in high technology, manufacturing and insurance industries.  He prepared agency responses to no-action letters and interpretive requests on securities law regulatory issues.  He also participated in enforcement referrals and investigations for violations of regulatory, compliance and reporting obligations.  Between 1982 and 2018, Kesner built an extremely successful practice as an attorney representing clients in securities matters.  Kesner was a partner in the New York law firm, Sichenzia Ross Ference Kesner, which consistently ranked as one of the top law firms in the nation for issuer, investor and private placement-agent legal counsel.  Kesner's practice focused on finance, mergers and acquisitions, and public company representation.  He has extensive experience in financing and counseling late-stage private companies transitioning to public company status through initial public offerings and alternative public offerings.

Kesner's expertise includes counseling already public companies in SEC filings, compliance (including Sarbanes Oxley) and regulatory reporting, registered public offerings, private offerings, PIPEs, venture capital, leveraged buy-outs, restructurings, workouts, and day-to-day operational and regulatory issues.  He served as an Arbitrator for the New York Stock Exchange ("NYSE") and the Financial Industry Regulatory Authority ("FINRA") in numerous securities and employee disputes.  He was a frequent speaker on legal developments and evolving financial products and markets.  Kesner enjoyed an untarnished personal and professional reputation in the community in which he lived and worked, with clients, with professionals at his firm, with colleagues in the law and the securities industry, and with his many friends.

38.     It took Kesner a life-time to earn his reputation and standing.  It took the Defendants but a moment to destroy Kesner.  As was known and intended, the Defendants' defamation spread like wildfire throughout the Internet and social media, causing Kesner to be ostracized, causing enormous loss of clients, loss of business, loss of long-time friendships, and causing Kesner actual damages, including insult, pain, embarrassment, humiliation, mental suffering and permanent and irreversible injury to his reputation.

39.     Defendant, Barrons, is a Delaware corporation with headquarters and a principal place of business in New York.  Barrons is a subsidiary of News Corporation (NASDAQ:NWS, NWSA).  Barrons publishes a weekly investment magazine for senior executives, institutional investors, individual investors, and financial professionals worldwide.  Barrons operates www.barrons.com, the website on which the Barron's Article was originally published and remains available for viewing.

40.     Defendant, Alpert, is a citizen of New Jersey.  He has been employed by Barrons as a writer and editor since 1984. [https://www.barrons.com/authors/8520]. Alpert is an attorney. [https://sites.google.com/view/billalpertjournalist/curriculum-vitae]. At all times relevant to this action, Alpert was acting within the scope of his duties as an employee of Barrons, and during the course of his employment.  Alpert pitched the idea of the Barrons Article to his editors/publishers at Barrons.  Prior to publication on October 4, 2018, Barrons' editors and publishers reviewed and approved the Barrons Article, ratifying the false and defamatory statements made by Alpert.

41.     Barrons reach and engagement is enormous.  In July 2018, approximately 510,000 people subscribed to Barron's print magazine and digital-only media. [https://www.statista.com/statistics/691894/barrons-paid-circulation/].                 Upon information and belief, Barrons distributes, sells and publishes hundreds, perhaps, thousands, of its weekly magazines to professionals in Florida and has hundreds, perhaps thousands, of subscribers in Florida.  The Barrons Article at issue in this action was distributed and published in Florida, where it was read by securities industry professionals and others.  Plaintiff suffered injury in Florida as a result of Defendants' publication of false statements in Florida.  The Barrons Article and Buhl Blogs have been cited by a multitude of Florida residents as the reason why Plaintiff and his former Firm were terminated, and for the refusal to hire or publicly associate with Plaintiff.

42.     Defendant, Buhl, upon information and belief, is a citizen of New York. Buhl's twitter profile confirms that she tweets, retweets, replies and likes from "everywhere" in the United States.  Buhl's blogs and tweets at issue in this case were

knowingly and intentionally directed at Plaintiff in Florida with the intent that the false statements would harm Plaintiff's reputation and practice.

## V.  JURISDICTION AND VENUE

43.    The United States District Court for the Southern District of Florida has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (Diversity Jurisdiction) and 28 U.S.C. § 1367 (Supplemental Jurisdiction).  The parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest, costs and fees.

44.    The Defendants are subject to general and specific personal jurisdiction in Florida.  They transact substantial business in Florida and committed multiple acts of defamation and intentional torts, in whole or part, in Florida.  They have minimum contacts with Florida such that the exercise of personal jurisdiction over them comports with traditional notions of fair play and substantial justice and is consistent with the Due Process clause of the United States Constitution.   Defendants' defamation was purposefully directed at Florida and was continuous and systematic.  Plaintiff's claims directly arise from and relate to Defendants' publication of false and defamatory statements in Florida. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) and *Calder v. Jones*, 465 U.S. 783 (1984)); *see Internet Solutions Corp. v. Marshall*, 39 So. 3d 1201, 1214-1216 (Fla. 2010) (holding a nonresident defendant commits a tortious act in Florida by virtue of posting defamatory statements about a Florida resident on a website accessed in Florida).

45.    Venue is proper in the Fort Lauderdale Division of the United States District Court for the Southern District of Florida because Defendants published and

republished defamatory statements to a wide audience that includes securities attorneys and other persons who reside within the Fort Lauderdale Division. Defendants caused substantial harm to Plaintiff's personal and professional reputations in Florida. A substantial part of the events giving rise to the claims stated in this action occurred in the Southern District of Florida.

## VI.   STATEMENT OF ADDITONAL MATERIAL FACTS

46.   On September 7, 2018, after a thorough, multi-year investigation, the SEC filed a civil enforcement action in the United States District Court for the Southern District of New York (the "SEC Action"). All of the principal individuals and entities named in the SEC Action reside in Florida. The SEC's complaint alleged as follows:

> 1.   This case involves three highly profitable "pump-and-dump" schemes perpetrated by Honig, Stetson, Brauser, O'Rourke, Groussman, and Frost, and their entities GRQ, SCI, Grander, HSCI, Melechdavid, ATG, Opko, FGIT, and Southern Biotech from 2013 through 2018 in the stock of three public companies (Company A, Company B, and Company C) that, while enriching Defendants by millions of dollars, left retail investors holding virtually worthless shares.

47.   On March 8, 2019 the SEC filed an amended complaint against the defendants in the SEC Action, after reviewing over 1,200,000 records related to the allegations in the complaint.

48.   The SEC did not bring any charges against Kesner, his firm, or any other party.

49.   The SEC did not name Kesner as a relief defendant.[10]

50.   The SEC did not otherwise suggest in any way that Kesner had engaged in any wrongdoing.

51.   Prior to October 4, 2018, there was no information – not a scintilla of evidence – anywhere from which anyone could conclude or infer that any department or agency of the United States believed that Kesner had engaged in any wrongdoing in the case.

52.   Prior to publishing the false and defamatory statements at issue in this action, the Defendants reviewed the SEC's complaint.   Based upon this review, the Defendants knew that the accusations they levelled against Plaintiff were false.   At the very least, in light of the allegations in the SEC complaint, the Defendants acted with reckless disregard for the truth.

53.   On September 10, 2018, Barrons and Alpert published an article entitled, "**SEC Charges Against Phillip Frost Might Just Be the Tip of the Iceberg**". [https://www.barrons.com/articles/sec-charges-phillip-frost-1536608366].   In this article, Barrons and Alpert reported on the SEC Action.   The article makes no mention of Plaintiff.

54.   On April 11, 2019, Plaintiff, pursuant to Fla Stat. § 770.01, served notice on Barrons and Alpert, specifying the article and statements therein which Plaintiff alleges to be defamatory.

---

[10]   In the context of an SEC enforcement action, a relief defendant "is a person who holds the subject matter of the litigation in a subordinate or possessory capacity as to which there is no dispute." *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991).   Accordingly, a relief defendant is not a real party in interest and "can be joined to aid the recovery of relief without the assertion of subject matter jurisdiction" because he or she "has no ownership interest in the property which is the subject of litigation." *Id.*

55.     On May 13, 2019, Kesner, pursuant to Fla Stat. § 770.01, served notice on Buhl, specifying the statements on Buhl's website and Twitter feed which Plaintiff alleges to be defamatory.

56.     The Defendants' false and defamatory statements were not published in good faith; the falsity was not due to an honest mistake of the facts; and there were no reasonable grounds for believing that the statements about Plaintiff were true.  In spite of Plaintiff's request for a retraction and apology, the Defendants refused to make and issue a full and fair correction, apology, or retraction.  In fact, the Defendants, in open and notorious retaliation, have increased their attacks on Plaintiff.  Defendants' defamatory statements remain on the Internet to this very day.

## COUNT I – <u>DEFAMATION</u>

57.     Plaintiff restates paragraphs 1 through 56 of this Amended Complaint and incorporates them herein by reference.

58.     Barrons, Alpert and Buhl made and published to third-parties, including subscribers, viewers, listeners, followers, mainstream media, and print media, numerous false factual statements, which are detailed verbatim above, of or concerning Plaintiff. The conduct attributed to Plaintiff by Barrons, Alpert and Buhl is completely incompatible with the proper exercise of Plaintiff's lawful business, trade, profession or office as an attorney.   Barrons, Alpert and Buhl defamed Plaintiff directly or by implication.

59.     By publishing the Barrons Article and Buhl's blogs on the Internet and by tweeting the false statements, Barrons, Alpert and Buhl each knew or should have known that their false and defamatory statements would be republished over and over and over

by third-parties millions of times to Plaintiff's detriment and injury.  Republication by mainstream media, print media and on social media was the natural and probable consequence of Barrons, Alpert and Buhl's actions and was actually and/or presumptively authorized by Barrons, Alpert and Buhl.  In addition to their original publications, Barrons, Alpert and Buhl are liable for the millions upon millions of republications of the false and defamatory statements by third-parties.

60.     Barrons, Alpert and Buhl's false statements constitute defamation *per se* or defamation *per quod*.  The statements accuse and impute to Plaintiff the commission of crimes involving moral turpitude (securities fraud) and for which Plaintiff may be punished and imprisoned in a state or federal institution.  The statements impute to Plaintiff an unfitness to perform the duties of an office or employment for profit, or the want of integrity in the discharge of the duties of such office or employment, and tend to subject Plaintiff to hatred, distrust, ridicule, contempt, or disgrace.  Barrons, Alpert and Buhl's statements also prejudice Plaintiff in his profession as a securities attorney in the eyes of a substantial and respectable minority of the community.

61.     Barrons, Alpert and Buhl false and defamatory statements caused Plaintiff to suffer and incur both presumed and actual damages, including loss and injury to his business, insult, pain, embarrassment, humiliation, mental suffering, harm to Plaintiff's name and reputation, out-of-pocket loss, and other actual damages.

62.     Barrons, Alpert and Buhl acted with actual malice and reckless disregard for the truth for the following reasons:

a.     Barrons and Alpert violated their own Code of Conduct [https://www.dowjones.com/code-conduct/] and Barrons, Alpert and Buhl abandoned all

journalistic standards in writing, editing and publishing the Barrons Article and the blogs at issue.

        b.    Barrons, Alpert and Buhl conceived a story line in advance of any investigation and then consciously set out to manufacture evidence to conform to the preconceived story.  Barrons, Alpert and Buhl pursued and regurgitated a preconceived narrative that they knew to be false.  Plaintiff was not part of "Team Honig" and was not involved in an "pump-and-dump schemes".

        c.    Barrons and Alpert relied on sources, including Buhl, that Barrons and Alpert knew to be wholly unreliable.  Based on information known and available to Barrons, Alpert and Buhl, including the SEC complaint and information on Buhl's website, Barrons, Alpert and Buhl in fact harbored serious doubt as to the veracity of their statements about Plaintiff.  Indeed, the statements were knowingly false, with not a shred of supporting evidence, and the Defendants knew that before they wrote the articles and blogs in question.

        d.    Barrons, Alpert and Buhl were in possession of information that demonstrated the falsity of their statements.  They consciously and intentionally ignored known and available contradictory evidence that demonstrated the preconceived thesis about Plaintiff was false.  Barrons, Alpert and Buhl deliberately failed to investigate sources of information (*e.g., the SEC*) that contradicted the preconceived storyline.

        e.    Barrons, Alpert and Buhl knowingly presented half-truths wrapped in misstatements and conjecture.  They intentionally omitted material facts and repeated words knowing that the words were false or inherently improbable and at a time when there were obvious reasons to doubt the veracity and credibility of their statements.

Overall, Defendants intentionally painted a grossly inaccurate picture of Plaintiff.   As Plaintiff pointed out in his demand letter to Barrons and Alpert:

> With respect to specific statements in the Stories, Barron's has defamed our client, made false representations in furtherance of questionable motivations by its reporter and painted a grossly inaccurate picture or our client.  The details of hiring by MabVax are false.  The involvement of our client in any "pump-and-dump" activities is false.  The graphic depiction of our client with a false caption and insertion into a Story related to claims of wrongdoing is false.  The title of Barron's article proclaiming our client is the "center" of the universe described in SEC charges is false.  Virtually nothing said about our client, the  SEC investigation or the MabVax litigation is accurate.

f.       Barrons, Alpert and Buhl were out to get anyone who they believed was part of "Team Honig", especially Plaintiff.  They exhibited a singular focus and strong motive to lie about Plaintiff, and a motive to fabricate the charges securities fraud.  The Barrons Article and the Buhl blogs were the product of the Defendants' extreme bias, ill-will and desire to publish a salacious story about Plaintiff – one of many attorneys who had at times represented parties involved with companies involved or defendants named in the SEC Action.

g.       Barrons, Alpert and Buhl chose to manufacture and publish false statements about Plaintiff and use unnecessarily strong and violent language, disproportionate to the occasion, when they knew there was no evidentiary basis for the statements.  Barrons, Alpert and Buhl did not act in good faith because, in the total absence of evidence, they could not have had an honest belief in the truth of their statements about Plaintiff.

h.       Barrons, Alpert and Buhl reiterated, repeated and continued to publish the false defamatory statements out of a desire to gain notoriety, generate revenues and profits for themselves, and hurt Plaintiff.

i.      Barrons, Alpert and Buhl initiated the defamation, going out of their way to publish extra-judicial statements about Plaintiff.

63.    Barrons, Alpert and Buhl lacked reasonable grounds for any belief in the truth of their statements and acted negligently in failing to determine the true facts.

64.    As a direct result of the Defendants' defamation, Plaintiff suffered substantial presumed and actual damages and loss, including, but not limited to, pain and suffering, emotional distress and trauma, insult, anguish, stress and anxiety, public ridicule, humiliation, embarrassment, indignity, damage and injury to his personal and professional reputations, loss of business and income, attorney's fees, costs, and other out-of-pocket expenses in the amount of $20,000,000.00 or such other amount as is determined by the Jury.

**COUNT II – <u>COMMERCIAL DISPARAGEMENT</u>**

65.    Plaintiff restates paragraphs 1 through 64 of this Amended Complaint and incorporates them herein by reference.

66.    Barrons, Alpert and Buhl published and disseminated widespread false and disparaging information about Plaintiff, which is detailed verbatim above.

67.    Barrons, Alpert and Buhl knew their statements were false and acted with the specific intent to call into question the quality of Plaintiff's legal advice and services and to injure Plaintiff in his business as a securities attorney.  Barrons, Alpert and Buhl knew or reasonably should have known that their published statements would likely result in inducing others, especially those in the securities industry, not to deal with the Plaintiff.

68.     None of Barrons, Alpert's or Buhl's statements are privileged.  Barrons, Alpert and Buhl had no right to publish false and disparaging information about Plaintiff. They knew of the falsity of their statements and acted with wanton, intentional and reckless disregard concerning publication.  Barrons, Alpert and Buhl acted with ill-will and they intended to interfere with the economic interests of Plaintiff, including Plaintiff's law practice, in an unprivileged fashion.

69.     Barrons, Alpert and Buhl's statements and actions constitute commercial/business disparagement under Florida law.

70.     Barrons, Alpert and Buhl's commercial disparagement caused Plaintiff to suffer and incur special damages, including loss of income and clients and out-of-pocket expenses in the amount of $20,000,000.00 or such other amount as is determined by the Jury.

## COUNT III – <u>DECEPTIVE AND UNFAIR TRADE PRACTICES</u>

71.     Plaintiff restates paragraphs 1 through 70 of this Amended Complaint and incorporates them herein by reference.

72.     Barrons, Alpert and Buhl publication, republication and widespread dissemination of falsehoods about Plaintiff constitutes unconscionable acts or practices and unfair or deceptive acts or practices in the conduct of a trade or commerce.  Barrons, Alpert and Buhl's actions violate Fla. Stat. § 501.204 and are unlawful.

73.     Barrons, Alpert and Buhl willfully used methods, acts, or practices declared unlawful under Fla. Stat. § 501.204.

74.     Plaintiff suffered a loss as a result of acts or practices that violate Fla. Stat. § 501.204.

75.     Kesner brings this action against Barrons, Alpert and Buhl pursuant to Fla. Stat. 501-211 to recover to actual damages, plus attorney's fees and court costs, in the amount of $20,000,000.00 or such other amount as is determined by the Jury.

### COUNT IV – <u>TORTIOUS INTERFERENCE</u>

76.     Plaintiff restates paragraphs 1 through 75 of this Amended Complaint and incorporates them herein by reference.

77.     At the time Barrons, Alpert and Buhl published their false and defamatory statements, Plaintiff had valid and enforceable contracts and existing business expectancies in his relationships with clients.  Plaintiff had a reasonable expectation of earning substantial income from those business relationships.

78.     Barrons, Alpert and Buhl knew about Plaintiff's law practice, contracts and business expectancies.

79.     Barrons, Alpert and Buhl intentionally interfered with Plaintiff's property rights and business expectancies by, *inter alia*, devising, aiding, abetting and actively participating in the scheme to defame and injure Plaintiff, by intentionally lying in the Barrons Article and Buhl's blogs, and by fabricating claims about Plaintiff.  Barrons, Alpert and Buhl's improper methods, actions and practices were, *inter alia*, defamatory, unethical, oppressive, over-reaching, fraudulent, hostile, and sharp.  Barrons, Alpert and Buhl's interfere was completely unjustified.

80.     As a direct result of Barrons, Alpert and Buhl's tortious interference with Plaintiff's contracts and business expectancies, Plaintiff suffered damage and incurred loss, including, without limitation, injury to his business, loss of clients, damage to his

reputation, prestige and standing, attorney's fees, court costs, and other damages in the amount of $20,000,000.00 or such other amount as is determined by the Jury.

## COUNT V – <u>COMMON LAW CONSPIRACY</u>

81.     Plaintiff restates paragraphs 1 through 80 of this Amended Complaint and incorporates them herein by reference.

82.     Beginning in or about October 2018 and continuing through the present, Alpert and Buhl combined, associated, agreed or acted in concert together and with one or more benefactors of the Buhl Blogs for the express purposes and illegal objective of injuring Plaintiff, intentionally interfering with and destroying his business and employment as a securities attorney, and defaming Plaintiff.   In furtherance of the conspiracy and preconceived plan, Alpert and Buhl worked together and engaged in a joint scheme the unlawful purpose of which was to publish false and defamatory statements about Plaintiff in order to destroy Plaintiff's personal and professional reputations.   The Barrons Article and Buhl Blog were overt acts in furtherance of the conspiracy.

83.     Alpert and Buhl acted intentionally, purposefully, without lawful justification, and with the express knowledge that they were defaming Plaintiff.

84.     The Defendants' actions constitute a conspiracy at common law.

85.     As a direct result of the Defendants' willful misconduct, Plaintiff suffered actual damages, including, but not limited to, insult, pain, embarrassment, humiliation, mental suffering, injury to his reputation, loss of business and income, diminished earnings capacity, special damages, costs, and other out-of-pocket expenses, in the sum of $20,000,000.00 or such greater amount as is determined by the Jury.

Plaintiff alleges the foregoing based upon personal knowledge, public statements of others, and records in his possession.  Plaintiff believes that substantial additional evidentiary support, which is in the exclusive possession of Barrons, Alpert and Buhl, their sources (if any), and their agents and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

Plaintiff reserves the right to amend this Complaint upon discovery of additional instances of the Defendants' defamation and wrongdoing.

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, Harvey J. Kesner respectfully requests the Court to enter Judgment against Barrons, Alpert and Buhl, jointly and severally, as follows:

A.     Compensatory damages in the amount of $20,000,000.00;

B.     Punitive damages in the amount of $5,000,000.00 as a result of the Defendants' specific intent to harm Plaintiff and the actual harm inflicted on Plaintiff;

C.     Prejudgment interest on the principal sum awarded to Plaintiff by the Jury from October 4, 2018 to the date of Judgment at the maximum rate allowed by law;

D.     Postjudgment interest at the maximum rate allowed by Florida law;

E.     Costs and such other relief as is just and proper.

## TRIAL BY JURY IS DEMANDED

DATED:     September 16, 2019

HARVEY J. KESNER


By:  ___*/s/ Robert C. Buschel*_____
       Robert C. Buschel, Esq.
       Florida Bar No. 0063436
       BUSCHEL GIBBONS, P.A.
       One Financial Plaza
       100 S.E. Third Avenue, Suite 1300
       Fort Lauderdale, Florida 33394
       Tele: (954) 530-5301
       **Buschel@BGlaw-pa.com**

       *Counsel for the Plaintiff*

       Steven S. Biss (VSB # 32972)
       300 West Main Street, Suite 102
       Charlottesville, Virginia 22903
       Telephone:    (804) 501-8272
       Facsimile:    (202) 318-4098
       Email:      **stevenbiss@earthlink.net**

       *Counsel for the Plaintiff*
       *(Application for Admission Pro Hac Vice*
          *To be Filed)*

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2019 a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will send notice of electronic filing to the Parties and all interested parties receiving notices via CM/ECF, and copy was emailed to Defendant Buhl.

By:   */s/ Robert C. Buschel*

Robert C. Buschel, Esq.
Florida Bar No. 0063436
BUSCHEL GIBBONS, P.A.
One Financial Plaza
100 S.E. Third Avenue, Suite 1300
Fort Lauderdale, Florida 33394
Tele: (954) 530-5301
**Buschel@BGlaw-pa.com**

*Counsel for the Plaintiff*

Steven S. Biss (VSB # 32972)
300 West Main Street, Suite 102
Charlottesville, Virginia 22903
Telephone:    (804) 501-8272
Facsimile:    (202) 318-4098
Email:        **stevenbiss@earthlink.net**

*Counsel for the Plaintiff*
*(Application for Admission Pro Hac Vice*
*To be Filed)*