UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HARVEY J. KESNER,

                                        Plaintiff,

                    -v-

DOW JONES & COMPANY, INC. d/b/a BARRON'S,
WILLIAM "BILL" ALPERT, and TERI BUHL,

                                        Defendants.

---

20 Civ. 3454 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

    This case involves defamation claims arising out of press coverage of plaintiff Harvey

Kesner ("Kesner") by defendants Dow Jones & Company, Inc. ("Dow Jones" or "*Barron's*"),

William Alpert ("Alpert"), and Teri Buhl ("Buhl").  Kesner is an attorney whose former law

firm, Sichenzia Ross Ference LLP, represented three public companies embroiled in an alleged

pump-and-dump stock-selling scheme that became the subject of an investigation by the

Securities and Exchange Commission ("SEC").  Defendants published articles concerning the

firm and Kesner's potential involvement in the scheme.  Kesner now sues them for defamation,

commercial disparagement, deceptive and unfair trade practices, tortious interference with

contract, and common law conspiracy.

    Now pending are two motions to dismiss: one by Dow Jones and its reporter, Alpert,

Dkt. 43 ("Dow Jones Mem."), and the other by Buhl, Dkt. 105 ("Buhl Mem.").  For the

following reasons, the Court grants Dow Jones's and Alpert's motions, and grants in part and

denies in part Buhl's motion.

## I.      Background

### A.      Factual Background[1]

#### 1.      Parties

Kesner is a lawyer and member of the State Bar of New York.  Am. Compl. ¶ 37.

Between 1982 and 2018, Kesner's legal practice focused on securities law and other financial

matters.  *Id.*  Until 2018, he was a partner at Sichenzia Ross Ference Kesner LLP (now Sichenzia

Ross Ference LLP).  *Id.*  Since 2016, Kesner has resided in Florida.  *Id.* ¶¶ 9, 37.

---

[1] The facts are drawn from the Amended Complaint, Dkt. 36 ("Am. Compl."), and attached
exhibits.  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering
a motion to dismiss . . . pursuant to Rule 12(b)(6), a district court may consider the facts alleged
in the complaint, documents attached to the complaint as exhibits, and documents incorporated
by reference in the complaint.").  The Court also considers the full text of the allegedly
defamatory articles and tweets, which the Amended Complaint incorporates by reference. *See
id.*  True and correct copies of the articles and tweets are filed at docket 111.

The Court also takes judicial notice of the pleadings in *SEC v. Honig*, No. 18 Civ. 8175 (ER),
Dkt. 1 (S.D.N.Y. filed Sept. 7, 2018) ("SEC Compl."); *MabVax Therapeutics Holdings, Inc. v.
Sichenzia Ross Ference LLP*, No. 37-2018-00045609-CU-PN-CTL (Cal. Super. Ct., San Diego
Cnty. filed Sept. 10, 2018) ("MabVax Compl."); and *Kesner v. Haynes and Boone, LLP*,
No. 1 Civ. 4009 (SAS), Dkt. 1 (S.D.N.Y. filed May 14, 2020) ("Haynes Compl.").  *See Medcalf
v. Thompson Hine LLP*, 84 F. Supp. 3d 313, 321 (S.D.N.Y. 2015) (court may take judicial notice
of complaints and other documents filed in other courts "not for the truth of the matters asserted
in the other litigation, but rather to establish the fact of such litigation and related filings"
(quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991))).  Kesner disputes
whether any pleadings other than the SEC Complaint are properly noticed.  *See* Dkt. 48 ("Opp'n
to Dow Jones Mem.") at 4 n.3; Dkt. 112 ("Arg. Tr.") at 18–19.  However, like the SEC
Complaint, both the MabVax Complaint and the Haynes Complaint are quoted and described in
the *Barron's* article.  On a motion to dismiss a claim for defamation, the Court may "consider the
allegations and statements in the court records in order to determine whether the Article provides
a 'fair and true' report of those allegations and statements, but will not consider the documents to
be evidence of any of the facts stated therein."  *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 478
(S.D.N.Y. 2012).

For the purpose of resolving the motion to dismiss under Rule 12(b)(6), the Court presumes all
well-pled facts to be true and draws all reasonable inferences in favor of plaintiff.  *See Koch v.
Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

*Barron's* is a weekly publication of Dow Jones aimed at financial professionals.  *Id.*
¶¶ 39, 41.  Dow Jones publishes *Barron's* both in print and online at www.barrons.com.  *Id.*
Dow Jones is a Delaware corporation with its principal place of business in New York.  *Id.* ¶ 39.
Alpert has been a financial journalist and editor for *Barron's* since 1984.  *Id.* ¶ 40.  He is a
citizen of New Jersey.  Arg. Tr. at 29.

Buhl is an investigative journalist who focuses on financial reporting.  Am. Compl. ¶ 24;
Buhl Mem. at 1.  She operates a website: "Teri Buhl Smashmouth Investigative Journalism,"
www.teribuhl.com.  Am. Compl. ¶ 24.  Buhl is a citizen of New York.  *Id.* ¶ 42.

### 2.    The Challenged Publications and Statements

#### a.    Background

For years, Buhl has been covering the exploits of investor Barry Honig and his associates
in the small- and micro-cap stock markets.  As synopsized by Alpert:  "Honig . . . [has] been the
subject of dogged investigation by independent journalist Teri Buhl, who self-publishes her work
and had to defend against two lawsuits filed by Honig over her stories, including a libel suit
Honig dropped."  Bill Alpert, *SEC Charges Against Phillip Frost Might Just Be the Tip of the
Iceberg*, Barron's (Sept. 10, 2018), https://www.barrons.com/articles/sec-charges-phillip-frost-
1536608366; *see also* Am. Compl. ¶¶ 3 n.1, 53 (incorporating the article by reference).

Buhl began writing in earnest about Kesner in August 2018, following his announced
retirement from his firm law, then-named Sichenzia Ross Ference Kesner LLP.  *See* Dkt. 111-2
("Aug. 29, 2018 Art.").  Her focus as to Kesner was his relationship with Honig.  As Buhl
reported at the time, Honig was the subject of multiple SEC investigations, including for
participating in alleged pump-and-dump schemes in which Honig and affiliates had allegedly
engaged in stratagems to artificially drive up corporate stock prices and then to sell their stakes
before the stock prices collapsed.  In describing the Honig-Kesner relationship, Buhl reported

3

that Kesner had served as counsel both to investor Honig and to issuers in which Honig had invested. Her articles raised questions about whether Kesner's connections to Honig had led him to disserve the interests of his corporate clients. Buhl's articles also questioned the extent to which Kesner—who was an owner of the stock-transfer agent used in a number of Honig's investments, Equity Stock Transfer—had controlled the agent's relevant conduct. After the removal of Kesner's name from his law firm, Buhl speculated about whether the SEC might bring charges against either or both men.

Shortly thereafter, on September 7, 2018, the SEC took enforcement action. It filed suit in this District, alleging that Honig and his associates, including Phillip Frost, Michael Brauser, Elliot Maza, and Brian Keller, had carried out pump-and-dump schemes to manipulate the stock of three public companies. *See* SEC Compl. The SEC Complaint did not identify these companies by name, referring to them instead as companies A, B, and C. *See id.*; *see also* Am. Compl. ¶ 2. Since the filing of the SEC's Complaint, however, two of the three companies, MGT Capital Investments, Inc. ("MGT") and MabVax Therapeutics Holdings, Inc. ("MabVax"), have identified themselves in their public filings.[2] And reporters Alpert and Buhl have publicly identified the third company as Biozone Pharmaceuticals, Inc. ("BioZone"). *See* Dkts. 111-1,

---

[2] *See* MGT Capital Investments, Inc., Prospectus (Form 424B3), at 10, 33 (June 26, 2019); MabVax Therapeutics Holdings, Inc., Annual Report Am. No. 1 (Form 10-K/A), at 2 (Oct. 15, 2018).

The Court takes judicial notice of each company's SEC filings, not for the truth of the matters there asserted, but to establish that these companies have publicly acknowledged that they were subjects of the SEC Complaint. *See Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (summary order) ("[O]n a Rule 12(b)(6) motion to dismiss a court may consider matters of which judicial notice may be taken, including 'the fact that press coverage or regulatory filings contained certain information, without regard to the truth of their contents.'" (alterations omitted) (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008))).

111-8.  The SEC Complaint alleged that between 2013 and 2018, Honig and his associates had touted the companies' stock, causing their stock prices to rise, as part of a manipulative trading scheme.  SEC Compl. ¶ 3.  Once the prices had risen, the SEC alleged, Honig and his associates then "dumped" the stock, leaving remaining investors with stock that was virtually worthless. *Id.* ¶ 9.  On March 8, 2019, the SEC filed an amended complaint against the approximately 20 defendants.  *See* Am. Compl. ¶ 47.  Neither Kesner nor anyone at his law firm was named as a defendant in either SEC complaint.  *Id.* ¶¶ 2, 48–49.

On October 4, 2018, *Barron's* published an online article, authored by Alpert, headlined, "The Lawyer at the Center of the SEC Pump-and-Dump Case."  Dkt. 111-1 ("*Barron's* Art.").  Alpert reported that although Kesner had been "unmentioned" in the SEC Complaint, he or someone at his former firm had represented all three companies implicated in the SEC Complaint.  Alpert's article further reported that one such company, MabVax, was suing Kesner and his former firm for malpractice in connection with their alleged role in Honig's scheme, and questioned Kesner's ties to Equity Stock Transfer.

Between October 2018 and August 2019, Buhl published numerous articles on Honig's schemes and the related SEC investigations.  Many referenced Kesner, sometimes tangentially and sometimes in great depth.  Buhl reported on the Financial Industry Regulatory Authority's ("FINRA") investigation into whether small-cap broker-dealer Laidlaw & Company had assisted Honig in stock manipulation.  Dkt. 111-6 ("Oct. 31, 2018 Art.").  She explained that certain Laidlaw executives had been accused of executing the "dump" portion of Honig's pump-and-dump schemes.  Buhl followed developments in the SEC's case involving the manipulation of the stock prices of BioZone, MabVax, and MGT, promptly reporting, for example, when Elliot Maza, BioZone's former CEO, and Brian Keller, its former Chief Scientific Officer, settled with

the SEC.  Dkt. 111-7 ("Mar. 26, 2019 Art.").  Buhl also reported on a lawsuit between BioZone founder Daniel Fisher and Honig and a number of his associates.  Kesner, according to Buhl's articles, had represented a number of the defendants, whom Buhl collectively termed "Team Honig."  Buhl also wrote multiple articles on lawsuits brought by MabVax: one against Honig and associates, Dkt. 111-5 ("Apr. 11, 2019 Art."), and another, for malpractice, against Kesner and his former law firm, Dkt. 111-3 ("May 4, 2019 Art.").  When the SEC moved to compel documents from MGT, Buhl covered the motion and identified the individuals about whom the SEC was seeking information.  Dkt. 111-4 ("Aug. 29, 2019 Art.").

Buhl also examined other deals in which Kesner had served as counsel beyond those involving the companies allegedly involved in the pump-and-dump schemes.  Dkt. 111-9 ("June 7, 2019 Art.").  She reported that Kesner assisted a client, Andy Defrancesco, in a "questionable" deal involving the moving of Defrancesco's "hidden shares" in a cannabis company.  Buhl covered this deal on both her blog and in another outlet, *Cannabis Law Report*.

### b.    The Barron's Article

On October 4, 2018, Alpert published the *Barron's* article at issue here, headlined, "The Lawyer at the Center of the SEC Pump-and-Dump Case."  Am. Compl. ¶ 8.  It is undisputed that the headline referred to Kesner.  Kesner contends that the *Barron's* article expressly and impliedly accused him of securities fraud, and that the headline's description of him as at the "center" of the SEC's case was, separately, defamatory.  *Id.* ¶ 20.

The *Barron's* article reported that Kesner and/or his law firm had been counsel to all three companies whose stock prices were manipulated in Honig's pump-and-dump schemes.  *See Barron's* Art. at 1 ("Unmentioned in the SEC's case is how all three public companies in the alleged swindles used the same securities law firm and two of the three used the same stock transfer agency.").  It further reported that two of the companies "also happened to use Equity

6

Stock Transfer, a New York outfit that SEC registrations show was financed and controlled by Kesner."

Although the SEC Complaint had not named any of the companies, the *Barron's* article identified one as MabVax.  The article reported that MabVax had sued Sichenzia Ross Ference for malpractice, in a complaint alleging that "Kesner and his law firm advanced the interests of Honig at the expense of MabVax, deceiving the company and committing malpractice that led to its delisting from Nasdaq."  The article also reported that MabVax's Complaint had alleged that Honig had "forced [MabVax] to hire Kesner and the Sichenzia Ross firm as a condition of his financing."  In describing the *MabVax* case, the *Barron's* article stated that "[s]ecurities lawyers and transfer agents are essential gatekeepers under federal regulations meant to protect the investing public."  Kesner alleges that the article conveyed that he had failed in his role as a "gatekeeper," an accusation he states is false.  Am. Compl. ¶ 20.

The *Barron's* article also discussed Kesner's departure from his prior law firm, Haynes and Boone, LLP.  It stated that the "firm terminated [Kesner] in 2009," while noting that a spokesperson for the firm had told *Barron's* that "Mr. Kesner left the firm in March of 2009" and "resolved [its] disputes at that time."  The *Barron's* article was tweeted numerous times, by Alpert and others.  *Id.* ¶ 23.

<em>c.     Buhl's Publications</em>

As noted, between August 2018 and March 2019, Buhl published, on her website, a series of articles concerning Kesner and the SEC's investigation.  *See id.* ¶¶ 9–36.  Kesner alleges that each article is false and defamatory.  *See id.*  Specifically:

On August 29, 2018, Buhl published her first such article, titled, "Kesner's Out: Why is Barry Honig's Securities Lawyer Retiring."  It reported that Kesner was leaving the Sichenzia

Ross Ference Kesner law firm, and noted his relationship to Equity Stock Transfer.  The article further reported, in relevant part:

- "Kesner has also made an apparent move to claim Florida as his home state. . . . Florida often becomes a home for people with judgments or government fines lobed on them because it is a 'homestead state'.  This means in the case of bankruptcy or say an SEC fine they can't come and take your home."

- "Additionally I believe there could be issues of unregistered shares being sold or restricted shares being released when they should be held in restriction.  It's hard to get restricted stock to the DTC for free trading unless you have a friendly transfer agent not doing due diligence on if the shares are legal to trade in the first place."

On September 5, 2018, Buhl updated her article.  The updated text reported that, as of September 5, 2018, Sichenzia Ross Ference had removed Kesner's name from the firm, and that, the same week, Honig had resigned from the board of Pershing Gold, in which he purportedly owned a 42.6% stake.  Buhl's update also made the following claims:

- "According to a member of the law firm this a clear signal that his fellow partners don't want to be associated with him or his ties to his biggest client Barry Honig."

- "Honig is currently not on the board of any public companies.  These actions could signal an SEC charge or settlement coming in the near future for both men.  Remember if you are deemed a bad actor by the SEC you can't serve on the board of a public company."

Buhl also stated that hers was the first outlet covering Kesner's departure from the firm.  *Id.* Two days later, on September 7, 2018, the SEC filed its Complaint, and on October 4, 2018, *Barron's* published Alpert's article on its website.

On October 31, 2018, Buhl posted an article, "Honig Deals Lead to FINRA Investigation of Laidlaw & Co."  The article focused on a stock-manipulation investigation by FINRA into a small-cap broker-dealer with connections to Honig.  It included the following reference to Kesner:

His crew of alleged bad actors – Team Honig – has been chronicled for years here at TERIBUHL.com and by Chris Carey at Sharesleuth and Bill Albert at Barron's. It consists of biotech billionaire and philanthropist Philip Frost, his fellow co-investing partners Michael Brauser/John O'Rourke/Marc Groussman, John Ford – the promoter who wrote favorable analysis on stocks, priming them for the 'pump' of Honig's 'pump and dump' – and Harvey Kesner, a deal lawyer from SIRF LLP linked to a number of Honig's investments.

On March 26, 2019, Buhl posted an article titled, "Honig's Puppet CEO Elliot Maza settles with the SEC." The article primarily covered the settlement of one defendant in the Honig pump-and-dump case. It included the following reference to Kesner:

Honig's deal lawyer, Harvey Kesner, who was pushed out of his law firm as a named partner last year, sued Daniel Fisher on behalf of Team Honig, with accusation of speaking to journalists after Fisher had settled his case with the bad actors for $2 million. . . . Kesner used his suit against Fisher to try and force a judge to make Fisher turn over any emails to journalist.

On March 27, 2019, Buhl tweeted a link to the March 26, 2019 article with the following text: "The illegal back room deals and intimidation Honig and attorney Harvey Kesner did with BioZone (company A in SEC lawsuit) were egregious and the SEC sat back and watched it happen[.]" Dkt. 111-8 ("Mar. 27, 2019 Tweet").

On April 11, 2019, Buhl posted an article, titled, "Hudson Bay Capital tied to Barry Honig Pump and Dump Ring: MabVax $MBVX," which linked to the *Barron's* article. Buhl's article stated that "Kesner was removed from the New York Law firm that bore his name Sichenzia, Ross, Ference, Kesner LLP just days before the SEC brought their case against Team Honig," but that he was not named in the SEC complaint. It further reported that:

Kesner has disappeared from the microcap stock scene since the SEC brought their enforcement action but has not been bared [sic] as an attorney. It's unclear if he is a confidential informant for the government or if charges will be brought against him in the future. MabVax also has another lawsuit against Kesner and his old law firm for malpractice for Kesner's alleged role in helping Honig hide his true disclosure as a group of affiliates trading together to control a stock. Kesner is also accused of providing Honig with advance information of the SEC investigation when he served as MabVax's counsel. That suit was filed in September 2018 just days after the SEC brought their case.

On May 4, 2019, Buhl posted an article, headlined, "Judge says Honig's attorney Harvey Kesner can be Sued for Fraud and Malpractice: $MBVX."  It reported that the fraud claims against Kesner in the MabVax malpractice case had survived a motion to dismiss.

 The article further stated, in relevant part:

- "Attorney Kesner was profiled last year in a Barron's article for his questionable role with MabVax and Barry Honig.  The story titled *The Lawyer at the Center of the SEC Pump and Dump Case* highlighted the internal emails that said Kesner's partners and associates were realizing the firm had a conflict of interest between representing Barry Honig & his band of investors and representing MabVax when the SEC started asking questions.  The emails showed lawyers at Sichenzia Ross Ference saying the SEC subpoena is really all about the investors (meaning Barry Honig and friends)."

- "Honig was charged by the SEC in September for being the ring leader of a pump and dump ring that netted him and his co-defendants at least $27 million. Kesner is not a named defendant in the SEC lawsuit but the SEC details a lawyer allegedly aiding Honig's securities fraud.  That lawyer is believed to be Harvey Kesner."

- "Just days before the SEC brought their case against Kesner's long time client Honig, I broke the news he was leaving the law firm that bore his name as partner.  People inside the firm were talking about Kesner being forced out and that the partners would allow him to call it a retirement.  There was no press release announcing any retirement from the law firm but days after the SEC's lawsuit was filed Sichenzia Ross Ference rushed to remove any resemble of ties to attorney Kesner taking down his profile and press releases touting his legal work.  They also quickly changed the name of the firm removing Kesner's name."

- "Yesterday I received a letter from a lawyer from Virginia representing Harvey Kesner asking for some of my reporting on Kesner leaving his law firm and my speculation that the SEC is looking at Kesner also or he is working as a confidential witness for the government to be taken down."

- "He is either trying to harass an independent journalist [sic] or it's something even more troubling."

- "Kesner recently moved his main residence to South Florida which is a homestead state.  Meaning your home can't be seized if you have judgments or government fines against you.  Kesner had previously lived in New Jersey for decades."

The article linked to (1) the MabVax Complaint; (2) an SEC bulletin describing the SEC

investigation into Honig and his associate; (3) the *Barron's* article; (4) Buhl's first article

covering Kesner's departure from his firm; and (5) a letter from Kesner's legal counsel to Buhl.

On June 7, 2019, Buhl posted an article, titled, "New Emails show attorney Harvey

Kesner aided Defrancesco in Questionable Cannabis stock Deal: $APHA $SOLCF." That article

alleged that Kesner had assisted insiders at a cannabis company in circumventing SEC

"beneficial ownership disclosure rules":

- "Andy DeFrancesco[] was using Barry Honig's deal lawyer to move hidden shares within his family. I am reporting for Cannabis Law Report today that new emails written by attorney Harvey Kesner on behalf of the DeFrancescos could show how the insiders skirt beneficial ownership disclosure rules. I reported last week, DeFrancesco's alleged hidden stock ownership is at the heart of a new securities fraud lawsuit filed against him and his band of sophisticated bad actors by Aphria main street investors."

- "When the U.S. broker dealer saw attorney Harvey Kesner was pushing to get the shares through the U.S. clearing system call the DTC the transaction's legitimacy was challenged."

On July 25, 2019, Buhl tweeted that her website, "http://teribuhl.com, ha[d] suffered a

DDOS attack. It's down until I can move it to a private server. This is on the heels of Honig and

Defrancesco's attorney Harvey Kesner suing me 4 reporting on him. Donations for web hosting

are needed. Paypal donation is teribuhl@gmail.com." Dkt. 111-10 ("July 25, 2019 Tweet").

On August 20, 2019, Buhl published an article, titled, "SEC looking at New Names in

Barry Honig Pump and Dump Scheme: $MGTI $MBVXQ." Alongside the article was a

photograph of Kesner in his law offices. Am. Compl. ¶ 14. The article stated that the SEC was

pursuing documents that "could show others [sic] role in the long running scheme," and adds:

- "Yesterday the regulator filed a motion to compel against MGT Capital CEO Robert Ladd who refused SEC enforcement attorney Nancy Brown's demand for documents that relate to Harvey Kesner, Honig's long time SEC transaction lawyer, and others who invested in the company or are suspected of promoting the company."

11

- "Kesner has made statements in other court filings and in press reports that he does not think he is under SEC investigation.  The new court filing could show otherwise."

Kesner alleges that, contrary to the article's suggestion, he has never personally served as counsel for MGT.  Am. Compl. ¶ 14.  The article identified a number of attorneys, about whom the SEC was seeking discovery, who had purportedly worked with Kesner at Sichenzia Ross Ference.  Towards its end, the article noted that Kesner had sued Buhl and Alpert for defamation in connection with these reports.  Buhl also tweeted a link to the article, with the following text: "SEC is trying to force $MGT CEO to turn over possible evidence on attorney Harvey Kesner's role in Honig P&D scheme along with Hudson Bay partners, Iroquois Capital Richard Abbe and stock promoter Drew Ciccarelli."  Dkt. 111-11 ("Aug. 20, 2019 Tweet").

On August 21, 2019, Buhl tweeted another link to her August 20, 2019 article, with the following text: "@SichenziaRoss past & current lawyers the SEC is seeking info on in the Barry Honig P&D case: Tara Guarneri-Ferrara, Avital Even-Shoshan, Arthur Marcus, Jay Kaplowitz, and Honig's main lawyer Harvey Kesner."  Dkt. 111-12 ("Aug. 21, 2019 Tweet").

## B.   Procedural History

On May 31, 2019, Kesner filed his original complaint against Dow Jones, Alpert, and Buhl in U.S. District Court for the Southern District of Florida.  Dkt. 1.  On August 26, 2019, Alpert moved to dismiss for lack of personal jurisdiction and improper venue, or, in the alternative, to transfer the case to this District, Dkt. 21, and Dow Jones moved to dismiss for improper venue and failure to state a claim, or for transfer to this District, Dkt. 24.  On September 16, 2019, Kesner amended the complaint, adding a claim for civil conspiracy. Dkt. 36.

On September 30, 2019, Alpert moved to dismiss for lack of personal jurisdiction and improper venue, or, in the alternative, for transfer to this District.  Dkt. 40.  The same day, Dow

12

Jones and Buhl joined Alpert's motion, and Dow Jones moved to dismiss for failure to state a claim.  *See* Dow Jones Mem.; Dkt. 46.  On October 14, 2019, Kesner filed an opposition to Alpert and Dow Jones's motion.  *See* Dkt. 48.  On October 21, 2019, Alpert and Dow Jones filed a reply.  Dkt. 51.  On May 1, 2020, the Honorable Rodney Smith, U.S. District Judge for the Southern District of Florida, ordered that the case be transferred to this District.  Dkt. 76 ("Transfer Order").  Judge Smith found venue in the Southern District of Florida improper, and that the interests of justice would be best served by a transfer to this District pursuant to 28 U.S.C. § 1406(a).  *Id.* at 4.

On May 21, 2020, after receiving this case, this Court held a conference, after which it ordered a stay of all discovery pending resolution of Dow Jones's motion to dismiss, which Alpert had joined, and Buhl's forthcoming motion to dismiss.  Dkt. 90.  On August 3, 2020, Buhl filed a motion to dismiss the complaint for failure to state a claim.  Dkts. 103–06.  On August 17, 2020, Kesner filed an opposition to Buhl's motion.  Dkt. 107.  On August 24, 2020, Buhl filed her reply.  Dkt. 108.

On October 16, 2020, Kesner filed true and correct copies of each of the allegedly defamatory articles and tweets, which are incorporated by reference in the Amended Complaint. Dkts. 111-1–12.  On October 19, 2020, the Court held argument.

## II.   Legal Standards Governing Motions to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of

entitlement to relief." *Twombly*, 550 U.S. at 558.  When resolving a motion to dismiss, the Court

must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the

plaintiff." *Koch*, 699 F.3d at 145.  That tenet, however, does not apply to legal conclusions.  *See*

*Iqbal*, 556 U.S. at 678.  Pleadings that offer only "labels and conclusions" or "a formulaic

recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

"[T]here is particular value in resolving defamation claims at the pleading stage, so as not

to protract litigation through discovery and trial and thereby chill the exercise of constitutionally

protected freedoms." *Biro*, 883 F. Supp. 2d at 457 (quotation marks and citation omitted); *see*

*also Adelson v. Harris*, 973 F. Supp. 2d 467, 481 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413

(2d Cir. 2017).

## III.    Discussion

Kesner brings claims for defamation and for related torts: commercial disparagement,

deceptive and unfair trade practices, tortious interference with contract, and civil conspiracy to

defame.

### A.    Choice of Law

At the outset, the Court must determine which state's substantive law applies to Kesner's

defamation claims: Florida (as Kesner urges, based on his domicile) or New York (as defendants

urge, based on a variety of factors). [3]

---

[3] This determination as to the choice of law with respect to the defamation claims also dictates
the law applicable to Kesner's civil conspiracy claim, insofar as defamation was the object of the
alleged conspiracy.  *See Cohen Bros. Realty Corp. v. Mapes*, 181 A.D.3d 401, 404 (1st Dep't 2020)
(while not recognizing a separate tort for civil conspiracy, allowing conspiracy claims to proceed
"to connect the actions of separate defendants with an otherwise actionable tort"); *Am. United
Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1067 (11th Cir. 2007) (setting out elements of
conspiracy under Florida law).

The transferor court transferred this case to this District pursuant to § 1406(a), finding venue improper in the Southern District of Florida.  Transfer Order at 4.  This Court accordingly applies New York choice-of-law principles to determine which state's law applies to Kesner's claims.  *See Gerena v. Korb*, 617 F.3d 197, 204 (2d Cir. 2010) ("If a district court receives a case pursuant to a transfer under 28 U.S.C. § 1406(a), for improper venue . . . it logically applies the law of the state in which it sits, since the original venue, with its governing laws, was never a proper option."); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (federal courts sitting in diversity apply forum state's choice of law rules).

First, the Court must determine whether there is a conflict between New York and Florida defamation law.  *See Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993) ("The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.").  Two actual conflicts are readily apparent.  First, as to the availability and extent of the "fair report privilege" as an affirmative defense to defamation, New York recognizes an absolute immunity for "any person, firm or corporation[] for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published."  N.Y. Civ. Rights Law § 74.  Florida also recognizes a common law fair report privilege, but it is "a qualified one" that does not have an express protection for headnotes.  *See Larreal v. Telemundo of Fla., LLC*, No. 19 Civ. 22613, 2020 WL 5750099, at *7 (S.D. Fla. Sept. 25, 2020) (citing *Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 502 (Fla. Dist. Ct. App. 1993)).  Second, and relatedly, New York recognizes a "fair index privilege," under which a headline itself is not actionable if it is a fair index of the accurately reported subject matter of the larger report, but Florida does not.  *See*

*Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 115 n.1 (2d Cir. 2005). These areas of legal difference are implicated in this case, because Kesner claims that various headlines, including on the *Barron's* article, defamed him.

Because there is an actual conflict, the Court must conduct a choice-of-law analysis. In tort cases, New York law applies the "most significant interest test," which distinguishes between "conduct regulating" and "loss allocating" rules. *Lee v. Bankers Tr. Co.*, 166 F.3d 540, 545 (2d Cir. 1999). Discouraging defamation is a conduct-regulating rule. *Id.*

Where conduct-regulating rules conflict, New York looks to the "jurisdiction [that] has the greatest interest in regulating behavior within its borders"—usually the state where the tort occurred. *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993). In defamation cases, often this is as simple as identifying the plaintiff's domicile. *See Adelson*, 973 F. Supp. 2d at 476. However, choice of law in multi-state defamation cases presents a challenge under New York law. Because these are "invariably adjudicated in the federal courts, . . . New York state courts have not had the opportunity to weigh in on how the choice of law analysis should be undertaken." *Id.* New York law appears to show a "marginal preference for the law of the plaintiff's domicile, at least where there is no other reason to apply New York law." *Hatfill v. Foster*, 401 F. Supp. 2d 320, 324–25 (S.D.N.Y. 2005) (collecting choice of law analyses in multi-state libel cases), *rev'd on reconsideration*, 415 F. Supp. 2d 353 (S.D.N.Y. 2006). But "in cases where a defamatory statement is published nationally, there is only a presumptive rule that the law of plaintiff's domicile applies," which can be overcome by a showing that "some other state has a more significant relationship to the issue or the parties." *Adelson*, 973 F. Supp. 2d at 477 (citations and quotations omitted).

In determining whether a state other than the plaintiff's domicile has a more significant relationship to the case, New York courts "weigh all the factors that might impact on the interests of various states in the litigation to make a choice of law determination," including "'where the plaintiff suffered the greatest injury'; 'where the statements emanated and were broadcast'; 'where the activities to which the allegedly defamatory statements refer took place'; and 'the policy interests of the states whose law might apply.'" *Catalanello v. Kramer*, 18 F. Supp. 3d 504, 512 (S.D.N.Y. 2014) (quoting *Condit v. Dunne*, 317 F. Supp. 2d 344, 353–54 (S.D.N.Y. 2004) (collecting cases)).

Kesner is currently domiciled in Florida, where he has lived since 2016. Am. Compl. ¶¶ 9, 37. Although this creates a presumption in favor of Florida law, on balance, New York has the more significant relationship to, and greater interest in, this case.

First, New York is the location from which the plaintiff, Kesner, conducted his legal practice, which was the subject of defendants' allegedly defamatory reporting and the area of his life in which he claims to have experienced injury. *See* Am. Compl. ¶ 37. Kesner is a member of the bar of New York and at all relevant times was licensed to practice in New York state and federal court. *Id.* Until 2018, Kesner was a named partner in the New York law firm Sichenzia Ross Ference Kesner LLP. *Id.* He also served as an arbitrator with the New York Stock Exchange. *Id.* To be sure, Kesner claims that he has "a large number of clients and companies based in Florida" and that the alleged defamation affected his "practice in Florida" and his "professional reputation, integrity and standing in the Florida community." *Id.* ¶¶ 1–2. But these assertions are entirely general. And, tellingly, Kesner does not allege that he is, or ever has been, licensed to practice law in Florida. *See* Arg. Tr. at 27. Kesner's legal reputation, if any,

therefore suffered greater damage in New York, where he is licensed to practice and practiced for many years.

Second, the defendants have strong ties to New York and limited ones to Florida. Buhl is domiciled in New York, and *Barron's* maintains its principal place of business is New York. Am. Compl. ¶¶ 39, 42. Alpert is domiciled in New Jersey but works for *Barron's* in New York. Arg. Tr. at 29; Am. Compl. ¶ 40. Where authors accused of defamation are located in New York and the publishing entity is headquartered in New York, New York has a strong interest in the case. *See Levin v. McPhee*, 917 F. Supp. 230, 236 (S.D.N.Y. 1996), *aff'd*, 119 F.3d 189 (2d Cir. 1997).

Attempting to offset these factors, Kesner alleges that a "substantial part of the events giving rise to the claims" in this case took place in Florida. Am. Compl. ¶ 45. He points to the fact that the individuals named in the SEC investigation reside in Florida. *Id.* ¶ 46. But while that fact could bear on the proper venue for a complaint brought for violations of the securities laws, the location of the alleged pump-and-dump malefactors has little if any bearing on the law applicable to the defamation claims Kesner brings against *Barron's*, Alpert, and Buhl.[4] And Kesner does not allege that any defendant took any action whatsoever in Florida in connection with the alleged defamation. He does allege, on information and belief, that Buhl has "hundreds of readers/subscribers in Florida," *id.* ¶ 29, and that *Barron's* "distributes, sells and publishes hundreds, perhaps, thousands, of its weekly magazines to professionals in Florida and has hundreds, perhaps thousands, of subscribers in Florida," *id.* ¶ 41. But Kesner notably does not allege that either Buhl or *Barron's* has any more readership in Florida than in any other state, including New York. Accordingly, these arguments do not assist his bid.

---

[4] The complaint that the SEC did bring, in any event, was brought in New York. *Id.*

Finally, Kesner argues that Florida has a strong relationship to the case because Buhl suggested in an article that Kesner moved to Florida because it is a homestead state, affording protection to individuals facing adverse judgments. *Id.* ¶¶ 9, 24. But Florida's homestead law is not at issue here—there are no counterclaims against Kesner, and Kesner's Florida homestead is not in jeopardy on account of this case. Thus, the Court will not be required to interpret or apply that law. Merely because a feature of Florida law was mentioned in an article does not give Florida an interest in this case.

Accordingly, although Kesner is today domiciled in Florida, all other factors favor New York, which, the Court finds, has by far the most significant relationship to this case. New York substantive law accordingly controls Kesner's claims.

> **B.     Defamation Claims**

> > **1.     Legal Standards Governing Defamation Claims**

> > > *a.     General Standards*

Defamation is the "making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." *Foster v. Churchill*, 87 N.Y.2d 744, 751 (1996) (citations and quotations omitted). Under New York law, to state a claim for defamation, a plaintiff must allege "(1) a written [or spoken] defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019).

At the motion to dismiss stage, the court "must decide whether the statements, considered in the context of the entire publication, are reasonably susceptible of a defamatory connotation, such that the issue is worthy of submission to a jury." *Id.* (citations and quotations omitted); *see*

*also Levin*, 917 F. Supp. at 236 (in defamation cases, the court's "limited function" is to determine "as a matter of law whether the statements complained of are reasonably susceptible of a defamatory construction"). This determination is "guided not only by the meaning of the words as they would be commonly understood . . . but by the words considered in the context of their publication." *Levin v. McPhee*, 119 F.3d 189, 195 (2d Cir. 1997) (citing *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 381 (1995)). Allegedly defamatory statements must not "be read in isolation, but must be perused as the average reader would against the 'whole apparent scope and intent' of the writing." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (quoting *November v. Time Inc.*, 13 N.Y.2d 175, 178 (1963)). A court may not "strain" to interpret statements in their most mild or defamatory sense. *See Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 518 (S.D.N.Y. 2013). Where the challenged statements are "susceptible of multiple meanings, some of which are not defamatory," the court may not conclude, as a matter of law, that the statements are or are not defamatory. *Celle*, 209 F.3d at 178 (citing *Davis v. Ross*, 754 F.2d 80, 83 (2d Cir. 1985)).

New York recognizes, in addition to express defamation, defamation by implication. Defamation by implication "is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements." *Armstrong*, 85 N.Y.2d at 380–81. On a motion to dismiss, New York law holds claims of defamation by implication to a heightened standard:

> To survive a motion to dismiss a claim for defamation by implication where the factual statements at issue are substantially true, the plaintiff must make a rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference.

*Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 37–38 (4th Dep't 2014); *see Partridge v. State*, 173 A.D.3d 86, 91 (3d Dep't 2019). This standard "strikes the appropriate balance between a

plaintiff's right to recover in tort for statements that defame by implication and a defendant's

First Amendment protection for publishing substantially truthful statements." *Stepanov*,

120 A.D.3d at 38.

### b.    Opinion Statements

Under New York law, statements of opinion are not actionable as defamation, "however

unreasonable the opinion or vituperous the expression of it may be." *Davis*, 754 F.2d at 85

(quoting *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977)). Whether a challenged

statement is an opinion is a question of law. *See id.* A statement of "pure opinion" is "'either

accompanied by a recitation of the facts upon which it is based' or 'does not imply that it is

based upon undisclosed facts.'" *Biro*, 883 F. Supp. 2d at 461 (quoting *Steinhilber v. Alphonse*,

68 N.Y.2d 283, 289 (1986) (citations and quotations omitted)).

The New York Court of Appeals has identified several factors to assist courts in

distinguishing opinion statements from potentially actionable statements of fact:

> (1) whether the specific language in issue has a precise meaning which is readily
> understood; (2) whether the statements are capable of being proven true or false;
> and (3) whether either the full context of the communication in which the statement
> appears or the broader social context and surrounding circumstances are such as to
> signal readers or listeners that what is being read or heard is likely to be opinion,
> not fact.

*Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 153 (1993) (alteration omitted) (citations and

quotations omitted). "Unlike the Federal Constitution, the New York Constitution provides for

absolute protection of opinions." *Celle*, 209 F.3d at 178. However, statements of opinion that

"impl[y] a basis in facts which are not disclosed to the reader or listener" may be actionable

"because a reasonable listener or reader would infer that the speaker or writer knows certain

facts, unknown to the audience, which support the opinion and are detrimental to the person

toward whom the communication is directed." *Gross*, 82 N.Y.2d at 153–54 (alterations omitted)

(citations and quotations omitted).  Such statements are referred to as "mixed opinion." *Chau v. Lewis*, 935 F. Supp. 2d 644, 658–59 (S.D.N.Y. 2013), *aff'd*, 771 F.3d 118 (2d Cir. 2014) (quoting *Steinhilber*, 68 N.Y.2d at 289–90).

        c.     *Defamation* Per Se

Under New York law, to recover on a defamation claim, a plaintiff must either plead special damages or that the statements are defamatory *per se*.  *Celle*, 209 F.3d at 179.  Special damages are those that involve the "loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation."  *Id.* (citations and quotations omitted).  Statements that are defamatory *per se* "are actionable without pleading and proof of special damages."  *Id.* (citations and quotations omitted).  Two such categories of defamatory *per se* statements are those that "charge the plaintiff with a serious crime" and those that "tend to injure another in his or her trade, business or profession."  *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992).  However, "the law distinguishes between serious and relatively minor offenses."  *Id.*  "[O]nly statements regarding the former are actionable without proof of damage."  *Id.*

If a statement is defamatory *per se*, "injury is assumed," even where the plaintiff does not plead special or even actual damages.  *Celle*, 209 F.3d at 179.  Whether a challenged statement constitutes defamation *per se* is a question of law.  *Geraci v. Probst*, 15 N.Y.3d 336, 344 (2010).

        d.     The Fair Report Privilege

New York has a statutory "fair report" privilege.  It provides absolute immunity for "any person, firm or corporation[] for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published."  N.Y. Civ. Rights Law § 74.  A statement is "fair and true" if it is "substantially accurate."  *Karedes*, 423 F.3d at 119 (quoting

*Glendora v. Gannett Suburban Newspapers*, 201 A.D.2d 620, 620 (2d Dep't 1994)).  "A report is 'substantially accurate' if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth." *Id.* (quoting *Zerman v. Sullivan & Cromwell*, 677 F. Supp. 1316, 1322 (S.D.N.Y. 1988)).  Although "the exact words of every proceeding need not be given if the substance be substantially stated," *Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*, 49 N.Y.2d 63, 67 (1979), section 74 does not protect statements that, "considered in their context, suggest more serious conduct than that actually suggested in the official proceeding," *Lan Sang*, 951 F. Supp. 2d at 521 (alterations omitted) (citations and quotations omitted).  Section 74 protects both statements that "essentially summarize or restate the allegations of a pleading" and "the release of background material with regard to the case." *Id.* (citations and quotations omitted).

### e.    The Fair Index Privilege

New York common law also recognizes a separate "fair index" privilege, whereby a headline is not actionable "so long as it is a 'fair index of the article with which it appears.'" *Cummings v. City of New York*, No. 19 Civ. 7723 (CM), 2020 WL 882335, at *21 (S.D.N.Y. Feb. 24, 2020) (quoting *Mondello v. Newsday, Inc.*, 6 A.D.3d 586, 587 (2d Dep't 2004)); *see also Karedes*, 423 F.3d at 115 n.1.  A publication "need not choose the most delicate word available in constructing its headline; it is permitted some drama in grabbing its reader's attention, so long as the headline remains a fair index of what is accurately reported below." *Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*, 603 F. Supp. 2d 584, 589 (S.D.N.Y. 2009).  Whether a headline is a fair index of the body of the article is a question of law.  *See Mondello*, 6 A.D.3d at 587.

2. **Application to the *Barron's* Article**

Kesner, making a variety of arguments, claims that both the body and headline of the *Barron's* article defamed him. The Court first examines whether any statements in the article's body are reasonably susceptible of a defamatory construction, and then examines the headline.

*a.    The Body of the Article*

The Amended Complaint identifies two allegedly defamatory statements within the body of the *Barron's* article: (1) that Kesner failed in his "gatekeeper" role as a securities lawyer; and (2) that Kesner had been "terminated" from Haynes and Boone, LLP. Am. Compl. ¶¶ 20, 20 n.4; Arg. Tr. at 19. The Amended Complaint also alleges that, viewed holistically, the article's "defamatory gist" is that Kesner engaged in securities fraud. Am. Compl. ¶ 20.

i.    Kesner's Status as a "Gatekeeper"

Kesner argues that the article "unequivocally state[d]" and also implied that he failed in his role as a "gatekeeper" charged with "protect[ing] the investing public," and that this message was defamatory. Opp'n to Dow Jones Mem. at 14; *see also* Am. Compl. ¶ 20; Arg. Tr. at 17.

The portion of the article relevant to this point stated as follows:

Securities lawyers and transfer agents are essential gatekeepers under federal regulations meant to protect the investing public. But one of the three companies featured in the SEC's New York case, the tiny biotech firm MabVax Therapeutics Holdings (MBVX), says that Honig forced it to hire Kesner and the Sichenzia Ross firm as a condition of his financing, according to a little-noted malpractice case that MabVax filed in a San Diego state court after the SEC case became public.

The MabVax suit contends that Kesner and his law firm advanced the interests of Honig at the expense of MabVax, deceiving the company and committing malpractice that led to its delisting from Nasdaq. Although MabVax had retained Kesner's law firm 'to keep the company safe,' says the biotech's complaint, Kesner's firm instead 'put MabVax in harm's way.'

Kesner's claim that the article defamed him by explicitly accusing him of failing in his gatekeeper role is easily put aside. The statement that "[s]ecurities lawyers and transfer agents are essential gatekeepers under federal regulations meant to protect the investing public" did not specifically concern Kesner. It concerned securities lawyers generally. And Kesner concedes, as is true, that securities lawyers for public companies do have gatekeeping responsibilities to help assure compliance with law. *See* Arg. Tr. at 21. Further, the statements that immediately follow, which synopsized the detailed allegations in MabVax's malpractice suit to the effect that Kesner had repeatedly taken steps to favor Honig and entrench Honig's power over MabVax at the expense of his client MabVax, were undisputedly accurate accounts of the claims alleged in that pleading. The article did not adopt MabVax's accusations as its own. It merely chronicled them. This aspect of the article thus did not explicitly defame Kesner.

Kesner next claims that the "gatekeeper" portion of the article impliedly defamed him, insofar as it conveyed that he failed in his role as a gatekeeper for his clients, such as MabVax. *See id.* at 21–22; *see also* Am. Compl. ¶ 20. That too is wrong. To state a claim for implied defamation, a complaint must make a "rigorous showing" that the language of the communication as a whole not only "can be reasonably read both to impart a defamatory inference" but also that it "affirmatively suggest[s] that the author intended or endorsed that inference." *Stepanov*, 120 A.D.3d at 37–38. Here, however, to the extent that the article implied that Kesner failed in his role as a gatekeeper, the article expressly attributes that accusation to the detailed and pungent MabVax Complaint. The article nowhere adopted MabVax's thesis. On the contrary, the *Barron's* article supplied the other side of the story: Kesner's refutation. It reported that "Kesner's former firm strongly denies that it wronged its client MabVax."

25

To the extent Kesner is distressed with the implication that he failed as a gatekeeper and serially allowed his clients to violate the securities laws, his grievance is thus with MabVax.  It is not with *Barron's* or Alpert, whose article accurately recognized the "gatekeeper" role that securities attorneys play in representing public companies and fairly synopsized the competing allegations in the MabVax litigation, in which Kesner was accused of malpractice by allegedly repeatedly enabling Honig to control the company and manipulate its stock price.  The article further noted that Kesner's other clients, including the other two featured in the case brought by the SEC, had not sued Kesner.

In any event, even if the article could be fairly read to impliedly defame Kesner, it would be protected by the fair report privilege of section 74.  That is because the content tending to disparage Kesner came from MabVax's publicly filed complaint.  "Comments that essentially summarize or restate the allegations of a pleading filed in an action are the type of statements that fall within § 74's privilege." *Lacher v. Engel*, 33 A.D.3d 10, 17 (1st Dep't 2006).  In its pertinent part, the *Barron's* article—accurately—reported the allegations in MabVax's Complaint, which accused Kesner and his then-firm of malpractice by allowing MabVax's stock to be exploited by Honig.  These components of the article thus were absolutely privileged, as is any defamatory implication that follows from these allegations.

        ii.     Kesner's Departure from Haynes and Boone, LLP

Kesner next contends that the statement in the article that the Haynes and Boone firm "terminated him in 2009" is defamatory.  *See* Am. Compl. ¶ 20 n.4.  For multiple reasons, that statement of fact is not actionable.

First, without more, "terminated" does not carry a defamatory construction.  A reader would likely understand that when a person is "terminated," the employer, rather than the employee, ended the relationship.  But the use of the word "terminated" alone does not convey

whether the employee was terminated for cause or for other reasons (*e.g.*, company economics). *See Lian v. Sedgwick James of N.Y., Inc.*, 992 F. Supp. 644, 649 (S.D.N.Y. 1998) ("The mere statement of discharge or termination from employment, even if untrue, does not constitute libel."); *see also Nichols v. Item Publishers*, 309 N.Y. 596, 601 (1956) ("The mere fact of one's removal from office carries no imputation of dishonesty or lack of professional capacity. . . .   It is only when the publication contains an insinuation that the dismissal was for some misconduct that it becomes defamatory.").

And the *Barron's* article did not suggest that Haynes and Boone terminated Kesner for cause or for any misconduct.  That termination preceded both Kesner's joining Sichenzia Ross Ference and Honig's alleged pump-and-dump schemes, on Kesner's watch, involving that firm's clients.  There was thus no implication that the termination arose from misconduct associated with those events.  And the article did not supply context as to why Haynes and Boone terminated Kesner.  As to the termination, it stated only that, (1) afterwards, "[i]n a lawsuit that was quickly settled, Kesner demanded $15 million from the Dallas firm and alleged that his partners defamed him by telling others 'Harvey is dirty' and 'had relationships with clients that the firm did not wish to associate with'"; and (2) "A Haynes and Boone spokesman said, 'Mr. Kesner left the firm in March of 2009.  We resolved our disputes at that time and have had no further contact with him.'"

In any event, even if the bare statement that Haynes and Boone had "terminated" Kesner could constitute defamation by implication, as used here that statement falls squarely within the protections of the fair report privilege.  That is because Kesner himself sued Haynes and Boone to protest the termination.  At numerous times in his publicly filed Complaint in that case, Kesner stated that Haynes and Boone had "terminated" him in a "wrongful termination."  *See*

27

Haynes Compl. ¶¶ 73, 111, 125, 131, 137, 145, 149, 174.  *See Lacher*, 33 A.D.3d at 17

(summaries of pleadings are protected under Section 74). [5]  Accordingly, this statement, drawing

on pleadings filed by Kesner himself, is absolutely privileged under section 74.

iii.    Defamatory "Gist"

Finally, Kesner argues that the body of the Barron's article, viewed as a whole, is

defamatory, because it was not a "*fair or substantially accurate* portrayal of Kesner's role and/or

involvement in the alleged 'pump-and-dump' scheme."  Opp'n to Dow Jones Mem. at 11

(emphasis in original).  But, in thus challenging the article's "defamatory gist," Am. Compl.

¶ 20, Kesner does not identify any part of the article, other than the two statements held above

not to support a viable defamation claim, as inaccurate or defamatory.  Kesner's theory of

holistic defamation therefore also fails.

In any event, as a review of the other statements in the article reflects, none comes close

to supporting a defamation claim.  The balance of the article:

- summarized (and linked to) the SEC Complaint; Kesner does not dispute the accuracy of

  this summary, which is protected under section 74; and the article noted that the SEC

  Complaint had not mentioned Kesner or his law firm;

- summarized the allegations in the MabVax Complaint, including MabVax's claims that

  Honig was a separate client of Kesner's; that Honig had acted to insert Kesner as counsel

  for companies that his group backed; that the advice that Kesner had given MabVax was

  secretly designed to serve Honig's interests, not MabVax's; and that Kesner had tipped

  off Honig to take steps to strengthen Honig's control over MabVax; Kesner does not

---

[5] The Haynes Complaint is cognizable on this motion.  It is a publicly filed lawsuit to which the
*Barron's* article, which is referenced in Kesner's Amended Complaint here, explicit refers.  *See
supra* p. 1 n.1.

28

dispute the accuracy of this summary of MabVax's claims, which is protected by the fair
report privilege;

- stated that, according to SEC registrations, Kesner financed and controlled Equity Stock
  Transfer, the stock transfer company used by two of the public companies victimized by
  Honig's alleged pump-and-dump schemes;

- stated that the Sichenzia Ross Ference law firm represented all three companies involved
  in Honig's schemes, and that two used the same stock transfer agency; Kesner does not
  dispute the accuracy of these statements, which do not mention him; and

- described Kesner's role in building the securities-law practice at Sichenzia Ross Ference,
  the firm in general, and the fact that the firm had removed references to Kesner on its
  website; Kesner does not challenge the accuracy of these statements.

These remaining statements are factually undisputed.  They do not add "defamatory gist"
to the allegations addressed above.

In sum, whether Kesner's claim against *Barron's* and Alpert is analyzed based on the two
distinct statements on which he focuses or on the article as a whole, the body of the article does
not support a viable defamation claim.  To the extent that a reader might take away the inference
that Kesner, and/or his then-law firm, violated their duties towards MabVax by allowing Honig
to gain control and manipulate its stock price, the article explicitly attributes that allegation to the
MabVax Complaint.  *See Stepanov*, 120 A.D.3d at 37–38 (implied defamation under New York
requires that the author intended or endorsed the defamatory meaning).  And to the extent that a
reader might infer a gatekeeping failure by Kesner, that inference naturally follows from the
undisputed facts: that he or someone from his firm was outside securities-law counsel to the
three companies at a time when the SEC has allegedly each fell prey to a venal pump-and-dump

scheme carried out by a person (Honig) with established associations to Kesner.  Kesner's beef is

thus not with *Barron's* or Alpert.  It is with the MabVax Complaint, and, even more so, with

underlying undisputed facts which the article accurately recites.[6]

> b.    *The Article's Headline*

Kesner next argues that the article's headline—"The Lawyer at the Center of the SEC

Pump-and-Dump Case"—accused him personally of securities fraud, and thus is defamatory *per*

*se* and by implication.  *See* Am. Compl. ¶¶ 4, 20–22, 60.  Dow Jones and Alpert counter that the

headline is not actionable because it was a fair index of the article, protected by the fair report

privilege, and constitutionally protected opinion.  Defendants are correct.

> i.    Fair Index Privilege

The headline of the Barron's article did not identify Kesner by name.  It is therefore not

independently actionable as defamation, *Triano v. Gannett Satellite Info. Network, Inc.*, No. 09

Civ. 2497 (KMK), 2010 WL 3932334, at *4 (S.D.N.Y. Sept. 29, 2010) (citations and quotations

omitted) (collecting cases), but must instead be evaluated in the context of the entire article.

Read in that context, the headline "The Lawyer at the Center of the SEC Pump-and-

Dump Case" fairly indexes the body of the article.  As explained above, the article itself fairly

---

[6] Kesner contends that the article is not "impartial" and therefore should not be protected by the fair report privilege.  Opp'n to Dow Jones Mem. at 5, 9.  That is wrong.  Kesner relies on a case applying Texas's "official/judicial proceedings" statutory privilege, which protects "fair, true, and impartial accounts of judicial, executive, legislative, and other official proceedings." *Butowsky v. Folkenflik*, No. 18 Civ. 442, 2019 WL 2518833, at *14 (E.D. Tex. Apr. 17, 2019), *report and recommendation adopted*, 2019 WL 3712026 (E.D. Tex. Aug. 7, 2019).  But Texas law has no bearing here.  And New York's analogue, the section 74 fair reporting privilege, has "no requirement that the publication report the plaintiff's side of the controversy."  *Cholowsky v. Civiletti*, 69 A.D.3d 110, 115 (2d Dep't 2009).  In any event, the article states that *Barron's* gave Kesner an opportunity to comment on MabVax's allegations but that he did not respond; and that outside counsel to Sichenzia Ross Ference stated that the firm would "vigorously defend" itself against the MabVax suit and viewed MabVax's claims as meritless.

reports on three publicly filed complaints: the SEC's securities-fraud complaint against Honig and associates; MabVax's malpractice complaint against Kesner and his then-law firm; and Kesner's earlier complaint against Haynes and Boone.  Kesner does not dispute that the firm at which he was formerly a partner had been counsel to three companies implicated in the SEC investigation; that he controlled Equity Stock Transfer, a stock transfer agent used by two of the three companies; that he had various ties to Honig, as chronicled in the SEC Complaint; and that one of his client companies, MabVax, sued Kesner and his former firm for malpractice, alleging that a host of actions by Kesner were intended to and did benefit Honig at MabVax's expense.

Kesner contends that the use of the word "center" implied that Kesner not only personally committed securities fraud but that he "essentially orchestrated" or "mastermind[ed]" that fraud, which constitutes defamation *per se*.  Opp'n to Dow Jones Mem. at 4, 11; Am. Compl. ¶ 22.  An allegation that a person violated securities laws can indeed constitute defamation *per se*.  *See Lucking v. Maier*, No. 03 Civ. 1401 (NRB), 2003 WL 23018787, at *6 (S.D.N.Y. Dec. 23, 2003) (statements that broker engaged in illegal stock transactions held actionable as libelous *per se*).  But the headline of the Barron's article does not state that Kesner is legally or morally culpable. Instead, using a spatial metaphor, it states that he was "at the center" of the SEC's case.  That figure of speech is not self-defining.  A person may be at the center of a case involving improprieties as a perpetrator, but alternatively could be so as a witness, a victim, or unwitting tool.

And a person reading the article—as necessary to identify the lawyer referred to in the headline as Kesner—would understand the headline's locution.  The body of the article stated explicitly that Kesner was "[u]nmentioned" in the SEC Complaint and that the "pump-and-dump schemes [were] organized by investor Barry Honig."  It did not comment on Kesner's *mens rea*.

It did not purport to know whether Kesner had been a witting participant or an unwitting pawn in Honig's alleged frauds.  Instead, it situated Kesner factually at the "center" of the SEC's case in light of his connections to the key participants: the lead perpetrator (Honig), victims (MabVax and two others), and the stock-trading company used by two victims (Equity Stock Transfer).

The headline thus supplied, at a minimum, "a fair index of what is accurately reported in the article below," *Test Masters*, 603 F. Supp. 2d at 589, in that it captured Kesner's nexus to the central players in the scheme charged by the SEC, without purporting to opine on whether Kesner was, or was not, culpable.  *See Seldon v. Shanken*, 143 A.D.2d 3, 4 (1st Dep't 1988) (dismissing defamation claim on summary judgment where headlines were ambiguous but "the accurate description in the text of the article dispelled any possible misleading meaning of the headlines"); *see also Triano*, 2010 WL 3932334, at *5 (dismissing defamation claim where headline was "literally false, [but] the full context of the article contradicted the headline and was substantially true such that the reasonable reader likely would conclude that the headline was inaccurate"; court notes that standard for accuracy in cases claiming defamatory headline is "substantial, not literal, accuracy").

Accordingly, the Court finds that, to the extent the headline is susceptible of a defamatory construction, it is protected by the fair index privilege.

### ii.      Fair Report Privilege

As noted, a headline may also be protected under the fair report privilege.  Section 74 protects "any heading of the report which is a fair and true headnote of the statement published." N.Y. Civ. Rights Law § 74.  For purposes of section 74, "the effect of the headline and the article on the ordinary reader must be examined together under a totality of circumstances." *Idema v. Wager*, 120 F. Supp. 2d 361, 367 (S.D.N.Y. 2000), *aff'd*, 29 F. App'x 676 (2d Cir. 2002) (summary order).

For the same reasons covered in connection with the fair index privilege, the Court, considering the headline in the context of the entire article, finds the fair report privilege to apply. To the extent that the headline is susceptible of a defamatory construction, it is a fair and true headnote—or miniature synopsis—of the body of the article, which the Court has found accurate and not defamatory. The body of the article, insofar as it restated the pungent allegations in MabVax's Complaint that associate Kesner with Honig's scheme, unavoidably makes Kesner a centrally relevant player in the events at issue, while leaving his state of mind indeterminate. And, as with the fair index privilege, in considering whether the fair report privilege applies, the reader must consider the article's body, because the headline did not name Kesner. And "[a]ny ambiguities and questions" about the manner in which Kesner is at the "center" of the investigation "would have been resolved by perusing the article." *Idema*, 120 F. Supp. 2d at 369.

Accordingly, the Court finds that, to the extent the headline is susceptible of a defamatory construction, it is separately protected by the fair report privilege.

        *c.*    *Republications of the* Barron's *Article*

The Amended Complaint, finally, states that there have been several "republications" of the *Barron's* article, including Alpert's tweet of a link to the article, which "republished[] the Barrons Article to a new target audience." Am. Compl. ¶ 23. It further notes that Apple News featured the article, which was "tweeted (republished) thousands more times by third parties." *Id.* Such acts of re-publication are of no consequence here, however, because the Court has held that neither the article's body nor its headline are reasonably subject to a defamatory

construction.  The Amended Complaint does not allege that any text accompanying Alpert's tweet added defamatory content.[7]

In sum, Kesner's Amended Complaint does not plausibly allege that any aspect of the *Barron's* article was actionable as defamation.  The Court accordingly dismisses Kesner's defamation claims against Alpert and Dow Jones.

### 3.  Application to Buhl's Publications

The Amended Complaint alleges that seven articles and four tweets by Buhl contain defamatory statements.  The Court examines each publication in turn.

#### a.  *August 29, 2018 Article*

Kesner challenges three statements made in the August 29, 2018 article, as updated on September 5, 2018.  First, Kesner points to Buhl's statement that the removal of his name from his former firm and Honig's retirement from Pershing Gold "could signal an SEC charge or settlement coming in the near future for both men."  Dkt. 107 ("Opp'n to Buhl Mem.") at 2.  Second, Kesner challenges Buhl's statement regarding the sale of unregistered securities:

> Additionally I believe there could be issues of unregistered shares being sold or restricted shares being released when they should be held in restriction.  It's hard to get restricted stock to the DTC for free trading unless you have a friendly transfer agent not doing due diligence on if the shares are legal to trade in the first place.

Finally, Kesner alleges that the article implied that he had deliberately moved to Florida, a "homestead state," because he had engaged in wrongdoing.  *Id.*  Buhl defends these statements as protected pure opinion and notes that the facts underlying these statements are substantially true.

---

[7] The Amended Complaint does not allege that any third party's re-publication added defamatory content.  In any event, under New York law, Alpert and Dow Jones could not be held responsible for the re-publication of the article by third parties absent allegations—of which there are none here—that they were personally involved in the re-publication.  *See Pasqualini v. MortgageIT, Inc.*, 498 F. Supp. 2d 659, 670–71 (S.D.N.Y. 2007) ("[R]epublication of the defamatory material by a third party cannot be attributed to the original publisher . . . absent her personal involvement in or ratification of the republication, which plaintiff has not alleged.").

Buhl Mem. at 8–10.  The Court holds with Buhl, finding that, viewed in context, the challenged statements are protected pure opinion.

With respect to Buhl's statement that the removal of Kesner's name from his former firm could "signal an SEC charge or settlement," Buhl disclosed the facts on which she based the statement: that (1) Kesner and his "biggest client" Honig had left their positions in the same week; (2) individuals named as "bad actors" may not serve on the board of a public company; and (3) Kesner was the securities-transaction lawyer for two companies that had, at the time of the article, disclosed that they were under SEC investigation.  Kesner does not dispute these facts.  Drawing on them, Buhl opined that they "could signal" an SEC charge of or settlement with Kesner.  Where an author "imputes criminality to the plaintiff as a hypothesis drawn from stated facts, rather than as an assertion of fact in itself, he has not vouched for the truthfulness of the defamatory statement." *Levin*, 917 F. Supp. at 241 (quoting *Gross*, 82 N.Y.2d at 155).  The statement that these facts "could signal" action from the SEC "in the near future" made clear that Buhl was speculating based on disclosed facts.  And the article did not suggest that Buhl was basing her forecast on any undisclosed facts that would render it a mixed statement of opinion and fact.  Rather, "a reasonable reader would understand the statements defendant made about plaintiff as mere allegations to be investigated rather than as facts." *Brian v. Richardson*, 87 N.Y.2d 46, 53 (1995).

Buhl's statement that improper transfers of unrestricted shares may have occurred is similarly not actionable.  In claiming to have been defamed, Kesner argues that this statement "insinuate[d]" that he "was involved in the sale of unregistered securities."  Am. Compl. ¶ 24.  Viewed as a whole, the surrounding passages certainly suggested that Honig had engaged in the sale of unregistered securities and implied that Equity Stock Transfer acted as a "friendly"

transfer agent to assist him.  As to Kesner, however, Buhl's article was nuanced.  It noted that
"Kesner put in writing that he doesn't have control over [Equity Stock Transfer], but only lends
the firm money."  *Id.*  It also noted that although Kesner had a known relationship with Equity
Stock Transfer's CEO, Kesner had told her "through his attorney that he is NOT a control person
at Equity Stock Transfer."  *Id.*  And the article, while disclosing that Kesner and the CEO had a
prior working relationship, reiterated that Kesner had denied controlling Equity Stock Transfer
and that his wife "only held a 50% ownership in Equity Stock Transfer for 4 months in 2014
from April 1st to July 3rd."  *Id.*  Buhl's article further described her hypothesis that Kesner
actually controlled Equity Stock Transfer as a "gut feeling" and admitted that although she hopes
the SEC and FINRA are investigating Kesner's relationship to Equity Stock Transfer, "[she has]
also never seen Kesner's name show up in an SEC subpoena that related to Honig."  *Id.*  A
reasonable reader, reading the article in this full context, would understand that Buhl was purely
opining based on the facts she there disclosed about the possibility that Kesner had been
involved in the improper transfers, and was not purporting to opine based on undisclosed facts
known to her.  Buhl's use the of the terms "gut feeling" and "I believe" as to Kesner's possible
control of the stock transfer company, Equity Stock Transfer, were particularly clear cues that
she was expressing an opinion.  *See Chau*, 935 F. Supp. 2d at 660 (collecting cases wherein use
of language such as "I believe" signals that the statement is opinion).  The speculative quality of
Buhl's opinion was reinforced by her acknowledgment that she was unaware of any SEC
subpoena mentioning Kesner and that she "hopes" but did not know that the SEC was
investigating him.

Finally, the implication that Kesner may have moved to Florida to take advantage of its
homestead laws—under which a person's home cannot be seized to satisfy judgments, fines, or

creditors—was also clearly a pure opinion.  The August 29, 2018 article broadly opined—as reflected in its headline ("Kesner's Out:  Why is Barry Honig's Securities Lawyer Retiring")—about the reasons for Kesner's retirement at age 61.  As to Florida, Buhl wrote that Kesner had made an "apparent move" there in December 2016, and that "Florida often becomes a home for people with judgments or government fines lobed [sic] on them because it is a 'homestead state'. This means in the case of bankruptcy or say an SEC fine they can't come and take your home." The article did not, however, anywhere flatly state that such had been Kesner's motive.  It instead merely identified this as a possibility.  A reasonable reader would understand Buhl's discussion of the homestead laws to reflect her conjecture that such had been a motive of Kesner's—that he may have moved to Florida in anticipation of possible adverse action by the SEC.  To be sure, in so stating, Buhl does not use the classic words (*e.g.*, "I believe") that overtly denote a statement as opinion.  But the article, taken as a whole, disclosed that she was opining as to Kesner's possible culpability based solely on the facts disclosed.  As to Kesner's possible motive for having moved to Florida, the article did not purport to rely on undisclosed facts.  And the surrounding paragraphs were full of acknowledgments about Buhl's limited factual visibility. In addition to the factual disclaimers and qualifications earlier noted, the article also noted that it was "unclear if Honig will keep his business with Kesner's firm" after his retirement and that "[w]hy is he retiring now is an unknown and no one at the law firm has responded with comment."

All three challenged statements were thus pure opinion.  And critically, as to none does Kesner challenge any of the facts underlying them as set out in the article.  *See Chau*, 935 F. Supp. 2d at 659 ("[W]here a plaintiff challenges the veracity of only the opinions, and not

the underlying facts, the plaintiff cannot establish libel." (citing *Silsdorf v. Levine*, 59 N.Y.2d 8, 14 (1983))).  Accordingly, no challenged statement in the August 29, 2018 article is actionable.

b.      *October 31, 2018 Article*

Kesner challenges the statement in this article that he was a member of Honig's "crew of alleged bad actors – Team Honig."  Am. Compl. ¶ 24.  As to this discrete statement, the Amended Complaint has plausibly alleged the elements of defamation.  The article identified Kesner by name and was sufficiently of and concerning him; the article was published on a website accessible to third parties; the representation that Kesner is "an alleged bad actor" is plausibly pled to be factually false in that Kesner, as pled, has never been accused of a violation of law; and the Amended Complaint plausibly pleads that Buhl, whose commentary reflects familiarity with the facts associated with Honig's alleged schemes, acted with gross negligence—the standard applicable to defamation of non-public figures—in labeling *Kesner* an "alleged bad actor."  *See* Am. Compl. ¶¶ 24–27 (Buhl targeted Kesner and did not investigate whether he was an "alleged bad actor"); *id.* ¶ 37 (Kesner as private figure).  Finally, the label "bad actor" plausibly qualifies as defamation *per se*, *see Travelex Currency Servs., Inc. v. Puente Enters., Inc.*, No. 18 Civ. 1736 (ER), 2019 WL 1259102, at *7 (S.D.N.Y. Mar. 19, 2019) (plaintiff stated claim for defamation *per se* where publication called him a "bad actor" and accused him of "insurance fraud and other wrongful acts").  In any event, that label is susceptible of a defamatory meaning, and Kesner has pled special damages from it in the form of lost clients and business.  *See* Am. Compl. ¶ 38.

Buhl counters that the challenged statement qualifies for the fair report privilege.  She notes that the paragraph calling Kesner a member of Honig's "crew of alleged bad actors – Team Honig" included hyperlinks to the *Barron's* article and to an article about Honig, by a Chris Carey, posted on a website called *Sharesleuth*.  *See* Buhl Mem. at 10–11.  Because the *Barron's*

article was protected under the fair report privilege to the extent it drew upon the MabVax Complaint, Buhl argues that her article's commentary about Honig should likewise enjoy that privilege. Buhl is correct that on a motion to dismiss, "hyperlinking to another article that itself is a fair report of a proceeding" [may] "signal[] to the reader that the allegations stem from a proceeding." *Cummings*, 2020 WL 882335, at *19; *see also Adelson*, 973 F. Supp. 2d at 483–85. But that principle does not avail Buhl as to her article's factual claim that Kesner was an "alleged bad actor." That claim does not appear in the MabVax Complaint, which accuses Kesner of legal malpractice, not securities-law violations. Although the MabVax Complaint alleges facts from which a person could infer that Kesner might have engaged in securities-law violations, it stops short of making that accusation. Buhl's article thus goes beyond—and cannot be said to be a substantially accurate description of—the hyperlinked article. Accordingly, on the pleadings, the Court cannot find the fair report privilege necessarily to apply.[8]

### c.    March 26, 2019 Article and March 27, 2019 Tweet

Kesner next alleges that the March 26, 2019 article contains two defamatory statements, both embedded in this sentence: "Honig's deal lawyer, Harvey Kesner, who was pushed out of his law firm as a named partner last year, sued Daniel Fisher on behalf of Team Honig, with accusation of speaking to journalists after Fisher had settled his case with the bad actors for $2 million." Kesner contends that the article's reference to "bad actors" defamed him, as does its statement that he had been "pushed out of his law firm as a named partner." Am. Compl. ¶ 24. Kesner also challenges the text of Buhl's tweet of the following day, which linked to the March 26, 2019 article. *Id.*

---

[8] The Amended Complaint does not attach, and the parties have not supplied the Court with a copy of, the *Sharesleuth* article, which the Court has not found readily accessible. The analysis above accordingly is limited to Buhl's arguments based on the *Barron's* article.

39

Kesner's defamation claim as to the label "bad actor" is not actionable for a simple reason: on the face of the article, that description is not used to refer to him. It refers to the defendants (whom the article does not name) in a case brought by Daniel Fisher, whom the article describes as an SEC whistleblower with respect to a fraud allegedly committed by Honig in connection with the company BioZone. Kesner is referenced in the article for having later sued Fisher, on Honig's behalf, for violating a non-disparagement clause.

Kesner's challenge to the statement that he was "pushed out" of his law firm is also not actionable. The article addressed the subject of Kesner's departure from the firm only as recited above: in a single dependent clause describing Kesner in the sentence reporting the lawsuit he filed against Fisher. And the article did not provide any context as to the circumstances of his involuntary departure. Much as the statement in Buhl's August 29, 2018 article that reported Kesner's "termination" from the firm was not alone actionable, so too, the statement that the firm "pushed [Kesner] out" was not, without more, defamatory. It said nothing about why the firm decided to part ways with Kesner. And Buhl's article did not state or suggest that Kesner had engaged in misconduct or that the firm acted on account of perceived misdeeds by him, including in cahoots with Honig. As presented in the article, the firm's decision to jettison Kesner could equally have reflected the firm's economics, its business plan, or the emergence of superior lawyers in Kesner's practice area. *See Lian*, 992 F. Supp. at 649 ("The mere statement of discharge or termination from employment, even if untrue, does not constitute libel."); *Howard v. Alford*, 229 A.D.2d 996, 996 (4th Dep't 1996) (statement that employees were terminated because they were less productive than the company desired protected as opinion); *Chang v. Fa-Yun*, 265 A.D.2d 265, 265 (1st Dep't 1999) (announcement in community newspaper that plaintiff had been terminated as officer of non-profit not actionable because it "did not mention

40

or imply any wrongdoing or incompetency on plaintiff's part"); *cf. McCusker v. Hibu PLC*, 159 F. Supp. 3d 341, 348 (E.D.N.Y. 2016) (email that CEO was terminated for conduct "considered to be disloyal and against the interests of its employees and other stakeholders" is capable of defamatory meaning).

Buhl's March 27, 2019 tweet, however, was of a different character. Although the tweet links to Buhl's March 26 article, it also flatly accuses Kesner of breaking the law. The tweet reads: "The illegal back room deals and intimidation Hong and attorney Harvey Kesner did with Biozone (company A in SEC lawsuit) were egregious and the SEC sat back and watched it happen." This accusation of criminal conduct is plausibly pled as defamation *per se*. And Buhl's linked article of the next day did not, on its face, permit a finding that the fair report privilege applies, because the hyperlinks in the article did not link to any pleading accusing Kesner of illegal conduct. The Court therefore denies Buhl's motion to dismiss, limited to this aspect of the March 27, 2019 tweet.

### d.    *April 11, 2019 Article*

The April 11, 2019 article is entitled "Hudson Bay Capital tied to Barry Honig Pump and Dump Ring." Kesner contends that three statements in the article are defamatory. *See* Opp'n to Buhl Mem. at 3. First, Kesner alleges that Buhl's statement that "attorney Kesner was removed from New York Law firm that bore his name Sichenzia, Ross, Ference, Kesner LLP" was defamatory. Am. Compl. ¶ 24. Second, Kesner alleges that Buhl defamatorily named him as a part of the Honig "pump and dump ring." *Id.* Third, Kesner finds defamatory the article's statement that:

> Kesner and Prag are not named defendants in the SEC lawsuit, although Kesner's actions are detailed in the complaint as an unnamed lawyer. Kesner has disappeared from the microcap stock scene since the SEC brought their enforcement action but has not been bared [sic] as an attorney. It's unclear if he is

41

a confidential informant for the government or if charges will be brought against him in the future.

*Id.*[9]  However, none of these statements, as pled, provides a viable basis for a defamation claim.

The statement that Kesner had been "removed" from his law firm is not actionable for the same reasons that the statement in the March 26, 2019 article that he was "pushed" out is not actionable.  Moreover, this statement can also be reasonably read to refer to the removal of Kesner's name from the firm's name, which Kesner does not allege is false.

As to the article's use of the term "pump and dump ring," it did not do so in a way that specifically identifies Kesner as a member.  That term appeared in the headline of the article and its first sentence.  Neither, however, names Kesner, whether by name or other identifier.  The article then went on to discuss, at length, the "additional stock promoters tied to Hong's stock manipulation ring," but Kesner was unmentioned in this extended discussion.  His name in fact did not appear until the 17th paragraph of the article, where he was identified as part of a "13D group" that had purchased stock in MabVax but as to whom the article did not allege misconduct.  And the article, which centrally focused on the SEC's stock-manipulation case, explicitly stated, as quoted above, that Kesner was not a defendant in that case.  The article's references to the "pump and dump ring" therefore cannot be read to specifically concern, or be of and about, Kesner.  *See, e.g.*, *Diaz v. NBC Universal, Inc.*, 536 F. Supp. 2d 337, 342 (S.D.N.Y. 2008), *aff'd*, 337 F. App'x 94 (2d Cir. 2009) (summary order) ("Although the 'of and concerning' requirement generally presents a factual question for the jury, the Court properly may dismiss an action pursuant to Rule 12(b)(6) where the statements are incapable of supporting a jury's finding that the allegedly libelous statements refer to plaintiff." (citations and

---

[9] Kesner also sues Buhl for a link republishing the *Barron's* article.  The Court, however, has held that the *Barron's* article is not defamatory.

quotations omitted)); *Goldman v. Reddington*, 417 F. Supp. 3d 163, 172 (E.D.N.Y. 2019) (same); *Church of Scientology Int'l v. Time Warner, Inc.*, 806 F. Supp. 1157, 1160 (S.D.N.Y. 1992) ("Whether the complaint alleges facts sufficient to demonstrate a reasonable connection between the plaintiff and the alleged libel is thus a question for the Court."), *aff'd sub nom. Church of Scientology Int'l v. Behar*, 238 F.3d 168 (2d Cir. 2001).

The second paragraph is also not actionable. Kesner contends that the statement that he "has disappeared from the microcap stock scene since the SEC brought their enforcement action but has not been bared as an attorney," *see* Am. Compl. ¶ 24 (quoting April 11, 2019 Art.), implied that he has been disbarred. That is not plausible. To be sure, Buhl's intended meaning in stating that Kesner "hasn't been bared" as an attorney is elusive. "Bared" means "uncovered," making a literal reading of the concluding clause of the sentence nonsensical. A reasonable reader would likely read "bared" as a misspelling of the word "barred," and understand the article to state that, notwithstanding that his recent inactivity in "the microcap stock scene," Kesner had not been disbarred. That fact is not disputed. And Kesner's apparent good standing in the bar is a benign fact. It is not susceptible of a defamatory construction.

Finally, Kesner faults the article for stating that it is "unclear if [Kesner] is a confidential informant for the government or if charges will be brought against him in the future." But that statement, too, is not actionable. As to the reference to Kesner's possibly being an informant, the precise statement in the article is factually accurate. From the vantage point of the article's author at the time of its publication, it was unclear whether Kesner had so served. The article's representation—that the truth as to his service as an informant was then unclear—was literally

accurate.[10]  And insofar as the article raised possible informant status as potentially explaining Kesner's disappearance from the microcap stock scene since the SEC brought its enforcement action against Honig and his associates, that speculation is a pure, and protected, statement of opinion.  Finally, as to the article's statement that it was unclear whether the charges would be brought against Kesner in the future, that statement, denying omniscience as to future events, is necessarily true.  And to the extent that it implicitly opined that such a charge was conceivable based on the disclosed facts, it was a pure, and protected, statement of opinion.

Accordingly, none of the challenged statements in the April 11, 2019 article are actionable as defamation.

---

[10] In any event, even if the article had stated affirmatively—and falsely—that Kesner had served as an informant, that claim would likely not be defamatory.  Nearly every court to consider the question has held, as a matter of law, that the false accusation that a person served as an informant cannot be defamatory.  *See Agnant v. Shakur*, 30 F. Supp. 2d 420, 424 (S.D.N.Y. 1998) (collecting cases); *see also Michtavi v. N.Y. Daily News*, 587 F.3d 551, 552 (2d Cir. 2009) ("The population of right-thinking persons unambiguously excludes 'those who would think ill of one who legitimately cooperates with law enforcement.'" (quoting *Shakur*, 30 F. Supp. 2d at 424)).  The basis for this line of authority, as noted in *Shakur*, is that:

> It is true that informers are not always held in too high esteem, and violators of the law might have good cause to shun one who engaged in such practice, but, nevertheless, such acts cannot constitute a foundation upon which to build an action for slander. . . .  To hold otherwise would be contrary to the public interest, in that it would penalize the law-abiding citizen and give comfort to the law violator.  It would impede law enforcement for the benefit of the anti-social.

*Shakur*, 30 F. Supp. 2d at 425 (quoting *Connelly v. McKay*, 28 N.Y.S.2d 327, 329 (Sup. Ct. 1941)).  Kesner argues that these cases are distinguishable because the claim that an attorney is an informant would tend to impede client relationships.  Am. Compl. ¶ 13.  Insofar as the article does not claim that Kesner was an informant but only that such is unclear, the Court has no occasion to address this question.

e.       *May 14, 2019 Article*

The May 14, 2019 article is entitled, "Judge says Honig's attorney Harvey Kesner can be Sued for Fraud and Malpractice."  Kesner alleges that the following statements in the article are defamatory:

- "Attorney Kesner was profiled last year in a Barron's article for his questionable role with MabVax and Barry Honig.  The story titled *The Lawyer at the Center of the SEC Pump and Dump Case* highlighted the internal emails that said Kesner's partners and associates were realizing the firm had a conflict of interest between representing Barry Honig & his band of investors and representing MabVax when the SEC started asking questions.  The emails showed lawyers at Sichenzia Ross Ference saying the SEC subpoena is really all about the investors (meaning Barry Honig and friends)."

- "Honig was charged by the SEC in September for being the ring leader of a pump and dump ring that netted him and his co-defendants at least $27 million. Kesner is not a named defendant in the SEC lawsuit but the SEC details a lawyer allegedly aiding Honig's securities fraud.  That lawyer is believed to be Harvey Kesner."

- "Just days before the SEC brought their case against Kesner's long time client Honig, I broke the news he was leaving the law firm that bore his name as partner.  People inside the firm were talking about Kesner being forced out and that the partners would allow him to call it a retirement.  There was no press release announcing any retirement from the law firm but days after the SEC's lawsuit was filed Sichenzia Ross Ference rushed to remove any resemble of ties to attorney Kesner taking down his profile and press releases touting his legal work.  They also quickly changed the name of the firm removing Kesner's name."

- "Yesterday I received a letter from a lawyer from Virginia representing Harvey Kesner asking for some of my reporting on Kesner leaving his law firm and my speculation that the SEC is looking at Kesner also or he is working as a confidential witness for the government to be taken down."

- "He is either trying to harass an independent journalist [sic] or it's something even more troubling."

- "Kesner recently moved his main residence to South Florida which is a homestead state.  Meaning your home can't be seized if you have judgments or government fines against you.  Kesner had previously lived in New Jersey for decades."

*See* Opp'n to Buhl Mem. at 3–4; *see also* Am. Compl. ¶ 11.

None of these statements are actionable.

First, the statements concerning the *Barron's* article, even if otherwise actionable, are protected by the fair index privilege. As explained, "hyperlinking to another article that itself is a fair report of a proceeding signals to the reader that the allegations stem from a proceeding." *Cummings*, 2020 WL 882335, at *19 (citing *Adelson*, 973 F. Supp. 2d at 482–86). And the Court has found the *Barron's* article a fair report of the allegations in the SEC and MabVax Complaints. *See supra* pp. 30–32. Buhl's hyperlink to the *Barron's* article signaled to the reader that the allegations in her article stemmed from the MabVax Complaint. That was all the clearer here, insofar as Buhl's article also linked to the *MabVax* court's order resolving Sichenzia Ross Ference's motion to dismiss.

Second, the statement that "Kesner is not a named defendant in the SEC lawsuit but the SEC details a lawyer allegedly aiding Honig's securities fraud. That lawyer is believed to be Harvey Kesner," is not actionable defamation. Kesner repeatedly emphasizes that "he was not named as a defendant or relief defendant in the original complaint filed by the SEC or in the SEC's amended complaint." Opp'n to Buhl Mem. at 12; Am. Compl. ¶¶ 9, 15. But, tellingly, he does not allege that the lawyer detailed in the SEC lawsuit is anyone other than himself. And the circumstantial conditions make that inference compelling. Because Kesner does not dispute the truth of the statement in Buhl's article that he was the unnamed lawyer to whom the SEC's Complaint referred, that statement is not actionable as defamation.[11] As for the article's description of the conduct of the unidentified lawyer as "allegedly aiding Honig's securities fraud," it is multiply protected. It is protected by the fair report privilege to the extent that the

---

[11] Kesner alleges that he is not at the "center" of the scheme and that he is "but one (of dozens) law lawyers that represented companies that were in the sights of the SEC," Am. Compl. ¶¶ 2, 4, but he does not allege that he is not the unnamed lawyer in the SEC complaint.

factual allegations undergirding this statement derived from the SEC Complaint that the article references, including that Company A obtained attorney opinion letters containing information Company A knew to be false.  *See* SEC Complaint ¶¶ 73, 86.  It is also protected as a pure statement of opinion, to the effect that the lawyer's conduct equates to aiding and abetting securities fraud.

Third, the article's statement that there was "speculation that the SEC is looking at Kesner also or he is working as a confidential witness" is also not actionable.  This statement largely tracked Buhl's statement in the April 11, 2019 article that it was "unclear if [Kesner] is a confidential informant for the government or if charges will be brought against him in the future" and is not actionable for the same reasons.  And Buhl's use here of the term "speculation" unambiguously conveyed that what followed were statements of opinion, not fact.

Fourth, the statement that Kesner had been "forced" out of his law firm is not actionable for the same reasons that the statement in the March 26, 2019 article that he was "pushed" out is not actionable.

Fifth, the statement that Kesner's defamation suit against Buhl—this suit—is an attempt "to harass an independent journalist [sic]" or "something even more troubling," is pure opinion and hence not actionable.  A reader would commonly understand Buhl's use of "harass" as "no more than rhetorical hyperbole," *Steinhilber*, 68 N.Y.2d at 291, and as Buhl's way of conveying that Kesner's defamation claim is baseless and aimed at deterring journalistic inquiry into his conduct in connection with Honig.  As for Buhl's statement that Kesner's motivations might be "even more troubling," the article went on to explain possible such motives.  The suit, it states, "could be all about trying to get the name of the person or persons from his old law firm that were leaking news about why he was leaving the firm," and/or Kesner "could try to use this to

get leverage on his old firm if they are facing a battle over who is going to have to pay MabVax

big bucks to settle."  Read in context, these statements, as underscored by Buhl's use repeatedly

of the qualifier "could," were clearly announced as speculation on Buhl's part.  A reader would

understand her conjecture as an opinion not based on undisclosed facts.

Finally, the article's speculation as to Kesner's reasons for moving to Florida tracked the

speculation in the August 29, 2018 article, and for the same reasons, is protected opinion.

Accordingly, Kesner may not pursue a defamation claim against Buhl on any of the

challenged statements in this article.

*f.*      *June 7, 2019 Article*

Kesner next challenges (1) the headline of Buhl's June 7, 2019 article, "New Emails

show attorney Harvey Kesner aided Defrancesco in Questionable Cannabis stock Deal: $APHA

$SOLCF," and (2) statements within the article to the effect that emails of Kesner obtained by

Buhl suggest that shares were transferred within an insider's family in a manner that might skirt

beneficial-ownership rules.  These statements are:

- "An insider, Andy DeFrancesco, was using Barry Honig's deal lawyer to move hidden shares within his family.  I am reporting for Cannabis Law Report today that new emails written by attorney Harvey Kesner on behalf of the DeFrancescos could show how the insiders skirt beneficial ownership disclosure rules.  I reported last week, DeFrancesco's alleged hidden stock ownership is at the heart of a new securities fraud lawsuit filed against him and his band of sophisticated bad actors by Aphria main street investors."

- "When the U.S. broker dealer saw attorney Harvey Kesner was pushing to get the shares through the U.S. clearing system call the DTC the transaction's legitimacy was challenged."

On the limited review permissible on the pleadings, these statements are actionable.

They are clearly of and concerning Kesner.  They—at a minimum—imply his intentional

participation in questionable or illegal transactions.

48

Buhl defends these statements based on the fair index and fair report privileges.  The June 7, 2019 article, Buhl notes, summarized and hyperlinked another article of hers of the same day, for *Cannabis Law Report*.  That hyperlinked article, Buhl states, was based on "substantially true" information.  But Buhl's attempt to bootstrap in this way—to elude review of the article on her website on the ground that it relied on a different article of hers elsewhere—is unavailing.  That is because, on the pleadings, the Court cannot assess whether Buhl's underlying article for *Cannabis Law Report* was itself substantially true.  It would not be a defense to the defamation claim here that Buhl was recapitulating a false report she had published elsewhere the same day.  Discovery is necessary to test the accuracy of the factual representations in Buhl's underlying article to the extent these are recapitulated in the article at issue here.  *See Tannerite Sports, LLC v. NBCUniversal News Grp., a division of NBCUniversal Media, LLC*, 864 F.3d 236, 247 (2d Cir. 2017) (where the substantial truth of a statement depends on material outside the complaint, "the outside material may be presented by the defendant at summary judgment so the court may determine whether a legitimate question exists as to its truth or falsity.").

In light of this ruling, the Court reserves, too, for summary judgment the question whether the headline is protected by the fair index privilege.

### g.      *July 25, 2019 Tweet*

On July 25, 2019, Buhl tweeted that "http://teribuhl.com has suffered a DDOS attack. It's down until I can move it to a private server.  This is on the heels of Honig and Defrancesco's attorney Harvey Kesner suing me 4 reporting on him.  Donations for web hosting are needed. Paypal donation is teribuhl@gmail.com[.]"  Kesner argues that this statement implied that Kesner "unethically retaliated against Buhl."  Am. Compl. ¶ 25.  He does not, however, challenge the accuracy of any of factual information contained in Buhl's tweet.

49

A reader of Buhl's tweet might indeed conclude that there was cause and effect: that Kesner's lawsuit in some fashion prompted an attack, by persons unknown, on Buhl's website. A reader might further speculate that Kesner was personally responsible for the website attack—as Buhl acknowledges.  However, as Buhl notes, the truthfulness of the statements in her tweet are undisputed:  She had experienced, back-to-back, a lawsuit and a DDoS attack.  And, she notes, nothing in her tweet assigned responsibility to Kesner for the attack.  Her tweet instead linked the events by explaining that both underscore her need for donations for web hosting.

The Court holds with Buhl.  The tweet did not expressly defame Kesner, and Kesner does not so argue.  Any defamation claim he might have would be for implied defamation.  Whether the author intended or endorsed the defamatory implication, however, must be found within "the language of the communication as a whole."  *Stepanov*, 120 A.D.3d at 37.  And Buhl's sparse tweet did not suggest her endorsement of the thesis that Kesner was behind the attack on her website.  On its face, the tweet instead linked these events on the different ground that the Buhl's dual misfortunes had prompted her to solicit donations.  And Buhl's tweet did not imply that she possessed any undisclosed information suggesting culpability on Kesner's part for the web attack.  Kesner therefore fails to state a claim for defamation by implication as to the July 25, 2019 tweet.

> h.     *August 20, 2019 Article and the August 20 and 21, 2019 Tweets*

Finally, Kesner challenges the headline of the August 20, 2019 article, "SEC looking at New Names in Barry Honig Pump and Dump Scheme," and Buhl's statement in that article that "Kesner has made statements in other court filings and in press reports that he does not think he is under SEC investigation.  The new court filing could show otherwise."

Buhl's statement that a "new court filing could show" that Kesner is under SEC investigation is clearly not actionable.  The paragraph in which Buhl makes this claim discusses,

and links to, a motion to compel filed by the SEC.  The SEC's motion "demand[s] . . . documents that relate to Harvey Kesner, Honig's long time SEC transaction lawyer, and others who invested in the company or are suspected of promoting the company."  Kesner does not dispute that such a motion to compel had been filed or that it sought information about three attorneys from his former firm, although he does argue that he was never personally counsel to the entity against whom the motion was filed: MGT Capital.[12]  *See* Am. Compl. ¶ 14.  This filing by the SEC supplied an obvious factual basis on which a reporter could speculate, as Buhl did, that Kesner's conduct was under review, that he was among the subjects of an ongoing SEC inquiry, and that he could be the subject of future SEC charges.  Buhl's citation to the SEC's filing was protected by the fair report privilege.  And her qualified forecast—that a future filing "could" show that Kesner was under SEC investigation—was a protected statement of pure opinion, and hardly a bold one given the SEC's filing.  Critically, her tweet did not suggest that, in opining that a new filing might confirm that Kesner was under investigation, she was relying on undisclosed facts. In these respects, this case differs from ones in which a factually baseless claim, or a claim that implied an undisclosed factual basis, that a person was under investigation was held actionable. *See BDCM Fund Adviser, LLC v. Zenni*, 103 A.D.3d 475, 478 (1st Dep't 2013) (sustaining defamation claim where defendants told "potential investors that plaintiffs were being investigated by the SEC for insider trading").  *But see Stephan v. Cawley*, 890 N.Y.S.2d 371 (Sup. Ct. 2009) ("[G]iven the high level of proof required to maintain an action for slander *per se*, a statement that there is an [SEC] investigation does not automatically imply guilt.").

---

[12] The Court takes notice of the fact of the motion to compel, *SEC v. Honig et al.*, No. 18 Civ. 8175 (ER), Dkt. 158 (S.D.N.Y. filed Sept. 7, 2018), not for the truth of the allegations therein, but as evidence that the SEC was in fact pursuing such relief in the matter at hand.

The headline, which did not name Kesner, is not independently actionable.  *See Triano*, 2010 WL 3932334, at *4.  And insofar as the article's body is not actionable, it is not so, either. Finally, Buhl's immediately following tweets—of August 20, 2019 and August 21, 2019—which linked to the article—are similarly not actionable.  None added consequential content to the August 20 article, or implied any additional factual basis, beyond the SEC's motion to compel, to infer that Kesner might be under investigation.  *See* Aug. 20, 2019 Tweet ("SEC is trying to force $MGT CEO to turn over possible evidence on attorney Harvey Kesner's role in Honig P&D scheme along with Hudson Bay partners, Iroquois Capital Richard Abbe and stock promoter Drew Ciccarelli[.]"); Aug. 21, 2019 Tweet ("@SichenziaRoss past & current lawyers the SEC is seeking info on in the Barry Honig P&D case: Tara Guarneri-Ferrara, Avital Even-Shoshan, Arthur Marcus, Jay Kaplowitz, and Honig's main lawyer Harvey Kesner[.]").

***

In summary, the Court sustains Kesner defamation claim as to three discrete statements by Buhl that accuse Kesner of involvement in wrongdoing, *i.e.*, the statements identified above within the October 31, 2018 article, the March 27, 2019 tweet, and the June 7, 2019 article, but dismisses Kesner's defamation claim as to all other statements, including all the statements within the August 29, 2018 article, the March 26, 2019 article, the April 11, 2019 article, the May 14, 2019 article, the July 25, 2019 tweet, the August 20, 2019 article, the August 20, 2019 tweet, and the August 21, 2019 tweet.

### C.     Non-Defamation Claims

The Amended Complaint also brings non-defamation and civil conspiracy claims against all defendants.

### 1. Commercial Disparagement, Deceptive and Unfair Trade Practices, and Tortious Interference Claims[13]

The Court first considers Kesner's claims for commercial disparagement, deceptive and unfair trade practices, and tortious interference with contract.  Am. Compl. ¶¶ 65–80.

Defamation is a unique tort in that, "unlike most torts, defamation is defined in terms of the injury, damage to reputation, and not in terms of the manner in which the injury is accomplished." *Morrison v. Nat'l Broad. Co.*, 19 N.Y.2d 453, 458 (1967).  Accordingly, under New York law, claims "sounding in tort" are construed as "defamation claims, not only where those causes of action seek damages only for injury to reputation, but also where the entire injury complained of by plaintiff flows from the effect on his reputation." *Jain v. Sec. Indus. & Fin. Mkts. Ass'n*, No. 08 Civ. 6463 (DAB), 2009 WL 3166684, at *9 (S.D.N.Y. Sept. 28, 2009) (citations and quotations omitted) (alterations omitted).  This is so even where a "generalized harm to professional reputation" results in economic loss.  *Lesene v. Brimecome*, 918 F. Supp. 2d 221, 225–26 (S.D.N.Y. 2013) (collecting cases where claims brought "under the guise of other causes of action actually sound in defamation," even where the complaint alleges economic harm).

---

[13] The Court need not conduct a choice-of-law analysis as to these claims because New York and Florida law both yield the same result: that these claims must give way to the defamation claim. *See Miller v. Gizmodo Media Grp., LLC*, No. 18 Civ. 24227, 2019 WL 1790248, at *10–11 & 11 n.6 (S.D. Fla. Apr. 24, 2019), *reconsideration denied*, 2019 WL 5864176 (S.D. Fla. June 5, 2019) (finding that Florida's "single-action rule" and New York's rule about duplicative torts sounding in defamation produce the same result).  Florida's single-action rule provides that "a single publication gives rise to a single cause of action," and prevents "plaintiffs from circumventing a valid defense to defamation by recasting essentially the same facts into several causes of action all meant to compensate for the same harm."  *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1256 (S.D. Fla. 2014) (citations and quotations omitted), *aff'd* (Feb. 17, 2015).  Under New York law, even where the defamation claims survive, if the plaintiff fails to plead any facts or injuries independent from those that make up the defamation claim, a claim may be dismissed as duplicative. *See id.* at 1257.

Here, Kesner's claims for commercial disparagement, deceptive and unfair trade practices, and tortious interference are based on exactly the same statements as his claims for defamation.  And Kesner's claimed damages on these claims ($20 million) are exactly the same as on his defamation claims.  Kesner's non-defamation claims therefore must all be dismissed. *See O'Brien v. Alexander*, 898 F. Supp. 162, 172 (S.D.N.Y. 1995) (dismissing injurious falsehood, negligence, and general tort claims that were "duplicative" of failed defamation claims because they were based on the same statements and injuries, even where the additional claims did not expressly reference reputational harm), *aff'd*, 101 F.3d 1479 (2d Cir. 1996); *see also Jain*, 2009 WL 3166684, at *9 (dismissing non-defamation claims where the "gravamen of Plaintiff's alleged injury in each of the non-defamation counts [wa]s either harm to her reputation or harm that flow[ed] from the alleged effect on Plaintiff's reputation," such as loss of income due to termination).  To be sure, the Amended Complaint "takes care not to state that the damages" for commercial disparagement and deceptive and unfair trade practices "are the result of injury to [Kesner's] reputation."  *O'Brien*, 898 F. Supp. 2d at 172.  But for each of Kesner's non-defamation claims, the claimed injury results from the reputational damage allegedly caused by defendants' statements.  *See* Am. Compl. ¶¶ 70 ("loss of income and clients"), 72–75 (unspecified losses as a result of defendants' "publication, republication and widespread dissemination of falsehoods"), 80 ("injury to his business, loss of clients, damage to his reputation, prestige and standing").

As to the claims against Dow Jones and Alpert, because each of Kesner's non-defamation claims duplicates his failed defamation claims, the non-defamation claims must be dismissed as a matter of law.  To hold otherwise would, as Dow Jones rightly notes, enable Kesner to plead around constitutional and statutory defamation defenses by rebranding his deficient defamation

claims as other torts.  And the non-defamation claims against Buhl must also be dismissed, notwithstanding that a small subset of Kesner's defamation claims have survived her motion to dismiss.  That is because the "entire injury pleaded in relation to" the non-defamation claims arises out of Buhl's allegedly defamatory statements.  *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 726 (S.D.N.Y. 2014) (upholding defamation claims but dismissing duplicative tort claims); *see also, e.g.*, *Travelex*, 2019 WL 1259102, at *7 (same); *Wexler v. Allegion (UK) Ltd.*, No. 16 Civ. 2252 (ER), 2018 WL 1626346, at *8–10 (S.D.N.Y. Mar. 30, 2018) (same); *Miller*, 2019 WL 1790248, at *11 (applying New York and Florida law and, while upholding defamation claims, dismissing counts for related torts that were "intended to compensate for the same alleged harm as a defamation claim" (citations and quotations omitted)).

Kesner contends loosely that his additional claims are not barred because the Amended Complaint alleges "more than simply dissemination of false statements."  Opp'n to Dow Jones Mem. at 15.  But Kesner does not elaborate on what these additional facts are.  And a review of the Amended Complaint reveals no non-conclusory factual allegations to support any of the non-defamation claims that are independent of the defamation claims.  Because "the only plausible reading of the Amended Complaint is that [Kesner] lost his industry connections and future economic opportunities because Defendants' actions injured his reputation and credibility," *Wexler*, 2018 WL 1626346, at *8, the follow-on claims for commercial disparagement, deceptive and unfair trade practices, and tortious interference must be dismissed.

### 2.    Conspiracy Claims

Finally, Kesner brings a claim for common law conspiracy against all three defendants. Am. Compl. ¶¶ 81–85.  The Amended Complaint alleges that the defendants conspired to defame

Kesner with the intent to "destroy[] his business and employment as a securities attorney." *Id.* ¶ 82.

Under New York law, "[t]here is no substantive tort of conspiracy." *Goldstein v. Siegel*, 19 A.D.2d 489, 493 (1st Dep't 1963). Rather, "allegations of civil conspiracy are permitted to connect the actions of separate defendants with an otherwise actionable tort." *Cohen Bros*, 181 A.D.3d at 404 (citations and quotations omitted). In addition to pleading the primary tort, a plaintiff alleging civil conspiracy must also plead the following four elements: (1) "an agreement between two or more parties"; (2) "an overt act in furtherance of the agreement"; (3) "the parties' intentional participation in the furtherance of a plan or purpose"; and (4) "resulting damage or injury." *Id.*; *see Pasqualini*, 498 F. Supp. 2d at 673 (applying New York test for civil conspiracy to conspiracy to commit defamation).

Even drawing all reasonable inferences in favor of Kesner as the non-moving party, the Amended Complaint falls far short of stating a claim for civil conspiracy to defame him against Dow Jones, Alpert, or Buhl. It alleges that the defendants conspired to defame Kesner for the purposes of selling their own publications and to "increase[e] their own reputations in the nebulous world of short sellers and pump-and-dump artists with whom they . . . are engaged in the manipulation of stocks for financial gain." Am. Compl. ¶ 3. In this vein, it alleges that Alpert and Buhl are "paid stock promotors" who short stock, use their publications to release false information to cause the stock price to fall, and then profit from the price decrease. *See id.* ¶ 16. It terms this scheme a "short and distort" attack. *Id.* Kesner alleges that the defendants and other unnamed "third parties" and "benefactors" then bring "stock-drop" lawsuits to further devalue the stock. *Id.* ¶¶ 16–18; *see id.* ¶ 34 (alleging that the defendants were "paid to create negative pieces on specific companies for compensation" in furtherance of stock manipulation).

The Amended Complaint, however, is utterly barren of any well-pled facts to support a claim that any defendant here engaged in any such "short and distort" attacks. The only non-conclusory allegation connecting any defendant to "short and distort" schemes is a citation to a single article from the *TheBlot Magazine*, which accuses Alpert and another *Barron's* writer of involvement in such schemes. *See id.* ¶ 18 n.3. The article, however, does not mention Buhl at all. It thus does not support a claim that she was party to such a conspiracy. And as to Alpert, the Amended Complaint alleges that, at all relevant times, he was acting within the scope of his duties. *See* Am. Compl. ¶ 40. He therefore cannot "conspire" with his employers, Dow Jones or *Barron's*. *See, e.g.*, *Davidson v. Yeshiva Univ.*, 555 F. Supp. 75, 79–80 (S.D.N.Y. 1982) (under New York law, an employee cannot conspire with his employer where he acted within the scope of his employment); *Merkel Assocs., Inc. v. Bellofram Corp.*, 437 F. Supp. 612, 618 (W.D.N.Y. 1977) (same).

The Amended Complaint's only remaining allegations bearing on its conspiracy claim allege only that Alpert and Buhl engaged in parallel activity, in that each wrote about the SEC investigation and about Kesner's role as counsel, and that each cited the other's reporting. *See* Am. Compl. ¶¶ 3 n.1 (quoting excerpt of another of Alpert's articles that references Buhl's coverage of defendants other than Kesner in the SEC investigation), 24 (alleging that Buhl republished Alpert's article by linking to it in one of her own), 29 (alleging that Alpert and *Barron's* adopted Buhl's theories and reasoning). The Amended Complaint alleges, on this basis, that Alpert and Buhl acted "in concert" in doing so. *Id.* ¶ 24; *see id.* ¶ 34; *id.* ¶ 29 (alleging that Alpert and *Barron's* "adopted" Buhl as their "sole source" and "repeated[ed] her themes and theories"). But such parallel activity alone does not support a claim of civil conspiracy because the competing inference, that the reporters acted separately in investigating and pursuing claims

of wrongdoing by Kesner, is at least equally plausible to Kesner's conclusory thesis that Alpert and Buhl agreed together to defame him. That reporters on separate platforms published allegedly "defamatory articles at the same time is not enough to state concerted action." *Friends of Falun Gong v. Pac. Cultural Enter., Inc.*, 288 F. Supp. 2d 273, 279 (E.D.N.Y. 2003), *aff'd sub nom. Friends of Gong v. Pac. Culture*, 109 F. App'x 442 (2d Cir. 2004) (summary order). And Kesner's Amended Complaint does not allege any facts from which a court could reasonably infer an agreement between Buhl and Dow Jones or Alpert. Reporters—including competitors on a beat—routinely draw upon one other's publicly available reporting without reaching any agreement with the other. The Amended Complaint does not come close to pleading "'enough factual matter (taken as true) to suggest that an agreement was made,' *i.e.*, . . . 'provide some factual context suggesting [that the parties reached an] agreement,' not facts that would be 'merely consistent' with an agreement." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 556).

Kesner's allegations stand in sharp contrast to those in *Carroll v. TheStreet.com, Inc.*, No. 11 Civ. 81173, 2014 WL 5474061 (S.D. Fla. July 10, 2014), on which he relies. In *Carroll*, the plaintiff pled that the employees of the defendants had a "long standing, established relationship, whereby" one employee served as "a source for insider financial information" for the other, and that the two employees had "collaborated closely . . . on the publication of the [allegedly defamatory] Article." *Id.* at *16. No such facts are pled here. The Amended Complaint does not plead that Alpert and Buhl ever met, spoke, or communicated.

Accordingly, the Amended Complaint does not sufficiently allege, as a matter of law, a claim for civil conspiracy against any defendant. *See Idema*, 120 F. Supp. 2d at 370 (dismissing conspiracy-to-defame claims where conspiracy claim alleges "nothing more than defamation").

**CONCLUSION**

For the foregoing reasons, the Court (1) grants in its entirety the motion to dismiss by Dow Jones and Alpert; (2) grants in its entirety Buhl's motion to dismiss all claims against her other than for defamation; and (3) grants in part and denies in part Buhl's motion to dismiss the defamation claim against her.  The case will now proceed promptly to discovery on the surviving aspects of that claim.  An order will issue shortly directing counsel for Kesner and Buhl to submit a case management and setting out parameters for that plan.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 43 and 104 and to terminate Dow Jones and Alpert as defendants in this case.


SO ORDERED.

*Paul A. Engelmayer*
_____
Paul A. Engelmayer
United States District Judge


Dated: January 26, 2021
       New York, New York

59