UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| HARVEY J. KESNER,<br><br>               *Plaintiff*,<br><br>   -v-<br><br>TERI BUHL,<br><br>               *Defendant*. | No.: 20-cv-03454 (PAE) |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PAUL LAW GROUP, LLP

Wesley J. Paul, Esq.
Everest R. Schmidt, Esq.
902 Broadway, Floor 6
New York, New York 10010
(646) 278-9955
*Attorneys for Defendant Teri Buhl*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ……………………………………………..…………..  i

PRELIMINARY STATEMENT …………………………………………….....…… 1

STATEMENT OF FACTS …………………………………………………………1

STANDARD OF REVIEW …………………………………………….…………5

ARGUMENT …………………………………………….……………………..… 6

I.   KESNER'S DEFAMATION CLAIM FAILS AS A MATTER OF LAW
     BECAUSE HE CANNOT PROVIDE CLEAR AND CONVINCING
     EVIDENCE OF ACTUAL MALICE …………………………………………..…8

     A.  Kesner Has Not Provided Clear and Convincing Evidence Necessary for a
         Reasonable Jury to Find that Buhl Acted with Actual Malice Based
         on the Allegations in Kesner's Amended Complaint ………………………..…… 10

     B.  The Record Clearly Supports Buhl's Belief in the Truth of Her Reporting ……..... 15

         1.  Foundational Basis, In General …………………………………………….....15

         2.  The Publications Themselves Do Not Evidence any Actual Malice. ………….17

             a.  October 31 Article ………………………………………………….…17

             b.  March 26 Article and March 27 Tweet …………………………..……… 19

             c.  The June 7 Article ………………………………………………….……21

II.  BUHL'S TWEET AND OTHER STATEMENTS ARE NON-ACTIONABLE ……....24
     OPINION

     A.  Buhl's Tweet is a Protected Opinion that Was Based on the Article
         Published the Day Before ………………………………………………………… 25

     B.  Statement in the June 7 Article is Protected Opinion ………………………..…… 29

CONCLUSION …………………………………………………………......……..29

**TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*Adelson v. Harris*,
    973 F. Supp. 2d 467 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017). …….…..22-23, 26

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 249-50 (1986). ………………………………………………….…..5, 9-10

*Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*,
    151 F. Supp. 3d 287 (E.D.N.Y. 2015), *aff'd*, 670 F. App'x 731 (2d Cir. 2016). …… 19, 25

*Biro v. Conde Nast*,
    883 F. Supp. 2d 441 (S.D.N.Y. 2012). …………………………………....…… 24-25, 29

*Bose Corp. v. Consumers Union of United States, Inc.*,
    692 F.2d 189 (1st Cir. 1982). …………………………………………………..9

*Bose Corp. v. Consumers Union of United States, Inc.*,
    466 U.S. 485 (1984). …………………………………………………….. 7

*Boyd v. Nationwide Mut. Ins. Co.*,
    208 F.3d 406 (2d Cir. 2000). ………………………………………….……13

*Brahms v. Carver*,
    33 F. Supp.3d 192 (E.D.N.Y. 2014). ………………………………..…….25-26

*BYD Co. Ltd. v. VICE Media LLC*,
    No. 20-CV-3281 (AJN), 2021 WL 1225918 (S.D.N.Y. Mar. 31, 2021). ……...…… 10

*Caldarola v. Calabrese*,
    298 F.3d 156, 160 (2d Cir. 2002). ………………………………..……………….5

*Celle v. Filipino Reporter Enters., Inc.*,
    209 F.3d 163 (2d Cir. 2000). ……………………………………………….*passim*

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 323 (1986). ……………………………………………….. 5-6, 10

*Chandok v. Klessing*,
    632 F.3d 803 (2d Cir. 2011). ………………………………………….…….. 6

*Coleman v. Grand*,
   No. 18-cv-5663 (ENV) (RLM), 2021 WL 768167 (E.D.N.Y. Feb. 26, 2021). ……. *passim*

*Colorado v. New Mexico*,
   467 U.S. 310 (1984). ………………………………………………………………...9

*Cummings v. City of New York*,
   No. 19-CV-7723 (CM)(OTW), 2020 WL 882335 (S.D.N.Y. Feb. 24, 2020). ……...… 26

*Fisher v. Biozone Pharms., Inc.*,
   No. 12-CV-03716-LB, 2017 WL 1097198 (N.D. Cal. Mar. 23, 2017). …………...….. 12

*Freeman v. Johnston*,
   84 N.Y.2d 52 (N.Y. 1994). ………………………………………………..…….. 8, 10, 24

*Ganske v. Mensch*,
   480 F.Supp.3d 542 (S.D.N.Y. 2020). ……………………………………………… 19, 25

*Good Government Group of Seal Beach, Inc. v. Sup. Court*,
   22 Cal.3d 672 (1978). ……………………………………………..…. 9, 19, 20

*Gunduz v. New York Post Co., Inc.*,
   188 A.D. 2d 294 (1st Dep't 1992). ……………………………………..… 21

*Harte-Hanks Comm., Inc. v. Connaughton*,
   491 U.S. 657 (1989). …………………………………………………….11, 13-14, 24

*Hoesten v. Best*,
   34 A.D.3d 143 (1st Dep't 2006). ……………………………………………… 7, 9

*Immuno AG. v. J. Moor-Jankowski*,
   77 N.Y.2d 235 (N.Y. 1991). ……………………………………………..…… 8, 24

*Jewell v. N.Y. Post*,
   23 F.Supp.2d 348 (S.D.N.Y. 1998). …………………………………...……… 24

*Kahl v. Bureau of Nat. Affairs, Inc.*,
   856 F.3d 106 (D.C.C. 2017). ……………………………………………...8

*Levin v. McPhee*,
   119 F.3d 189 (2d Cir. 1997). …………………………………………..… 18, 22, 25

*Liberman v. Gelstein*,
   80 N.Y.2d 429 (N.Y. 1992). ……………………………………………..…. 18, 20

*Martin v. Daily News LP*,
121 A.D.3d 90 (1st Dep't 2014). ……………………………………………………..8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986). ……………………………………………………………......5

*Michel v. NYP Holdings, Inc.*,
816 F.3d 686 (11th Cir. 2016). …………………………………………….…….. 12

*Mirage Entertainment, Inc. v. FEG Entretenimientos Sa*,
326 F. Supp. 3d 26 (S.D.N.Y. 2018). …………………………………………26, 28

*New York Times Co. v. Sullivan*,
376 U.S. 254  (1964). ……………………………………………………………..8-9, 20

*Nicosia v. De Rooy*,
72 F. Supp. 2d 1093 (N.D. Cal. 1999). …………………………………………28

*Palin v. New York Times Co.*,
482 F. Supp.3d. 208 (S.D.N.Y. 2020). ……………………………………....…9, 13, 20

*Palin v. New York Times Co.*,
510 F. Supp. 3d 21 (S.D.N.Y. 2020). ……………………………….……………...7

*Parsi v. Daioleslam*,
890 F.Supp.2d 77 (D.D.C. 2012). ……………………………………………….14

*Rapaport v. Barstool Sports, Inc.*,
No. 18 CIV. 8783 (NRB), 2021 WL 1178240 (S.D.N.Y. Mar. 29, 2021). …………25-26, 29

*Salahuddin v. Goord*,
467 F. 3d 263, 272-73 (2d Cir. 2006). …………………………………………….……5, 10

*Sprewell v. NYP Holdings, Inc.*,
841 N.Y.S.2d 7 (1st Dep't 2007). ………………………………………………11-12

*St. Amant v. Thompson*,
390 U.S. 727 (1968). ……………………………………………………….. 11, 23

*Steinhilber v. Alphonse*,
68 N.Y.2d 283 (1986). …………………………………………………….…..24-25

*Travelex Currency Servs., Inc. v. Puente Enterprises, Inc.*,
No. 18 CIV. 1736 (ER), 2019 WL 1259102 (S.D.N.Y. Mar. 19, 2019). …………..……18

*Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*,
603 F. Supp. 2d 584 (S.D.N.Y. 2009). ……………………………………..…..………..21

*Triano v. Gannett Satellite Info. Network, Inc.*,
No. 09–cv–2497, 2010 WL 3932334 (S.D.N.Y. Sept.29, 2010). ………………………21

*Trump v. O'Brien*,
422 N.J. Super. 540 (App. Div. 2011). …………………………………………………12

*U.S. v. Alvarez*,
567 U.S. 709 (2012). ……………………………………………………………………13

*Weinstock v. Columbia University*,
224 F.3d 33 (2d. Cir. 2000). …………………………………………………….………10

*Yiamouyiannis v. Consumers U. of United States*,
619 F. 2d 932 (2d Cir. 1980). …………………………………………………...……..9

## **Statutes**

N.Y. Civ. Rights Law § 76-a. ………………………………………………….………6-7, 15

## **Rules**

Fed. R. Civ. P. 56(a). …………………………………………………………………..5

17 CFR § 240.13d-102. ……………………………………………………………...…27

## **Other Authority**

Marc A. Franklin & Daniel J. Bussel, *The Plaintiff's Burden in Defamation:
Awareness and Falsity*, 25 WM. & MARY L. REV. 825, 836-37 (1984), *available at*
https://scholarship.law.wm.edu/cgi/viewcontent.cgi?article=2220&context=wmlr. …….. 20

## PRELIMINARY STATEMENT

Plaintiff Harvey Kesner brought action against Defendants Dow Jones & Company, Bill Alpert and Teri Buhl alleging defamation and other counts relating to the publication of one article (in the case of Dow Jones & Company and Alpert) and, in the case of Buhl, the publication of seven articles and four posted Twitter tweets. Following briefing of motions to dismiss filed by the Defendants and oral argument, the Court dismissed all counts against Dow Jones & Company and Alpert. Three statements published by Buhl survived the motion to dismiss.

In accordance with the Civil Case Management Plan and Scheduling Order (Dkt. 119) and the Court's Individual Rules and Practices governing the requirement of a pre-motion conference prior to the filing of a motion for summary judgment, a pre-motion conference was held on July 19, 2021, and the Court set a schedule for Buhl's motion for summary judgment.

## STATEMENT OF FACTS

Teri Buhl is a recognized and long-standing investigative journalist who focuses her reporting on wrong doing in the financial and securities industry.  Def. 56.1 Statement, at ¶ 4; Affidavit of Teri Buhl ("Buhl Aff."), at ¶¶ 1-6. She currently works as a freelance reporter for Cannabis Law Report, while also publishing numerous articles on her website teribuhl.com, which she has done since 2010. Buhl Aff., at ¶¶ 3,7.

Buhl began reporting on investor Barry Honig, and his associates, in 2016, when she initially learned of alleged fraudulent activity related to BioZone Laboratories, a private company that turned public through a reverse merger in 2011. *Id.* at ¶ 9-12.  During that time, and since, Buhl has tracked this group of investors, which she labels in many of her articles as

1

"Team Honig," including the group's attorneys, stockbrokers, and privately owned companies (which in turn make security investments), among others. *Id.* at ¶¶ 12.

In the course of her reporting on BioZone in 2016, Buhl began investigating and reporting on Kesner as well. *Id.* at ¶ 12. The public record at the time was replete with evidence that Kesner had a long history of association with Honig, and his many associates. *Id.* at ¶16,17. Including being counsel to these persons individually, Kesner also concurrently represented public companies these individuals invested in. *Id.* at ¶ 17.  Since 2016, Buhl has continued her reporting on Honig, certain of his business partners, and their investments in public companies, and the voluminous litigation that often follows after such investments.  *Id.* at ¶ 13, 15, 20, 32. Buhl  also occasionally provides her readers with her personal commentary/opinions on various issues, both in her articles, and her Twitter account.  *Id.* at ¶¶ 8.

The breaking point really came in 2018, when the SEC brought a five-count civil complaint against Honig and his business associates. *Id.* at ¶ 16.  Although Kesner goes unnamed as a defendant in the SEC complaint, the SEC refers to him as "Issuer's Counsel Partner," and alleges that Honig forced Company A (BioZone Laboratories), Company B (Mabvax Therapeutics), and Company C (MGT Capital) to retain Kesner or his law firm as securities counsel after Honig invested.  *Id.* at ¶ 16.  Kesner does not deny he is the Issuer's Counsel Partner so referenced, and even if he tried, those allegations are supported by collaborating evidence on the record. *Id.* at ¶ 18; Declaration of Wesley J. Paul ("WJP Decl."), at ¶¶ 9, Ex. B.

The SEC complaint included serious violations of the securities laws, and had a ripple effect, spawning related litigation that is still pending before the courts. Def. 56.1 Statement, at ¶¶ 24-26.  One of these cases was filed by Mabvax. The first was a malpractice action against

Kesner and his firm at the time Sichenzia Ross Ference, LLP. This case was settled in September 22, 2020 and voluntarily dismissed with prejudiced..

The second was filed in California Superior court against Honig and various other business associates of Honig. This case is still pending. Def. 56.1 Statement, at ¶ 26.

The SEC complaint also generated numerous news articles, not only from Buhl, but also reporters Bill Alpert and Chris Carey. Def. 56.1 Statement ,at ¶ 28.  Bill Alpert, who was a party defendant in this case before his dismissal, published the article title *The Lawyer at the Center of SEC Pump-and-Dump Case*, which detailed Kesner's representation of these companies and the numerous litigation that has surrounded his former clients.

Under this background, which was known to Buhl at the time, she published the first article that is relevant here. On October 31, 2018, Buhl published an article on her website titled *Honig deals lead to FINRA Investigation of Laidlaw & Co*. Def. 56.1 Statement, at ¶ 27. The bulk of this article concerns the broker-dealer Laidlaw & Company, which as Buhl reports, was allegedly under investigation by FINRA which was "examining the role of top Laidlaw executives in stock manipulation." Buhl Aff., at ¶¶ 21-29.[1]  The article reports that some of the stock offerings under investigation "were securities sold by Laidlaw brokers at the behest of known microcap investor Barry Honig" and that the SEC recently brought "an enforcement action against Honig and his associates (Team Honig) for orchestrating pump and dump schemes as a group of undisclosed affiliates." *Id.*

For the statement concerning the "alleged bad actors," Buhl relied on her previous reporting over the years on Kesner's activities, the allegations in the SEC's complaint, and what

---

[1] On July 15, 2021, FINRA entered into a Letter of Acceptance, Waiver, and Consent (No. 2016049087201) (the "AWC") with Laidlaw and its COO whereby Laidlaw agreed, among other things, to be fined $1.5 million and the COO agreed to a fine and two-month suspension. FINRA noted in the AWC that, "Laidlaw also failed to detect red flags of potential market manipulation." Buhl Aff., at ¶ 20, Ex. G.

other reporters have written on Team Honig's activities. Def. 56.1 Statement, at ¶ 28.  Buhl has

done significant research into Kesner's activities as they relate to Team Honig, including gaining

information from public records, confidential informants, and litigation filings that relate to

Kesner. Buhl Aff., at ¶¶ 17, 21-29, 35, 37, 50-54.

Then, on March 8, 2019, the SEC filed its amended complaint. Def. 56.1 Statement, at ¶

13; Buhl Affidavit at ¶ 17, Ex. E.  On March 26, 2019, Buhl published an article titled *Honig's*

*Puppet CEO Elliot Maza settles with the SEC*. Def. 56.1 at ¶ 29. The following day, on her

Twitter handle @buhlreports, Buhl published her opinion of that March 26 Article, which

included a link, and wrote "The illegal back room deals Honig and Kesner did with Biozone

(Company A in SEC lawsuit) was egregious, and the SEC sat back and let it happen." *Id.* at ¶¶

31, 32.  For Buhl's research of the March 26 Article, and corresponding tweet, Buhl used the

SEC's amended complaint and the recent settlement of BioZone's former CEO Elliot Maza.  She

also relied upon her research from her 2016 and 2017 articles related to BioZone and the *Fisher*

*v. BioZone* lawsuit, including, Pederson's public letters and the fact that Fisher filed

whistleblower complaints with the SEC and the DOJ.  She notes that these whistleblower

complaints were withdrawn by Fisher after a district court judge ordered him to do so.

Lastly, on June 2, 2019, Buhl published an article titled *New Emails show attorney*

*Harvey Kesner aided Defrancesco in Questionable Cannabis stock Deal*. This article was

essentially a copy of her article published the same day in *Cannabis Law Report* and included

links to the original reporting numerous times throughout the article. The premise of the

*Cannabis Law Report* article, and the June 2 article, centers on emails Buhl received from a

confidential source showing a back-and-forth email exchange between Kesner and an unnamed

broker-dealer.  She then speculates that these emails "could show how the insiders skirt beneficial ownership disclosure rules."

## STANDARD OF REVIEW

Ms. Buhl's motion for summary judgment should be granted because "there is no genuine dispute as to any material fact" and she is "entitled to judgment as a matter of law," i.e., the "record taken as a whole could not lead a rational trier of fact to find for the [Plaintiff]." *See* Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Initially, as the moving party, Buhl has the "responsibility of informing the district court of the basis for [her] motion," and identifying which materials she "believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where, as here, the Plaintiff bears the ultimate burden of proof at trial, Buhl may also meet her initial summary judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support the [Plaintiff's] case."  *See id.* at 325; *Salahuddin v. Goord*, 467 F. 3d 263, 272-73 (2d Cir. 2006) (same).

Once Ms. Buhl meets this initial showing, the burden shifts to the Plaintiff, where he "'must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87) (emphasis in original).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (internal citations omitted).

Summary judgment will be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-23; *Chandok v. Klessing*, 632 F.3d 803, 812 (2d Cir. 2011) ("Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to the other elements become immaterial and cannot defeat a motion for summary judgment.").

## ARGUMENT

Kesner's remaining claim for defamation is premised on three items: the October 31 Article; the March 27 Tweet; and the June 7 Article (collectively the "Buhl Statements").  Op. and Order, Dkt. 114, filed Jan. 26, 2021; Def. 56.1 Statement, at ¶¶ 28, 32, 35.  Kesner's claim of defamation fails as a matter of law.  To recover for defamation in this action, Kesner must prove the following elements: (1) a defamatory statement of fact of and concerning Kesner; (2) falsity of the defamatory statement; (3) publication to a third party without privilege; (4) actual malice; and (5) special damages or per se actionability.  *See Coleman v. Grand*, No. 18-cv-5663 (ENV) (RLM), 2021 WL 768167, at *4 (E.D.N.Y. Feb. 22, 2021) (citing *Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 176 (2d Cir. 2000)); N.Y. Civ. Rights Law § 76-a ("Section 76-a") (raising fault standard to actual malice).  The burden of proving each of these elements at trial falls entirely on the Plaintiff.  *Id.*  The failure to provide adequate evidence for any element of defamation means that Kesner's claim of defamation fails as a matter of law. *See Celotex Corp.*, 477 U.S. at 322-23.  In particular, Kesner has failed to provide <u>any</u> probative evidence for the element of actual malice.  Therefore, as the record demonstrates, there is no triable issue for a jury to decide, and summary judgment is warranted. *See id.*

Notably, in November 2020 (following briefing and oral arguments on the earlier motions to dismissed filed by the Defendants), New York expanded its anti-SLAPP law to apply to cases arising from the exercise of free speech.  *See* Section 76-a(1)(a).  The law now applies to claims arising from "lawful conduct in the furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest."  *Id.*; *Coleman*, 2021 WL 768167, at *13 (social media sites qualify as a "public forum" under § 76-a(1)(a)).  There cannot be any genuine dispute that Buhl's articles and tweet are of "public concern," a term that "shall be construed broadly, and shall mean any subject other than a purely private matter."  Section 76-a(1)(d).  Also, the anti-SLAPP law clearly applies to Kesner's defamation claim, a point which Plaintiff's counsel conceded during the pre-motion conference. WJP Decl. at ¶ 15, Ex. K, at p.14.

Because the anti-SLAPP law applies to this libel action, Kesner must establish "by clear and convincing evidence" that Buhl acted with "actual malice," i.e., she published the statement "with knowledge of its falsity or with reckless disregard of whether it was false."  Section 76-a(2); *Coleman*, 2021 WL 768167, at *8 (actual malice standard applies even if plaintiff is private individual); *Palin v. New York Times Co.*, 510 F. Supp. 3d 21 (S.D.N.Y. 2020) (Section 76-a has retroactive effect).  Consequently, even assuming, *arguendo*, that Buhl's statements are provably false, Kesner still cannot recover for defamation unless he establishes with clear and convincing evidence that Buhl subjectively knew her statements were false or "entertained serious doubts as to the truth of the publication."  *See, e.g.*, *Celle*, 209 F.3d at 184; *Bose Corp. v. Consumers Union of United States*, 466 U.S. 485, 511 (1984) ("there is a significant difference between proof of actual malice and mere proof of falsity"); *Hoesten v. Best*, 34 A.D.3d 143, 155 (1st Dep't 2006) ("The standard is a subjective one, focusing on the speaker's state of mind and mere proof of falsity will not be sufficient to establish liability." (internal citation omitted)).

On this motion for summary judgment, Buhl first asserts that Kesner cannot meet that high burden to show Buhl's actual malice and has thus failed to establish a necessary element for his claim.  Second, Buhl asserts that certain statements, including the alleged defamatory tweet, are protected opinion and thus those statements are not actionable for defamation as a matter of law.  *See Immuno AG. v. J. Moor-Jankowski*, 77 N.Y.2d 235, 254-55 (N.Y. 1991).  Summary judgment on these issues has "'particular value' in avoiding the 'chilling effect of protracted litigation.'"  *Coleman*, 2021 WL 768167, at *4 (quoting *Immuno AG.*, 77 N.Y.2d at 256); *see also Kahl v. Bureau of Nat. Affairs, Inc.*, 856 F.3d 106, 109 (D.C.C. 2017) (Kavanaugh, J.) ("To preserve First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits.").

## I.   KESNER'S DEFAMATION CLAIM FAILS AS A MATTER OF LAW BECAUSE HE CANNOT PROVIDE CLEAR AND CONVINCING EVIDENCE OF ACTUAL MALICE

The actual malice standard is routinely decided on motions for summary judgment and should be "granted if no reasonable factfinder could find, by clear and convincing evidence, that the defendant acted with actual malice."  *Coleman*, 2021 WL 768167, at *9; *see also Freeman v. Johnston*, 84 N.Y.2d 52, 57 (N.Y. 1994) ("This standard of 'convincing clarity' applies even on a motion for summary judgment."); *Martin v. Daily News LP*, 121 A.D.3d 90, 102 (1st Dep't 2014) (same).  The inherent purpose for such a high evidentiary standard is to protect First Amendment rights and to ensure that "the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive'" even if the defamatory statements contain factual errors.  *See New York Times Co. v. Sullivan*, 376 U.S. 254, 271-72 (1964).

Under New York law, the actual malice standard is comprised of two elements and requires the plaintiff to prove with clear and convincing evidence "actual malice with respect to meaning as well as falsity." *Palin v. New York Times Co.*, 482 F.Supp.3d. 208, 218 (S.D.N.Y. 2020) (adopting the rational found in *Good Government Group of Seal Beach, Inc. v. Sup. Court*, 22 Cal.3d 672, 684 (1978)). Both as to meaning and falsity, the actual malice standard is a subjective standard. *Id.*; *Hoesten*, 34 A.D.3d at 155. Although it is subjective, on a motion for summary judgment, a "'court typically will infer actual malice from objective facts.'" *Celle*, 209 F.3d at 183 (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 692 F.2d 189, 196 (1st Cir. 1982)). These facts may include "the defendant's own actions or statements, the dubious nature of his sources, [and] the inherent improbability of the story." *Id.*

Furthermore, although the court must construe the evidence on the record in the light most favorable to the Plaintiff, the court must nonetheless apply those facts to this demanding evidentiary standard, which requires the evidence on the record be highly and substantially more likely to be true than untrue, i.e., the fact finder must be convinced that the contention is "highly probable." *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (defining clear and convincing standard); *Anderson,* 477 U.S. at 254 ("in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden"); *Yiamouyiannis v. Consumers U. of United States*, 619 F. 2d 932, 940 (2d Cir. 1980) ("the court decides the materiality of the disputed facts by accepting the plaintiff's version and applying the actual malice standard"). Moreover, if Kesner's evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-250 (internal citations omitted).

However, there is no such evidence on the record here, nor is there any kind of probative circumstantial evidence from which a reasonable trier of fact could infer that Buhl knew she was publishing false statements, or even entertained serious doubts as to the truth of her publications. *See Freeman v. Johnston*, 84 N.Y.2d 52, 57 (N.Y. 1994) (granting summary judgment for defendant due to plaintiff's lack of evidence showing "the defendant in fact entertained serious doubts as to the truth of his publication"). For the following reasons, Plaintiff has failed to raise a triable issue for trial and Buhl is entitled to summary judgment as a matter of law.

### A. Kesner Has Not Provided Clear and Convincing Evidence Necessary for a Reasonable Jury to Find that Buhl Acted with Actual Malice Based on the Allegations in Kesner's Amended Complaint

Kesner's allegations of Buhl's actual malice are not by supported by the record, i.e., "there is an absence of evidence to support" his claim, and thus Buhl is entitled to summary judgment as a matter of law. *See Celotex*, 477 U.S. at 325. The Amended Complaint sets out mere conclusory allegations of actual malice because it states legal conclusions without alleging any facts for why those conclusions would be true. Am. Compl. at ¶ 62; *see BYD Co. Ltd. v. VICE Media LLC*, No. 20-CV-3281 (AJN), 2021 WL 1225918, at *7 (S.D.N.Y. Mar. 31, 2021) (dismissing defamation claim because plaintiff "alleges no nonconclusory facts that support the proposition that [defendant] knew that it was reporting falsities").

Now on summary judgment, as the Second Circuit colorfully described, it is time for the Plaintiff to "put up or shut up" and establish with clear and convincing evidence that Buhl published with actual malice. *See Weinstock v. Columbia University*, 224 F.3d 33, 41 (2d. Cir. 2000) ("unsupported allegations do not create a material issue of fact"); *see also Salahuddin*, 467 F. 3d at 273 ("[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment.").

The Amended Complaint alleges that Buhl acted with actual malice because she: (a) violated "journalistic standards"; (b) she "conceived a story line in advance of any investigation"; (c) relied on unreliable sources and knew the sources statements were false; (d) Buhl was in possession of information that contradicted her publications; (e) "intentionally omitted material facts," or used words that were "false or inherently improbable"; (f) Buhl has "extreme bias, ill will" towards Plaintiff; (g) Buhl knew there was "no evidentiary basis" for the statements; (h) Buhl acted out of a motive to "gain notoriety, generate revenues and profits"; (i) went "out of [her] way to publish extra-judicial statements about Plaintiff."  Am. Compl., at ¶ 62 (summarizing allegations a-i).[2]

Many of these deficient allegations do not support a finding of actual malice as a matter of law and those that remain are unsupported by the evidence. Taking each in turn:

Journalistic Standards: Kesner has provided no evidence of defined journalistic standards or Buhl's violations thereof.  In any case, any such evidence would not establish actual malice since even "an extreme departure from professional standards . . . cannot provide a sufficient basis for finding actual malice." *Harte-Hanks Comm., Inc. v. Connaughton*, 491 U.S. 657, 665 (1989); *St. Amant v. Thompson*, 390 U.S. 727, 732-33 (1968) ("a finding of actual malice cannot be predicated merely on a charge that a reasonable publisher would have further investigated before publishing").

Unreliable Sources: Plaintiff fails to identify which of Buhl's sources were unreliable, the obvious reasons to doubt their veracity, or how Buhl could have known the informant's statements were false.  For each article, Buhl relied on a number of different sources and informants, both confidential and non-confidential, public and non-public, to verify and

---

[2] Any other allegations of malice in the Amended Complaint are included in the summary of (a)-(i). *See* WJP Decl., at ¶¶ 3-5, Ex. B; Def. 56.1 Statement, at ¶ 40.

collaborate her reporting and the sources' information or statements. Buhl Aff., at ¶¶ 16(e), 21-29, 58; *see also Sprewell v. NYP Holdings, Inc.*, 841 N.Y.S.2d 7, 10-11 (1st Dep't 2007) (holding defendant may rely on information obtained from confidential sources in support of its motion for summary judgment); *Trump v. O'Brien*, 422 N.J. Super. 540, 551-53 (App. Div. 2011) (reliance on confidential sources may be used by defendant to rebut allegations of actual malice); *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 704 (11th Cir. 2016) ("That many of the sources were not identified by name does not render them or the reliance on them invalid."). None of Buhl's sources or informants were unverified or anonymous to her.  Buhl Aff., at  ¶ 58.

Kesner's primary evidence related to this point appears to relate to sworn statements provided by Daniel Fisher (the "Fisher Statements").  Am. Compl. at ¶¶ 31-32; Buhl Aff., at ¶¶ 14-15, Ex. C.  Even assuming the truth of the statements in the Fisher Statements, this does not impute actual malice to Buhl for at least the following reasons: (1) The statements in the Fisher Statements relate to Buhl articles from 2016 and 2017, which are not at issue here; (2) even if they were relevant, the Fisher Statements do not actually contradict her reporting in those articles, Buhl Aff. at ¶ 13-14, Ex. B; 3) Buhl used multiple informants and sources to write her articles, *id.* at ¶ 15, 16(e), 58-59; 4) Fisher does not and cannot claim that Buhl actually knew her reporting was false at the time Buhl wrote the applicable stories (which turned out to be substantially true based on the SEC Complaint).  Indeed, the *Fisher* court even stated "[t]he defendants suggest that Ms. Buhl's source was Mr. Fisher. Strictly speaking, though, even as the defendants relate matters, Ms. Buhl did not name her source."  *Fisher v. Biozone Pharms., Inc.*, No. 12-CV-03716-LB, 2017 WL 1097198, at *4 (N.D. Cal. Mar. 23, 2017).

Contradictory Information:  Plaintiff has not proffered any kind of contradictory information that would go against her reporting, let alone, establishing that Buhl was aware of

such information at the time of publishing.  Unlike the defendant in *Palin*, 482 F.Supp.3d. at 223, Buhl was not aware of any kind of contradictory news reports that would cause her to doubt the truth of her statements, her sources, or the underlying facts against Kesner. Buhl Aff., at ¶¶ 31, 40, 56.  Further, on multiple occasions, Buhl reached out to Kesner personally for comment, which he often declined to do.  *Id.* at ¶ 60, Ex. P.

To the extent that Kesner relies on the fact that there was "an absence of SEC or regulatory claims" against him, such absence of information does not provide the affirmative proof that her reporting was contradicted, although recent filings in the SEC action appear to suggest that the SEC is, in fact, investigating Kesner.  WJP Decl., at ¶¶ 6-7, Ex. C.  Lastly, it is "well settled that a defendant's failure to investigate before making defamatory statements does not support a finding of actual malice."  *Boyd v. Nationwide Mut. Ins. Co.*, 208 F.3d 406, 408 (2d Cir. 2000) (citing *Harte-Hanks Comm., Inc*, 491 U.S. at 666-67)

<u>Omitted Facts or used words that were false</u>:  Plaintiff does not identify which evidence Buhl intentionally omitted which would be required to be included in order to not give a purposely false impression to the reader of the Buhl Statements.  Further, proof that a defendant published a false statement will not alone show actual malice.  The Supreme Court has made clear there is a significant difference between proof of actual malice and proof of falsity.  *Bose Corp.*, at 511; *U.S. v. Alvarez*, 567 U.S. 709, 719 (2012) ("[W]hen considering some instances of defamation . . . the Court has been careful to instruct that falsity alone may not suffice to bring the speech outside the First Amendment").  The plaintiff must produce clear and convincing evidence that the defendant actually knew the information was false or entertained serious doubts as to the truth of the publication.  *Celle*, 209 F.3d at 184.  Kesner has failed to produce this sufficiently clear evidence, if any at all.

13

Bias or Ill Will: There is nothing on the record that would establish the kind of contentious relationship between Buhl and Kesner that would rise to that of spite, ill will, or bias on part of Buhl. *See Coleman*.  Communications on the record, between both parties, have always been professional.  *See* Buhl Aff., at ¶ 60, Ex. P.  Further, any evidence of bias or ill will "standing alone . . . is not sufficient to establish actual malice." *Celle*, 209 F.3d at 183; *see also Parsi v. Daioleslam*, 890 F.Supp.2d 77, 81 (D.D.C. 2012) ("Subjective ill will does not establish actual malice, nor does a malevolent motive for publication.  Even highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers does not establish actual malice.")

Conceived a Story Line: There is no showing whatsoever by Kesner that Buhl concocted the stories or the Buhl Statements before any of the underlying facts or events occurred.  This claim appears to be pure fabrication. And similar to common law malice, such as spite or ill will, any such proof would not be enough to prove that Buhl knowingly published false information, or was reckless thereto. *See id.*

Profit Motive: Kesner has not produced any evidence indicating that the Buhl Statements were published due to a profit motive.  The mere fact that Buhl solicits donations on her website fails as evidence to show any specific targeting of Kesner. Moreover, the fact that a "defendant published the defamatory material in order to increase its profits" cannot "suffice to prove actual malice." *Harte-Hanks Comm., Inc.*, 491 U.S. at 667.  Indeed, nearly every publisher or purveyor of news has a profit motive, and, as the Supreme Court wisely noted, if such motive "could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels." *Id.*

Evidentiary Basis:  Lastly, Plaintiff has not provided any evidence that Buhl knew she did not have an evidentiary basis for her reporting.  Plaintiff has provided no affirmative proof that Buhl's reporting was fabricated or a product of her imagination, or even establishing the inherently improbable nature of the statements themselves. *Cf. St. Ament*, 390 U.S. at 732. Rather, as the record shows, and as the next section demonstrates, Buhl had more than ample evidentiary basis for each of her articles and statements.

In summary, Plaintiff has failed to put forth evidence establishing his allegations of actual malice.  He has failed to establish a necessary element of his claim.  Absent this essential element, there is no defamation claim for a jury to decide and therefore Buhl is entitled to summary judgment in her favor.

**B.  The Record Clearly Supports Buhl's Belief in the Truth of Her Reporting**

**1.  Foundational Basis, In General.**

Buhl's un-refuted testimony, and collaborating sources, leaves no factual dispute that Buhl had a good faith basis for her statements.  Not only were the statements not false or made with reckless disregard, but the record shows that Buhl had a reasonable and/or substantial basis for her reporting on Kesner.  Thus, Plaintiff cannot prove that Buhl acted "with knowledge of its falsity or with reckless disregard of whether it was false." Section 76-a; *Coleman*, 2021 WL 768167, at *9.

Buhl's investigation began with a group of stock investors who were led by Barry Honig (i.e. "Team Honig").  Def. 56.1 Statement, at ¶ 36; Buhl Aff., at ¶ 12.  Buhl was previously engaged in investigative reporting related to the financial industry so Buhl had a significant professional interest in financial and securities fraud.  Def. 56.1 Statement, at 4; Buhl Aff., at ¶¶ 1-7.  Through several sources, Buhl came to learn of Barry Honig and his group of "investors"

who purportedly engaged in questionable stock transactions that are commonly referred to as "pump and dump"[3] transactions.  Buhl Aff., at ¶ 12.

As Buhl investigated the activities of Team Honig, however, it became apparent to Buhl that Kesner played a large role as securities counsel for Honig.  *Id.* at ¶ 16(a)-(e).  The record shows the following:

- Since at least 2006, Kesner had represented Honig and/or entities in which Honig or his business associates had invested in. WJP Decl., at ¶¶ 8-13, Ex. D-I; Buhl Aff., at ¶ 16-17.

- Kesner's representation of companies in which Honig or his business associates invested in usually included counsel in the area of securities law. *Id.*

- In September 2018, when the SEC filed a complaint against Team Honig alleging securities violations by Team Honig in connection with three public companies, Kesner was named as securities counsel in each of such public companies only after Team Honig made their respective investments in each public company. WJP Aff., at ¶¶ 8-13, Ex. D-I.

- The SEC alleges that Kesner knew he had to keep the group's trading activity a secret, for otherwise, this group would have to disclose their beneficial ownership in SEC filings before they could manage to effectuate their pump and dump scheme.  Def. 56.1 Statement, at ¶ 15; Buhl Aff., at ¶ 18, Ex. E - SEC Am. Compl, at ¶ 179.  The SEC also apparently alleges that  Kesner used his position as legal counsel to gain pre-paid legal fees, Buhl Aff., at ¶ 19, and the record collaborates that he received shares in these companies for himself and in one documented case using Laidlaw and Company to transfer those shares. WJP Decl., at ¶ 15, Ex. J.

- Kesner also has a documented interest in a stock transfer company, Equity Stock Transfer, which was involved in numerous Honig transactions. WJP Decl., at ¶¶ 11, 13, Ex. G, I.

- And, from her reporting from 2016 in BioZone, Buhl learned through confidential source that Kesner himself was being investigated by the SEC.  Buhl Aff., at ¶ 16(e).

---

[3] The term "pump-and-dump" is succinctly described in the SEC's Amended Complaint. Buhl Aff., at ¶ 17, Ex. E – SEC Am. Compl., at ¶ 48.

Given this foundation, Buhl's decision to report on Kesner was justified on reasonable grounds and does not evidence any implicit bias against Kesner and cannot be reasonably construed by any jury to constitute clear and convincing evidence of actual malice.

**2. The Publications Themselves Do Not Evidence any Actual Malice.**

Given the foundational background described in the record and as put forth above, the specific articles themselves do not provide any evidence of actual malice on Buhl's part.

**a. October 31 Article**

The first article was published on October 31, 2018 and is entitled "Honig Deals lead to FINRA Investigation of Laidlaw & Co." Def. 56.1 Statement, at ¶¶ 27-28. Buhl's reporting on this article was well researched and sourced. Buhl Aff., at ¶¶ 20-31. Overwhelmingly the article is centered on a regulatory investigation into Laidlaw & Company on deals related to Honig. Id. This reporting was prescient since a year and a half later FINRA imposed a $1.5 million dollar fine on Laidlaw and removed the company's COO. Id. at ¶ 20, Ex. G. Kesner's name is mentioned one time in this 37-paragraph article, and principally relates to his relationship with Honig. *See* Def. 56.1 Statement, at ¶¶ 27-28. .

Initially, the phrase "alleged bad actors" is an objectively vague and undefined phrase. "Alleged" is defined as "accused but not proven or convicted."[4] Bad actor is defined as an "unruly, turbulent, or contentious individual."[5] Although the SEC has its own "bad actor" definition,[6] there is no objective evidence that Buhl was using the term "bad actor" in the manner so defined. Buhl does not mention the bad actor rules and she does not elaborate in any way on

---

[4] https://www.merriam-webster.com/dictionary/alleged.
[5] https://www.merriam-webster.com/dictionary/bad%20actor.
[6] https://www.sec.gov/info/smallbus/secg/bad-actor-small-entity-compliance-guide.htm.

what she means by "bad actor," thus a reasonable reader would default to its ordinary meaning.[7]

Thus, putting the entire phrase in context, an allegation of something that is readily understood

as "conjecture, hypothesis, or speculation" and which "signals the reader that what is said is

opinion, and not fact" is not actionable as defamation. *Levin v. McPhee*, 119 F.3d 189, 197 (2d

Cir. 1997).

Regardless, the depiction of Kesner in the October 31 Articles does not evidence any

actual malice on Buhl's part.  The description of Kesner as a "deal lawyer from SIRF LLP linked

to a number of Honig investments," is factually true.  WJP Decl., at ¶¶ 10, 12-13, Ex. F, H-I;

Buhl Aff., at ¶ 16-17.  Further, this article comes shortly after the SEC filed its initial complaint

against Honig, and certain of his business associates, in September 2018 and detailed in part

Kesner's role in representing those public companies. Buhl Aff., at ¶¶ 17-19, Ex. E.   In August

2018, Buhl also learned that Mabvax sent a demand letter to Kesner and his firm seeking

restitution for alleged malpractice. *Id.* at ¶ 46, Ex. K.   Buhl also had information from a

confidential source as far back as 2016 that the SEC was looking into Kesner's activities. *Id.* at ¶

16(e).[8]   This information was collaborated when the SEC filed its amended complaint in March

2019. *Id.* at ¶ 17, Ex. E.

As the New York Court of Appeals has said, "there is a critical difference between not

knowing whether something is true and being highly aware that it is probably false. Only the

latter establishes reckless disregard in a defamation action."  *Liberman v. Gelstein*, 80 N.Y.2d

429, 438 (N.Y. 1992).  Even if "alleged bad actors" was an unambiguous and clearly false

---

[7] In *Travelex Currency Servs., Inc. v. Puente Enterprises, Inc.*, No. 18 CIV. 1736 (ER), 2019 WL 1259102, at *9 (S.D.N.Y. Mar. 19, 2019), the defendant accused plaintiff of being a "bad actor" but also "accused [plaintiff] of insurance fraud and other wrongful acts" which the court thought "viewed together, are defamatory *per se*." In her article, Buhl makes no other statements regarding Kesner, thus differentiating it from *Travelex Currency Servs*.

[8] Although Kesner denies that he was ever investigated, recent filings in the SEC case seem to suggest otherwise. WJP Decl., at ¶¶ 6-7, Ex. C.

statement of fact concerning Kesner, which it is not, Buhl had a reasonable, if not substantial

basis, for believing it was true, and Kesner cannot prove otherwise.

    **b.  March 26 Article and March 27 Tweet**

The March 27 Tweet links to an article dated March 26, 2019, and reads "The illegal

back room deals and intimidation Honig and attorney Harvey Kesner did with Biozone

(company A in SEC lawsuit) were egregious and the SEC sat back and watched it happen."  This

was shortly after the SEC filed its amended complaint, adding specific allegations of Kesner's

conduct as it relates to the three companies.

In determining whether a reasonable jury can determine if this tweet is clear and

convincing evidence of actual malice on Buhl's part, courts in this circuit have recognized the

inherent laxity of Twitter.  As the *Ganske* court put it, "[i]f the Internet is akin to the Wild West .

. . Twitter is, perhaps, the shooting gallery, where verbal gunslingers engage in prolonged

hyperbolic crossfire."  *Ganske v. Mensch*, 480 F.Supp.3d 542, 545 (S.D.N.Y. 2020).  A

reasonable reader understands that statements on Twitter do not, and should not, be judged on

standards that may apply to more traditional journalistic articles. *See id.* at 552-53 (collecting

cases); *Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287, 295

(E.D.N.Y. 2015), *aff'd*, 670 F. App'x 731 (2d Cir. 2016) ("New York courts have consistently

protected statements made in online forums as statements of opinion rather than fact.").

Thus, besides Buhl's argument that the tweet is protected opinion, *infra* part II, the

statement is still "entitled to constitutional protection if the words used are ambiguous but the

defendant honestly and without recklessness believes that they constitute an opinion or idea."

*Good Government Group of Seal Beach, Inc.*, 22 Cal.3d at 684.  Consequently, courts must

require the plaintiff to establish with clear and convincing evidence that the defendant "was

aware of, or recklessly blinded himself to, the defamatory import of his words." *Palin*, 482 F. Supp. 3d at 216 (citing Marc A. Franklin & Daniel J. Bussel, *The Plaintiff's Burden in Defamation: Awareness and Falsity*, 25 Wm. & Mary L. Rev. 825, 836-37 (1984)). Buhl states that her "tweet was intended to express [her] opinion based on the March 2019 Article and the March 2019 Article's fair and true reporting." Buhl Aff., at ¶¶ 42, 44. She also unequivocally states: "I did not view my tweet as accusing Kesner of a crime. Indeed, I have never accused Kesner of committing a crime, nor have I written that Kesner committed a crime or is alleged to have committed a criminal offense." *Id.* at ¶ 43. Kesner has not made any kind of showing, let alone a clear and convincing one, rebutting her belief that her statement was one of opinion, based on the March 26 Article. *See Good Government Group of Seal Beach, Inc.*, 22 Cal.3d at 684.

Second, Kesner must also establish by clear and convincing evidence that Buhl published the tweet "with knowledge that it was false or with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 279; *Liberman*, 80 N.Y.2d at 438 (finding "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action."). The Court has already determined that the linked March 26, 2019 article, which is the basis for Buhl's tweet, does not contain any defamation against Kesner. Op. and Order, Dkt. 114, at p. 39-40 (Jan. 26, 2021). Additionally, the record is clear that the SEC charged Honig with securities violations (i.e. "illegal back room deals"). The record is also clear that the SEC felt that Honig, assisted by Kesner, strong-armed unsuspecting public companies into appointing executives that were approved by Honig. Buhl Aff., at ¶ 17, Ex. E – SEC Am. Compl., at ¶ 172. The SEC also alleged that Kesner knew that he must keep the group's trading activity

undisclosed.  *Id.*, Ex. E – SEC Am. Compl., at 179.  Even if this tweet evidences some personal

frustration that Buhl may have at the lack of action by regulators, such frustration is not directed

Kesner.  Therefore, Buhl believed that the "tweet was a true expression of opinion based on the

March 26 Article, and [she] had a reasonable basis to believe the tweet was true." Buhl Aff., at

¶¶ 42, 44.

### c.   The June 7 Article

Kesner contends that the headline of the article, standing alone, is defamatory, and two

other statements in the body of the article are defamatory.  Def. 56.1 Statement, at ¶ 35.  Actual

malice cannot exist to these statements because Buhl's reporting is based, and clearly supported,

on undisputed evidence which she gained from a confidential source, as originally reported in

her article published the same day for *Cannabis Law Report*.[9]  *Id.* at ¶ 33.

The headline, *New emails show attorney Harvey Kesner aided Defrancesco in*

*Questionable Cannabis stock Deal*, is protected under New York law because it is a 'fair index'

of the 'substantially accurate' material included in the article." *Test Masters Educ. Servs., Inc. v.*

*NYP Holdings, Inc.*, 603 F. Supp. 2d 584, 589 (S.D.N.Y. 2009) (quoting *Gunduz v. New York*

*Post Co., Inc.*, 188 A.D. 2d 294, 294 (1st Dep't 1992)).  A publisher "need not choose the most

delicate word available in constructing its headline," and it is instead "permitted some drama in

grabbing its reader's attention."  *Id.*  Even if a headline is not factually true, that headline is not

defamatory if that headline, when read together with the rest of the article clarifies, explains, or

even dispels the headline. *See Triano v. Gannett Satellite Info. Network, Inc.*, No. 09–cv–2497,

2010 WL 3932334, *5 (S.D.N.Y. Sept.29, 2010). Thus, on this motion for summary judgment,

---

[9] On the motion to dismiss, the Court felt constrained from reaching these issues because "[d]iscovery is necessary
to test the accuracy of the factual representations in Buhl's underlying article to the extent these are recapitulated in
the article at issue here." Op. and Order, Dkt. 114, at p. 49.

the Court should first determine whether as a matter of law, the headline is a fair index of the article.

Applying these principles, Buhl accurately reports that certain investors were suing an investor named Andy DeFrancesco, which is the basis for the "questionable stock deal." The Article links several times to Buhl's original reporting in the *Cannabis Law Report*. The *Cannabis Law* article provided email correspondence that appear to reflect Kesner's writing on behalf of Andy Defrancesco, and Defrancesco's family's behalf, in connection with that deal. Significantly, Kesner does not dispute the existence, truth, or accuracy of these emails. Def. 56.1 Statement, at ¶ 36.

However, even if Kesner tries to dispute that he wrote these emails, he cannot dispute the fact that Buhl received them from a confidential, but not anonymous, source. Buhl Aff., at ¶ 48-50. Nor does Kesner provide any evidence for why Buhl had reason to doubt the veracity of the emails. Indeed, Buhl had a reasonable belief that the source was credible since the source had direct knowledge of the emails and the emails showed that they were sent from Kesner's email address. Id. at ¶ 50.

The June 7 Article then reports Buhl's supposition that these emails "<u>could show</u> how the insiders skirt beneficial ownership disclosure rules." Def. 56.1 Statement, at ¶ 35. The speculative phrase "could show," combined with hyperlinks to the original reporting in the *Cannabis Report*, signals to a reasonable reader that what is being said is Buhl's interpretation of the emails sent back and forth between Kesner and the "broker dealer." *Levin*, 119 F.3d at 197; *Adelson v. Harris*, 973 F. Supp. 2d 467, 483-85 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017) ("The hyperlink is the twenty-first century equivalent of the footnote for purposes of attribution in defamation law . . ..").  Similarly, the statement "[w]hen the U.S. broker dealer saw

attorney Harvey Kesner was pushing to get shares through the U.S. clearing system call the DTC the transaction's legitimacy was challenged," is also not actionable for defamation because whether or not the "legitimacy was challenged" is nothing more than a clearly true and believable conclusion.   Therefore, these statements are nothing more than protected opinion, and more importantly, Kesner cannot prove that Buhl knew these statements were false. *See* Buhl Aff., at ¶¶ 47-57 (explaining her research underpinning the article and why she believed the article to be true).

*          *          *

In summary, all of these facts on the record strongly indicate that Buhl did not act with actual malice.  The record demonstrates Buhl was diligent in her reporting. Buhl Aff., at ¶¶ 58-59.  She gathered information from multiple sources, including public records and informants. Id. at ¶ 58.  Some of these informants were confidential, but none of them were anonymous or unknown to her.  Id.  These informants showed her letters, emails, and other collaborating documents, on which she would report or gain insight into further leads and evidence.  Id. at ¶ 59.

In addition, Buhl regularly reached out to Kesner, and others who were the subject of her reporting, for comment, although Kesner rarely made a comment on the record.  Id. at ¶ 60, Ex. P.  If Kesner did provide relevant comments, she included such comments in her reporting.  Id. Buhl's reporting falls in line with that of a reasonable journalist in her profession.  Kesner's claims that Buhl acted with actual malice rest entirely on unproven claims, including unproven claims that Buhl did not act within the acceptable standards of journalism.[10]  Therefore, there is

---

[10] Even if Plaintiff could show, through inference or otherwise, that Buhl was negligent, that is not the standard that will allow him to recover.  Rather he must show clear proof that Buhl was subjectively aware that the statements were false or acted with a reckless disregard for the truth. Reckless disregard is defined as "a high degree of awareness of . . . probable falsity." *Harte-Hanks*, 491 U.S. at 688; *St. Amant*, 390 U.S. at 731 (reckless disregard

23

not a triable issue of fact as to actual malice and Buhl is entitled to summary judgment as a matter of law.

## II.  BUHL'S TWEET AND OTHER STATEMENTS ARE NON-ACTIONABLE OPINION

Each of the Buhl Statements are properly construed as statements of opinion, and therefore, not defamatory as a matter of law.  Under the New York Constitution, statements of opinion are absolutely privileged.  *Immuno AG.*, 77 N.Y.2d at 254-55; *Celle*, 209 F.3d at 178.  Whether a statement is an opinion is determined by the court as a matter of law.  *Celle*, 209 F.3d at 178. The court's analysis must consider "what the average person hearing or reading the communication would take it to mean" and "the context of the entire communication and of the circumstances in which they were spoken or written."  *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290 (1986).  Courts look to three factors to decide whether an alleged statement is and assertion of opinion or fact, namely:

> 1) whether the statement has a precise meaning; 2) whether it is capable of being proven true or false; and 3) "whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Jewell v. N.Y. Post*, 23 F.Supp.2d 348, 376 (S.D.N.Y. 1998) ("Application of these three factors is not rigid and mechanical, and no single factor is dispositive."). An opinion that is "either accompanied by a recitation of the facts upon which it is based' or 'does not imply that it is based upon undisclosed facts" is non-actionable.  *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 461

---

must be supported by "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication"). This "requires more than a departure from reasonably prudent conduct," *id.*, and any such finding must be supported by "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Freeman*, 84 N.Y.2d at 57.

(S.D.N.Y. 2012).  The "burden rests with the plaintiff to establish that in the context of the entire communication a disputed statement is not protected opinion." *Celle*, 209 F.3d at 179.

**A.   Buhl's Tweet is a Protected Opinion that Was Based on the Article Published the Day Before**

On March 26, 2019, Buhl published an article titled: *Honig's Puppet CEO Elliot Maza settles with the SEC* ("March 26 Article"). Def. 56.1 Statement, at ¶ 29.  The following morning, on March 27, 2019, Buhl posted her opinion of that article on Twitter, which read: "The illegal backroom deals and intimidation Honig and Kesner did with Biozone (company A SEC Lawsuit) were egregious and the SEC sat back and let it happen." *Id.* at ¶ 32.  The tweet was accompanied by a link to, and headline of, the March 26 Article.  *Id.* at 31.

Here, context is key, and the analysis of Buhl's tweet should be based with an understanding of that context since context can "'signal[] to the reader that what is being conveyed is likely to be opinion rather than fact.'" *Ganske*, 480 F.Supp.3d at 542 ("it is important to first account for the context") (quoting *Levin*, 119 F.3d at 196); *Flamm v. Am. Assoc. of Univ. Women*, 201 F.3d 144, 153 (2d Cir.2000) ("Since *Steinhilber*, the Court of Appeals of New York has consistently focused its analysis on the overall context in which the complained-of assertions were made."); *Brahms v. Carver*, 33 F. Supp.3d 192, 198 (E.D.N.Y. 2014) ("context is key"); *Rapaport v. Barstool Sports, Inc.*, No. 18-cv-8783 (NRB), 2021 WL 1178240, at *11, n.8 (S.D.N.Y. Mar. 29, 2021) (New York courts "place[] primary emphasis on the immediate and broader context of the statement").

Buhl's tweet was published on the social media platform Twitter, a site which "conveys a strong signal to a reasonable reader" that what is said is opinion.  *Ganske,* at 553; *see also Bellavia Blatt & Crossett*, 151 F. Supp.3d at 295 ("New York courts have consistently protected statements made in online for[a] as statements of opinion rather than fact." (alterations in

original)); *Rapaport*, 2021 WL 1178240, at *19 (The "basic premise that courts interpreting New York law have generally found [is] that comments made on Twitter are more likely to be understood by audiences as statements of opinion than statements of fact.").

The Court must also consider on summary judgment that Buhl's tweet was accompanied by the March 26 Article.  *See Mirage Entertainment, Inc. v. FEG Entretenimientos Sa*, 326 F. Supp. 3d 26, 38 (S.D.N.Y. 2018) (dismissing defamation claim where tweet linked to an article and was thus clear that the article provided the basis for the tweet); *Brahms*, 33 F.Supp. 3d at 200 (dismissing defamation claim because the online statement "was accompanied by the news articles on which it was so obviously based").

Moreover, the tweet and article were published just days after the SEC amended its complaint on March 8, 2019 (and announced by the SEC on March 22, 2019), against Kesner's clients, Honig, as well as Brauser and other members of Honig's investment group, and included greater detail of Kesner's actions as securities counsel to BioZone and MabVax (Kesner's law firm served as counsel to MGT Capital while Kesner continued to serve as counsel to Honig). Buhl Affidavit at ¶ 34.  In fact, the March 26 Article is itself a fair report of SEC's amended complaint and the *Fisher v. BioZone* litigation.  *See Cummings v. City of New York*, No. 19-CV-7723 (CM)(OTW), 2020 WL 882335, at *19 (S.D.N.Y. Feb. 24, 2020) ("hyperlinking to another article that itself is a fair report of a proceeding" [may] "signal[] to the reader that the allegations stem from a proceeding."); *see also Adelson*, 973 F. Supp. 2d at 483–85.  Further, the Court has already dismissed Plaintiff's claim that the March 26 Article was defamatory as a matter of law. Op. and Order, Dkt. 114, at p. 39-40.

Placed in this context, a reasonable reader would understand: 1) Buhl's tweet is an opinion; 2) Buhl's opinion is based on, and in response to, the March 26 Article; and 3) Buhl is

not basing her opinion on undisclosed facts but rather the opinion is based upon the reporting in the article, which is itself non-defamatory and a fair and true report. This is made even more clear when a reasonable reader examines the March 26 Article in relation to the tweet.

The March 26 Article reports on the settlement of Elliot Maza, the SEC amended complaint, and the Fisher Litigation. Buhl Aff., at ¶ 32, Ex. H. It goes into the SEC's allegations of security law violations by Honig and his associates, who as an undisclosed group, "ended up controlling 45% of Biozone." Id., Ex. H. Any party, or group, controlling more than 5% must disclose on Schedule 13 to the SEC.[11] Continuing, the article reports on the SEC's amended complaint that "[a]ccording to the SEC, after a successful pump and dump in early 2013 Honig and Brauser hatched a plan to sell . . . Biozone . . to another issuer they controlled . . . believed to be MuscelPharm." Honig and Brauser used their profits from this to "start a new pump and dump." Buhl Aff., at 32, Ex. H. It is clear from public filings that Kesner also represented MuscelPharm in filing the necessary forms with the SEC. WJP Decl., at ¶ 12, Ex. H.

The article then goes on to summarize her reporting on BioZone from 2016. In this regard, she reports how Kesner, on behalf of his clients Honig and Brauser, brought an action against Daniel Fisher, the founder of BioZone, in retaliation for Fisher filing whistleblower complaints with the FBI and SEC and filing a civil fraud complaint in California. Buhl Aff., at ¶ 32, Ex. H. The article also details how Lee Pederson "also blew the whistle with government officials" and thus, the "SEC knew about Team Honig scheme in Biozone for at least 4 years before they brought a case." Id. The article continues by claiming that "Kesner used his suit against Fisher to try and force a judge to make Fisher turn over any emails to journalist." Id.

---

[11] 17 CFR § 240.13d-102 - Schedule 13G - Information to be included in statements filed pursuant to § 240.13d-1(b), (c), and (d) and amendments thereto filed pursuant to § 240.13d-2

She includes a hyperlink to the California court opinion which, in part, allowed for further discovery into whether Fisher disparaged Honig to journalists. [cite]. The article characterizes this suit as a "move of <u>intimidation</u>" and that the SEC's "amended complaint confirmed it happened." Id.

Therefore, when read in context (as a court must do), the tweet is an opinion based on the article. *Mirage Entertainment, Inc.*, 326 F. Supp. 3d at 38.  The "illegal back room deals" by Honig and the "intimidation" by Kesner were in her opinion "egregious," and the "SEC sat back and watched it happen" because it learned of these events four years prior by virtue of Fisher and Pederson.

Lastly, turning to the other two factors courts look towards, the tweet by itself is ambiguous as to the meaning of "illegal backroom deals."  Buhl never actually accused Kesner of committing a criminal act.  *See Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1103-04 (N.D. Cal. 1999) (finding statements that referred to the plaintiff as a "self-serving fraud," a "criminal," and "acted illegally" to be only hyperbolic expression when viewed in context).  A finding to the contrary begs the question—under which criminal statute did Ms. Buhl accuse Kesner of violating? The term "illegal backroom deals" is of significantly different character and clarity than other cases where courts have found the defendant accused the plaintiff of an actual crime.

Illegal conduct does not equal criminal conduct.  The SEC brought its claims against Honig and his associates for violations of securities laws in <u>civil court</u>, rather than criminal court. "Intimidation" is also a vague term, inherently unable of being "proven true or false because of its subjective, relative meaning."  *Mirage Entertainment, Inc.*, 326 F. Supp. 3d at 37.  As used here, these labels represent nothing more than Buhl's "subjective evaluations" of Kesner's actions detailed in the article and the SEC's amended complaint and are incapable of being

proven true or false.  *See Rapaport*, 2021 WL 1178240, at *13 (granting defendants motion for summary judgment on this basis).

**B.  Statement in the June 7 Article is Protected Opinion**

The June 7 Article tracks, and essentially copies, Buhl's reporting of the same day in the Cannabis Law Report.  One of the specific statements Kesner alleges to be defamatory is: "An insider, Andy DeFrancesco, was using Barry Honig's deal lawyer to move hidden shares within his family. I am reporting for Cannabis Law Report today that new emails written by attorney Harvey Kesner on behalf of the DeFrancescos <u>could show</u> how insiders skirt beneficial ownership disclosure rules." Def. 56.1 Statement, at ¶ 35.  However, the statement is tempered by the speculative phrase "<u>could show</u> how insiders skirt beneficial ownership disclosure rules." This speculative phrase, combined with the fact that the article links to the original reporting in the Cannabis Report, allows the reader to understand that what is being said is Buhl's interpretation of the emails sent back and forth between Kesner and the "broker dealer."  The links "allows the reader to make up his or her own mind."  *See Biro*, 883 F. Supp. 2d at 482.

CONCLUSION

For the foregoing reasons, Mr. Kesner's litigation is unsupported by the facts and the law. He may not like what Ms. Buhl reports, but he is not entitled to a judgment condemning her for exposing the truth.  His purpose here was not to win a favorable judgment but to bully, harass, and ultimately censor Ms. Buhl's freedom of speech—a SLAPP suit in its purest form. Summary judgment should be granted in Ms. Buhl's favor on Mr. Kesner's last remaining claim.

Dated: August 09, 2021
    New York, New York

Respectfully submitted,

_____

Wesley J. Paul, Esq.
Everest R. Schmidt, Esq. (*pro hac vice*)

Paul Law Group, LLP
902 Broadway, 6th Floor
New York, NY 10010
Tel: (646) 278-9955
Fax: (646) 514-6829
wpaul@paullawgrp.com
*Attorneys for Defendant Teri Buhl*