L7JsKESc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    HARVEY J. KESNER,

4                    Plaintiff,

5            v.                              20 Civ. 3454 (PAE)

6    BARRON'S, INC., et al.,

7                    Defendants.

8    ------------------------------x
                                         New York, N.Y.
9                                        July 19, 2021
                                         3:00 p.m.
10
     Before:
11
                         HON. PAUL A. ENGELMAYER,
12
                                         District Judge
13
                              APPEARANCES
14
     STEVEN BISS
15        Attorney for Plaintiff

16   PAUL LAW GROUP LLP
          Attorneys for Defendants
17   BY:  EVEREST SCHMIDT

18

19

20

21

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

L7JsKESc

| 1  | (The Court and all parties appearing telephonically) |

2          THE COURT:  Good afternoon.  This is Judge Engelmayer

3  calling the case of, I guess it used to be called Kesner v.

4  Barron's, Inc.  It ought be recaptioned Kesner v. Buhl, and I

5  will take care that.  But in any event, it is 20 Civ. 3454.

6          Who do have I for the plaintiff, Harvey Kesner?

7          MR. BISS:  Good afternoon, your Honor.

8          This is Steve Biss here.

9          THE COURT:  Good afternoon, Mr. Biss.

10          Who do I have for the defendant, Teri Buhl?

11          MR. SCHMIDT:  Good afternoon, your Honor.

12          This is Everest Schmidt, and with your permission, I

13  would like to appear pro hac vice.

14          THE COURT:  Yes, you have my permission.  I understand

15  that you first applied, I think, for pro hac status very

16  recently, and that your pro hac application was bounced by the

17  clerk's office.

18          Do I have that right, Mr. Schmidt?

19          MR. SCHMIDT:  That's correct, your Honor.  I got

20  notice this morning.

21          THE COURT:  Can you take care of that in the next

22  couple of days?

23          MR. SCHMIDT:  I will try my best, your Honor.  I will.

24          THE COURT:  Let's try to succeed.  I'm happy to have

25  you in the case and happy to have you pro hac for this

L7JsKESc

1    conference, but we need to adhere to the formalities.  If you

2    could attend to that promptly, I would appreciate it.

3             MR. SCHMIDT:  I will.

4             THE COURT:  All right.  Let me confirm that our court

5    reporter is on the line.

6             THE REPORTER:  Good afternoon, your Honor.

7             Lisa Franko of the court reporter's office.

8             THE COURT:  Good afternoon, Ms. Franko.  As always,

9    thank you for your service.

10            All right.  This is a premotion conference in

11   anticipation of a motion by the defense for summary judgment.

12            Typically, counsel for Ms. Buhl anticipates moving for

13   summary judgment directed at one claim that remains by the

14   plaintiff, which is for defamation.  Separately, we will get to

15   this in a little bit, I'm mindful there was a counterclaim

16   filed by the defendant under New York's anti-SLAPP, S-L-A-P-P,

17   statute, as recently amended, and basically that statute got

18   amended earlier this calendar year.  And, thereafter, taking

19   advantage of the broadened reach of the anti-SLAPP statute,

20   defense counsel has moved to dismiss the plaintiff's defamation

21   action, and that motion to dismiss is fully briefed before me.

22            So at the outset, I want to focus just on the

23   defamation claim, and later on I will have some questions for

24   counsel about the interplay, if any, between the defamation

25   claim and the anti-SLAPP counterclaim.  But for the time being,

L7JsKESc

| | |
|---|---|
| 1 | just to keep for orderly discussion, I want to focus on the |
| 2 | defamation claim. |
| 3 | Mr. Schmidt, how long have you represented Ms. Buhl? |
| 4 | MR. SCHMIDT:  Just a few months, your Honor. |
| 5 | THE COURT:  Look, your outfit began representing her |
| 6 | after the motion to dismiss was resolved.  Do I have that |
| 7 | right? |
| 8 | MR. SCHMIDT:  Your Honor, we filed the motion to |
| 9 | dismiss last year -- |
| 10 | THE COURT:  Right. |
| 11 | MR. SCHMIDT:  -- during the summer, and we have been |
| 12 | representing her since then. |
| 13 | THE COURT:  Right.  You've been in the case throughout |
| 14 | the entire period of discovery, correct? |
| 15 | MR. SCHMIDT:  That's correct, your Honor.  I'm fully |
| 16 | aware personally of the facts and circumstances applicable |
| 17 | here. |
| 18 | THE COURT:  Great.  Tell me specifically -- obviously, |
| 19 | the fact discovery period is over.  I just want to get a sense, |
| 20 | it is informative for me in thinking about summary judgment |
| 21 | litigation, focus on the discovery that you sought either from |
| 22 | the plaintiff or from other parties. |
| 23 | What was that? |
| 24 | MR. SCHMIDT:  Well, we issued two subpoenas.  One was |
| 25 | to the SEC, but they objected to that because there is an |

L7JsKESc

ongoing investigation.  We also sent a subpoena to MabVax's

counsel, and MabVax, they did disclose quite a bit of

information.  Not all of it was relevant.  Then, of course, we

did issue interrogatories and requests for production from the

plaintiff.

THE COURT:  To what degree did you get responses from

the plaintiff to the interrogatories and requests for

production?

MR. SCHMIDT:  Well, we received a number of

objections, your Honor, and we still have a set of

interrogatories that have not been answered, but I believe most

of these probably relate to our counterclaim.

THE COURT:  Be that as it may, as it relates to the

schedule that I set, which was key to the defamation claim, it

goes without say that the period for fact discovery passed a

month ago without any notice to me of any discovery disputes.

So is there a reason you didn't, if you had a problem

with an objection that Mr. Biss made on behalf of Mr. Kesner,

you knew you were to come to me to seek to enforce your

objection, enforce your demand for production, correct?

MR. SCHMIDT:  Yes, your Honor.  We are aware of that.

But I think in this case, it is really the plaintiff's element

to prove, especially on this summary judgment motion.

THE COURT:  And that may be, but right now I'm just

trying to understand what the affirmative discovery is that you

L7JsKESc

1    elicited.  So when I asked you about the interrogatories and

2    requests for production, you immediately said that you got some

3    objections.

4           Let's focus on the interrogatories.  Were there some

5    interrogatories that were answered?

6           MR. SCHMIDT:  Yes, your Honor.

7           THE COURT:  And was there some written discovery that

8    was produced?

9           MR. SCHMIDT:  Yes, your Honor.  Yes, there was.

10          THE COURT:  How much of each?

11          MR. SCHMIDT:  We got about 3,000 pages from the

12   plaintiff with some discovery production, and I mean some of

13   that was duplicates and some of that was blank pages.  But I

14   think under the record we have now, I believe we have enough

15   to move for summary judgment.

16          THE COURT:  Other than interrogatories that were

17   responded to and document requests that were met by either

18   MabVax or the plaintiff, did you take any other affirmative

19   discovery in this case?

20          MR. SCHMIDT:  No, your Honor.

21          THE COURT:  Just to put a fine point on it, did you

22   ever notice the deposition of Mr. Kesner?

23          MR. SCHMIDT:  No, we did not, your Honor.

24          THE COURT:  One of the things that I had assumed, but

25   perhaps wrongly coming out of the motion to dismiss in which I

L7JsKESc

1    sustained only a limited subset of the defamation claims, but

2    they were the ones that accused Mr. Kesner of committing a

3    crime.  I assumed that pretty much the first thing you were

4    going to do was to take advantage of the opportunity presented

5    by that to depose Mr. Kesner about whether the statement that

6    he had committed the crime was true.  That would usually be one

7    of the most obvious tools in a defendant's toolbox in defending

8    against an allegation of defamation.

9         Not that anything turns on it, but I am curious what

10   the reason was not to depose Mr. Kesner.  Had you proven, for

11   example, his having committed those crimes that would have

12   presumably given you a defense here.  So I'm curious, why you

13   didn't do that?

14        MR. SCHMIDT:  I believe defense counsel didn't think

15   it was worth the time simply because we have such a strong

16   argument on the fault element and really whether Kesner

17   committed a crime or not.  I think that really goes to the

18   falsity --

19        THE COURT:  Right.

20        MR. SCHMIDT:  -- as opposed to the fault element.  And

21   really, here, I think it is what did Ms. Buhl know at the time

22   of publishing.  Did she believe what she was publishing was

23   true?  And we hold that she did, and there is no evidence on

24   this record to suggest otherwise.

25        THE COURT:  Look, I appreciate your confidence in your

L7JsKESc

1    view here, at least as to the basis for on which you propose to

2    move for summary judgment.  Nonetheless, I am mindful that, if

3    contrary to your expectations, you were to fail in the motion

4    for summary judgment, you have unilaterally disarmed on your

5    ability to prevail on a different element, which is falsity,

6    have you not?

7           MR. SCHMIDT:  Perhaps, your Honor, but I believe

8    that -- perhaps, your Honor, but I think, also, the plaintiff

9    never noticed a deposition for the defendant either, and it is

10   really his burden.

11          THE COURT:  Well, no, no, no, no.  I noted that, and

12   I'll have questions when the time comes with Mr. Biss about

13   that strategic judgment.  These are different elements that

14   are, to some degree, the focus here.  It may be the case that

15   Ms. Buhl is not in a position to affirmative prove-up as a

16   factual matter that Mr. Kesner is a criminal even if he is.

17          So the plaintiff's decision not to depose Ms. Buhl

18   doesn't mean that they are surrendering on the element of

19   falsity.  It just means that, for whatever reason, they chose

20   not to depose Ms. Buhl.

21          Look, I'm just puzzled because, as I understand it,

22   your client is -- you're representing Ms. Buhl pro bono, are

23   you not?

24          MR. SCHMIDT:  We are, your Honor.

25          THE COURT:  Wouldn't any junior associate who works

L7JsKESc

1   with you kill to take that deposition pro bono?

2          I mean, talk about great litigation experience.  And

3   it might give you a shot at knocking out the case in another

4   ground, if you develop evidence of the truth of the statement

5   that the man is a criminal.

6          MR. SCHMIDT:  Speaking personally, yes, your Honor,

7   but the decision was not up to me.

8          THE COURT:  I'm sorry.  I thought you were --

9          MR. SCHMIDT:  Senior counsel --

10          THE COURT:  One moment, I'm speaking.  One person at a

11   time, and that's me.

12          You are the one who has appeared here, albeit orally

13   pro hac.  Under my individual rules, lead counsel is supposed

14   to be here unless there is leave for somebody else to speak.

15   If not you, who made the decision to not depose the plaintiff?

16          MR. SCHMIDT:  Well, that would be co-counsel, Wesley

17   Paul, your Honor.  And the purpose of my pro hac motion was to

18   avoid any further delay of this conference.  I cannot give you

19   a clear answer right now why we did not.

20          THE COURT:  Is your co-counsel on the phone?

21          MR. SCHMIDT:  He's not, your Honor.  After the court

22   rescheduled this conference, he had a conflict at this exact

23   time in another matter.

24          THE COURT:  In the future, you need to abide by my

25   individual rules.  I expect lead counsel to be present so that

L7JsKESc

1    important questions like this, like what the strategic

2    thinking, if any, was behind the decision not to depose your

3    accuser in the case, it is an obvious question I would have put

4    to lead counsel, and I regret that there is not somebody on the

5    phone from the defense who is able to give me that answer.

6           All right.  Let me turn to Mr. Biss.  And for the time

7    being, again, I'm just focused on mirror-image questions put to

8    you.

9           What affirmative discovery did you take of the

10   defendant, Ms. Buhl?

11          MR. BISS:  Judge, we issued some initial

12   interrogatories and fairly detailed request for production of

13   documents.  They were designed to address what we considered to

14   be the issues in the case.  Principally, my goal was to gather

15   documentary evidence, since the articles themselves represented

16   that Ms. Buhl had engaged in due diligence.  She read the

17   record in the SEC case and the MabVax case.  I wanted to see

18   exactly what research she had done, I wanted to see what

19   communications she had had with other third parties, and she

20   ended up producing a lot of documentation.  She ended up

21   producing a fair amount; a number of pleadings, a number of

22   pieces of e-mail correspondence; and other things.  And she

23   objected to some things, but for the most part, I believe we

24   got what we needed, and I think that's principally why we

25   didn't depose her.

L7JsKESc

1          THE COURT:  Tell me what the volume was of what she

2     produced to you.

3          MR. BISS:  Judge, I think I indicated to the court --

4     I was in depositions, I don't have any file -- it was a fair

5     amount of documents.  She also supplemented.  I can't tell you

6     how many thousands it was.  We produced a little over 3,000

7     pages, and I didn't know that there were some blanks in there,

8     but we Bates stamped everything.

9          Her production wasn't as large as ours, but it was

10    pretty big.  I mean, it was a fairly voluminous production.  It

11    was more than I thought we were going to get from her.  So

12    there is a fair number of documents in here that would, again,

13    go to her knowledge, among other things.

14         THE COURT:  Did you seek discovery from any third

15    party?

16         MR. BISS:  No, I didn't, Judge.  I have a massive file

17    on the MabVax issues, the SEC issues.  You know, obviously my

18    client has access to the documents that he believes demonstrate

19    falsity.

20         THE COURT:  May I ask you what the thinking was in not

21    deposing Ms. Buhl?

22         I appreciate that you felt that you got some useful

23    documents from her, but presumably you would want to pin down

24    her as to what her thought process was and what she didn't

25    know.  And the documents that you have received may assist you,

L7JsKESc

1    but there is nothing like a deposition to exhaust the witness

2    on propositions like that.

3             What was the thinking in not deposing Ms. Buhl?

4             MR. BISS:  Judge, the thinking was utility only.  The

5    thinking was we have enough documents to demonstrate that she

6    acted with malice, we have enough documents to demonstrate

7    falsity.  There was no utility from doing this.  I mean, I've

8    taken over 10,000 of these things, and sometimes I depose the

9    party, sometimes I don't depose the party.  This one we just

10   made a decision that there weren't be any useful purpose, other

11   than to educate Ms. Buhl, no useful purpose in taking her

12   deposition.

13            THE COURT:  OK.  You also agree that whatever the fate

14   was or could have been of the objected-to demands, at this

15   point, fact discovery is closed?

16            MR. BISS:  I agree with that.  I mean, if I had

17   thought that there was an objection worth bringing to your

18   attention, I would have.  But yeah, I agree with what you said

19   on that.

20            THE COURT:  OK.  Fair enough.

21            All right.  Continuing on just focusing, for the time

22   being, on the defamation claim by the plaintiff and not at this

23   point on the anti-SLAPP claim, both sides seem to agree in your

24   letters, as appears to be the case, that actual malice is the

25   governing standard.

L7JsKESc

1          Let me just get a yes or no to make sure that that is

2     common ground.

3          Mr. Schmidt?

4          MR. SCHMIDT:  Yes, your Honor.

5          THE COURT:  Mr. Biss?

6          MR. BISS:  Judge, I have some reticence.  I just want

7     to explain that briefly to your Honor.  I understand what the

8     statute says.  The revised statute pretty much makes actual

9     malice the standard even in a private individual case.  Our

10    contention is Mr. Kesner is a private individual.  So, again, I

11    have some reticence as to whether or not actual malice is the

12    appropriate constitutional standard under <u>Gertz</u> or other

13    decisions.

14         But, again, I do acknowledge that the statute, as it

15    has now been amended, it seems to make actual malice applicable

16    even to a private individual case.

17         THE COURT:  I mean, that is really where I'm going

18    here, which is I appreciate from your perspective that, as a

19    matter of federal constitutional law, in the absence of a state

20    statute, you would have a leg to stand on, at least that is the

21    argument you're making.

22         But given that we're in New York, isn't it right that

23    as a matter of New York law, where we have a matter of public

24    concern which I think all agree we have here, actual malice is

25    the dispositive standard?

L7JsKESc

1          MR. BISS:  I think that's right, Judge.  I said I have

2     some reticence.  I don't want to belabor the issue.  I think

3     that's --

4          THE COURT:  What I'm trying to do is understand and

5     frame the issue for summary judgment.  I want to see if we can

6     close the door by agreement on some other standard being

7     dispositive here on the fault element of the cause of action.

8          Mr. Biss?

9          MR. BISS:  Judge, I do, with regret, I suppose, I do

10    have to admit the actual malice is probably the standard.  I

11    indicated in, I think, my letter to you that I had some

12    question about it.  But I think, in the end, the statute does

13    apply.  I didn't make any full-hearted or full-throttled

14    argument that this wasn't a matter of public concern, but I do

15    think the proper standard is actual malice.

16         THE COURT:  All right.  Thank you.

17         Look, I appreciate the candor with the court.  That is

18    certainly my read on the situation here, granted without the

19    benefit of briefing.  I thought it would be useful to make sure

20    we have common ground.

21         All right.  Given that, Mr. Schmidt, your summary

22    judgment argument is presumably then, at least as advertised to

23    me, key to and limited to that element, am I right, the actual

24    malice element?

25         MR. SCHMIDT:  That's correct, your Honor.

L7JsKESc

1          THE COURT:  You don't intend to move for summary

2     judgment on some other element?

3          MR. SCHMIDT:  We don't intend to do that, your Honor.

4          THE COURT:  Then just give me the short -- this is not

5     oral argument, it is an opportunity to give me the *Reader's*

6     *Digest* version, if you will.

7          What's the basis for arguing that Mr. Kesner cannot

8     get to a jury on actual malice, what he is saying -- and there

9     may well be more based on the evidence that he said he has

10     received from Ms. Buhl -- but you would be the movant here.

11          What is the snapshot as to why actual malice can't be

12     inferred from accusing a person of a crime that he says he

13     didn't commit?

14          MR. SCHMIDT:  Well, just starting off, the court can

15     cite actual malice on summary judgment and the summary judgment

16     should be granted if no reasonable fact-finder could find by

17     clear and convincing evidence that the defendant acted with

18     actual malice.

19          Now, the court is going to look at, even though it is

20     a subjective standard, the court is going to look at objective

21     facts, circumstantial evidence, looking at the motive and the

22     intent from the defendant.  And although the plaintiff claims

23     that Ms. Buhl simply brought these articles out of her

24     imagination, I mean, I think really the issue is that falsity

25     alone is not enough to prove actual malice.  And that comes

L7JsKESc

1     from the <u>Bose Corp. v. Consumers Union of America</u> case.

2             Further, your Honor, Ms. Buhl was not in a position to

3     have direct or personal knowledge of some of these facts.

4     Really, she as a journalist, was looking from the outside, and

5     looking at various filings with the SEC, AKs, 10Ks that have

6     the plaintiff's name on them.

7             And furthermore, she has sources, confidential and

8     non-confidential and also filings in the courts.  There is two

9     <u>MabVax</u> cases in California currently still going on.  There is

10    also, of course, the SEC case, which really supported many of

11    her findings in her reporting.

12            So really, I think when you're looking at the record,

13    even though the plaintiff may claim that a statement is false,

14    I mean, that is not enough to really prove actual malice.  It

15    is whether the defendant subjectively held the thought that the

16    statement was false.

17            THE COURT:  Can we expect then, in support of your

18    summary judgment motion, since the defense didn't depose

19    Ms. Buhl, can we expect a declaration from Ms. Buhl attesting

20    to evidence bearing on her basis for making the accusation?

21            MR. SCHMIDT:  That's correct, your Honor.  We do

22    intend to include a declaration by Ms. Buhl.

23            THE COURT:  All right.  May I ask you, I mean, I

24    appreciate that, in the ordinary course, one needs to keep the

25    falsity and fault inquiries distinct.  Nevertheless, ultimately

L7JsKESc

1    the relationship between the two is case dependent, right.  And

2    there are going to be some accusations you can make where

3    actual malice is more reasonably inferred from simply the fact

4    of accusing somebody of something.

5          If I were to imagine whatever the most vile accusation

6    I could make against John Doe would be -- and we're assuming

7    I'm naming John Doe by name, and in an article I accuse John

8    Doe of just the most vile behavior towards, you know, babies

9    and orphans -- one could presumably infer just from the false

10   statement about that, that I did so with actual malice.

11         Putting aside whether that is that case, would you

12   agree that, at least in some circumstances, there is a *res ipsa*

13   quality about the state of mind you have when you make a

14   particularly vile allegation?

15         MR. SCHMIDT:  I think the falsity was, of course, your

16   Honor, falsity is a fact in play, but it is not the only

17   factor.  Of course, it is what the plaintiff believed at the

18   time, and I think the record is clear from the sources that

19   Ms. Buhl drew upon for her reporting that, you know, this

20   wasn't from her imagination.  She did have some basis for

21   believing this.

22         THE COURT:  So will your summary judgment motion then

23   be focused on the absence of evidence known to you in the

24   record of bearing on Ms. Buhl's malicious state of mind?

25         MR. SCHMIDT:  Could you rephrase that, your Honor?

L7JsKESc

1          THE COURT:  Yes.

2          I'm trying to understand whether the look and feel of

3     your summary judgment is, A, going to just simply focus on the

4     gap here, what you can contend to be a lack of affirmative

5     evidence beyond just the falsity of the claim that Ms. Buhl had

6     malice, or will you be essentially trying to disprove it by

7     putting before me factual evidence in, let's say, a Buhl

8     declaration that would tend to be inconsistent with actual

9     malice?

10          MR. SCHMIDT:  Well, I think we are going to attack the

11     actual malice head on, and really, this is the plaintiff's

12     element to prove.  Really, the record, as I read, is completely

13     bare of any kind of these objective facts in this

14     circumstantial evidence that the court could look at to

15     establish actual malice.  So yes, we are going to be using her

16     declaration to fill the gaps in a way.

17          THE COURT:  All right.  OK.

18          Let me then ask you, do you expect, Mr. Schmidt, to

19     have factual declarations from anybody other than Ms. Buhl

20     submitted in support of the summary judgment motion?

21          MR. SCHMIDT:  We haven't gone into that in depth, but

22     from right now, I don't believe so, your Honor.  It would just

23     be Ms. Buhl.

24          THE COURT:  All right.  Thank you.

25          Mr. Biss, over to you.  If, essentially, the feel of

L7JsKESc

1    the declaration were, we know of no evidence of actual malice,

2    actual malice cannot be inferred even from the assumed falsity

3    of the accusation that Mr. Kesner was, you know, a criminal in

4    cahoots with his client, and they basically say, you know, ball

5    is in your court, Kesner, show us what the proof is on which a

6    jury could find actual malice, are you relying solely on the

7    inferences from the fact that Ms. Buhl made the allegation, or

8    is there something more you've got?

9            MR. BISS:  Judge, I think there is something more.

10           I think your Honor is correct in that there is a *res*

11   *ipsa* quality.  I've never heard anybody point it out and use

12   that phrase, but I think that is exactly what we have.  And

13   there are cases that I'm aware of in the Southern District of

14   New York in which people have been accused of crimes and the

15   courts have found there is a genuine issue of fact because

16   there was no criminal conviction, there was no charge, there

17   was nothing in the public record that would even provide a

18   kernel of truth to the statement.  And the court then said

19   there is a reasonable inference to be drawn from the complete

20   lack of evidence to support the idea that the person knew it,

21   knew it to false, and, therefore, it was fabricated or it was a

22   product of her or his imagination.

23           I think the idea of the profession of good faith, the

24   idea that if you say you can't prove the lack of actual malice

25   by simply saying that, oh, I believed in good faith, I believed

L7JsKESc

1   these statements in good faith, I think the Supreme Court in

2   the Sanidad case dealt with that very issue.

3           We will probably have declarations from two or three

4   other individuals, I believe one of whom I indicated in the

5   letter response that we filed, to dispute the good faith nature

6   of Ms. Buhl's allegations.

7           In addition --

8           THE COURT:  Who are those individuals?

9           MR. BISS:  Judge, there may be some member of,

10  quote-unquote, Team Honig.  Right now we're speaking with one

11  or more of those individuals who are involved in the SEC

12  litigation.  So there may be one or two others that we do

13  present, one or two other declarations.

14          THE COURT:  Are these people who had dealings with

15  Ms. Buhl?

16          MR. BISS:  Yes, they are individuals who would have

17  knowledge.

18          THE COURT:  Of what she knew and was asking?

19          MR. BISS:  That's correct, your Honor.  They would

20  have knowledge of what she knew or should have known.

21          THE COURT:  OK.  In other words, the theory here is

22  that you're not merely going to be relying on the fact that she

23  accused Kesner of a crime, but perhaps you will be adding to

24  that declarations of other people who had firsthand dealings

25  with her that, from your perspective, may get you over the line

L7JsKESc

1    to get to trial here.

2              MR. BISS:  Yes, your Honor.

3              THE COURT:  May I ask you, just go back though to the

4    *res ipsa* issue.  I was, I'm sure as you could tell, posing a

5    hypothetical.  I wasn't supposing that the facts in this case

6    give rise to that.  I'm happy to receive arguments from either

7    side on that point.  I was merely making a point which seemed

8    to me obvious.  One can imagination an allegation so

9    disgraceful and, perhaps, so clearly untrue that the inference

10   of actual malice could be drawn.

11             In this case, and you I think followed that up by

12   suggesting that the nature of the allegation in this case, even

13   if there were no corroborative declarations from people who

14   have had contact with Ms. Buhl, that the nature of the

15   allegation Ms. Buhl makes against Kesner in this case could

16   give rise to such an inference on the basis of some New York

17   case law.

18             May I ask you, I mean, in this case you've got

19   criminal charges, right, brought against the plaintiff's client

20   and you've got the MabVax complaint and the SEC's actions

21   there.  Wouldn't the connections that those draw between

22   Mr. Kesner and the offender and the offense be enough to get

23   rid of any basis for claiming on the basis of the allegation

24   alone that *res ipsa* there is an actual malice?

25             I mean, there is, to put it in, you know, literary

L7JsKESc

1  terms, there is a lot of smoke here, and isn't where there is a

2  degree of smoke like this, the fire accusation may be false,

3  but is it really actual malice?

4          MR. BISS:  Well, I mean, Judge, we obviously feel like

5  the acts of the client in this case can't be imputed to a

6  lawyer who wasn't involved.  I just think that the allegations

7  here of the criminal events which are repeated are extremely

8  egregious.  And so are they as egregious as a hypothetical that

9  your Honor suggested?  That is just it.  I think that's a

10 matter of viewpoint.

11         Mr. Kesner is an attorney who had a stellar

12 reputation, and these allegations, repeated allegations of

13 criminal conduct, attempted to tie him to Team Honig and

14 accusing him of multiple allegations in multiple different

15 securities transactions, we think they are extremely egregious

16 charges to be leveled against an attorney.

17         So, again, I think that there, although your Honor

18 said there may be smoke here, sometimes there is smoke but, you

19 know, it demonstrates that the person who made the statement

20 should have cleared the smoke out of the room before they

21 started accusing people of crimes.

22         THE COURT:  All right.  Well played.  I take the

23 point.  I mean, I understand what you're saying.

24         All right.  Look, I think this gives me a good

25 understanding of at least what the basis will be for the back

L7JsKESc

1    and forth on actual malice.

2          OK.  May I ask you, Mr. Schmidt, you're the movant

3    here.  How detailed is your 56.1 statement likely to be?

4          It doesn't appear to be, since we've got one element

5    and essentially one relatively similar set of repeated

6    actionable allegations here, it doesn't seem like it is going

7    to be that dense and deep.

8          But I would welcome some more concrete sense of what

9    the factual support, the 56.1 statement and attachments, is

10   going to look like.

11         MR. SCHMIDT:  Yes, your Honor.

12         Well, we will be citing to the record and publicly

13   filed documents.  I don't think it is going to be as extensive

14   as it would be if we were challenging all five elements.  We

15   are really narrowing it to one element.  But, nonetheless, and

16   in contravention of the plaintiff's position, I mean, he is

17   involved with these three clients and a lot of his actions are

18   detailed in the SEC complaint.  So we are going to be diving

19   into those filings and the MabVax filings from California and,

20   of course, what Ms. Buhl believed at the time.

21         THE COURT:  So what you're telling me is that some

22   portion of the 56.1 statement will consist of the pleadings in

23   the MabVax and SEC actions insofar as those are informative of

24   Ms. Buhl's state of mind.

25         What other material of consequence at this point do

L7JsKESc

1    you expect to populate your 56.1 statement?

2            MR. SCHMIDT:  Well, there is other statements on the

3    record from various people, including letters and e-mails that

4    concern the plaintiff, and also, your Honor, Ms. Buhl is not

5    the only one who is really casting the plaintiff in this light.

6    There is numerous, numerous public filings, and although we

7    can't take the truth of them for what it is, they are still out

8    there.  They are still allegations of misconduct, and serious

9    misconduct.

10           THE COURT:  May I ask you, though, I parsed Ms. Buhl's

11   many blogs carefully and drew out as actionable only the

12   subsets of them that accuse Kesner of a crime.

13           Is what you're saying that other publications not

14   merely are disparaging towards Mr. Kesner because that wouldn't

15   be actionable in all likelihood?

16           I certainly found the rest of what Ms. Buhl wrote not

17   to be actionable.  I found the entirety of the article that

18   Kesner seized upon in Barron's to be not actionable.

19           Are you saying that there actually are other materials

20   out there written before or at the time that Ms. Buhl wrote

21   hers that -- watch my words here -- accused Mr. Kesner of a

22   crime?

23           MR. SCHMIDT:  No, your Honor.  Ms. Buhl has never

24   really accused the plaintiff of a crime.  She has said numerous

25   times that he has never been charged and that he is not a named

L7JsKESc

1     defendant.

2                 THE COURT:  No, no, no.  She's the accuser.  She's the

3     accuser.  Look at page 41, among many other excerpts of my

4     decision, in which I write, "Although the twig links Buhl's

5     March 26 article, it also flatly accuses Kesner of breaking the

6     law."  I have construed repeated statements by your client that

7     way.  So my question to you is, is she the only one who in

8     print has done that?

9                 MR. SCHMIDT:  I think there are inferences from these

10    public court filings that, if proven true, could amount to a

11    crime of securities law.

12                THE COURT:  But the answer then to my question is no,

13    because you've just changed the hypothetical.  You said

14    inferences if proven true.  The issue is not whether the facts

15    that other people wrote or that Ms. Buhl elsewhere wrote about

16    Mr. Kesner are consistent with his committing a crime.  Of

17    course they are.  The issue is whether that means he did commit

18    a crime.

19                Any lawyer, it's possible, aided and abetted the

20    client.  It's possible that is true.  It's another thing to

21    flat out say it.  I thought you just said to me that part of

22    what your 56.1 statement would be, would be showing bird's of a

23    feather.  People like Ms. Buhl who, with similar data available

24    to them, equally accused Mr. Kesner of a crime.  Under my

25    questioning, you seem to be backing away from that.

L7JsKESc

1          Which is it?

2          MR. SCHMIDT:  We are in possession of a letter that I

3     would say accuses Mr. Kesner of a crime, yes.

4          THE COURT:  Where was the letter published?

5          MR. SCHMIDT:  It was not published.  It was, I think,

6     sent to a board member of one of these publicly -- public

7     companies, and also it seems to have been sent to the DOJ and

8     the SEC.

9          THE COURT:  But not something that is subject to the

10    standards of defamation, given its non-publication?

11         MR. SCHMIDT:  I believe it could be considered a

12    publication because it was sent to more than one person and it

13    was also posted online.

14         THE COURT:  OK.  All right.  Look, I assume your 56.1,

15    notwithstanding the limited discovery taken, will be up to the

16    task of authenticating as court admissible, everything you're

17    attaching.  One of the challenges we get in a case -- and I see

18    this time and again, and this applies to both counsel here --

19    when you don't take depositions, you run the risk that the

20    items you're trying to put before the court are unauthenticated

21    and you will be opening yourself up to a rejoinder by the other

22    side that the evidence that you are citing is not ready for

23    prime time in court.  It's not been properly authenticated.  I

24    expect you'll be able to do so.

25         All right.  With respect to you, Mr. Biss, what's the

L7JsKESc

1    volume of evidentiary material you expect to be bringing to

2    bear on the summary judgment motion, in effect, to beef up the

3    record to make sure from your perspective, you have cleared the

4    bar in terms of an amount of evidence that could support a jury

5    verdict that Ms. Buhl acted with actual malice?

6            MR. BISS:  Candidly, Judge, I don't want to sound

7    wishy-washy.  I'm going to indicate I'm not exactly sure what

8    the volume of it is going to be.  We plan to have declarations,

9    we plan to have documents, we plan to have the articles in

10   question, the blogs in question.

11           So I don't know the exact volume of material.  We

12   intend to present a fairly lengthy, I don't want to say

13   dissertation, because I just said it's not going to be lengthy,

14   but we intend to provide the court with an exhaustive 56.1

15   statement on the actual malice issues.

16           THE COURT:  OK.  All right.  Well, look, counsel, I

17   think the next step for me is to set a schedule for briefing as

18   to this motion.  Then after that, I want to just probe a little

19   bit the relationship between the defamation and the anti-SLAPP

20   claim and counterclaim respectively.

21           For the time being the issue is a schedule.  There are

22   cases in which I ask counsel to come together before the

23   briefing begins to submit a set of joint stipulated facts.

24   This is not a case in which I think this would be useful.  You

25   have had no time to collaborate on discovery.  You got some

L7JsKESc

1    documents going back and forth.  No depos.  And it seems to me

2    I'll be inviting more secondary disputes, if I ask you to work

3    together.

4              I would rather set a very brief schedule, first

5    of all, for the defendant's submissions, and then for the

6    plaintiff's opposition, and then for the defendant's reply, and

7    get it on here.

8              Mr. Schmidt, how soon until you can file your opening

9    motion for summary judgment and obviously your supportive 56.1

10   materials?

11             MR. SCHMIDT:  We would like at least two weeks, your

12   Honor, but more time would be useful.

13             THE COURT:  Look, I'm certainly willing to give each

14   side three weeks.  I think that is reasonable.  It's the summer

15   and I appreciate that there is probably some way in which the

16   pandemic has impeded your practice.

17             Will three weeks be tough?

18             MR. SCHMIDT:  Yes, your Honor.

19             THE COURT:  Three weeks from July the 19th is

20   August 9.

21             Mr. Biss, three weeks for you to respond?

22             MR. BISS:  Judge, that's fine.

23             THE COURT:  August 30.

24             Then, Mr. Schmidt, I'm going to give you two weeks to

25   reply.  I'm mindful that picks up Labor Day.  I usually would

L7JsKESc

1   have given one and a half.  Two weeks seems to make sense.

2   That is September 12.

3           Does that work for you, Mr. Schmidt?

4           MR. SCHMIDT:  Yes, your Honor.  Thank you.

5           THE COURT:  I will issue a scheduling order that

6   simply sets out those dates without more as the schedule for

7   the summary judgment submissions.

8           I do want to urge everybody, you should read some of

9   my old summary judgment decisions.  Among other things, there

10  is usually a framing paragraph or footnote early on, you know,

11  reiterating standard, right down the middle, circuit law

12  vis-a-vis materials that are cognizable and materials that need

13  to get set aside for lack of conformity with required procedure

14  with respect to 56.1 statements, and I cannot tell you how

15  often it is that people trip up on that.

16          For example, you know, there is a well-founded factual

17  proposition in the 56.1 statement of a movant, and it is just

18  generally denied by the opponent, but without, unlike the

19  affirmative statement, any admissible evidence in support of

20  the opposition.  Under those circumstances, I have got to

21  credit the factually supported statement in the 56.1.

22          I, as well, oftentimes see situations in which there

23  is a 56.1 proposition put forward by a party which may well be

24  something that could have been proven by competent evidence.

25  Alas, the material in support of it is unauthenticated, just

L7JsKESc

1    like a newspaper story or if it is a writing that is secondhand

2    or unauthenticated.

3          Don't be that guy.  I want you to make sure that you

4    are ticking and tying each statement to admissible evidence.

5    Just saying because I want this case to be litigated on the

6    merits, not because there was lawyerly inattention to those

7    evidentiary foundations.

8          All right.  Before we pivot to the anti-SLAPP

9    material, I'm just going to go around the horn to see if there

10   is anything else I need to be mindful of as we embark on the

11   important part of this case, that is briefing summary judgment.

12         Mr. Schmidt, you go first as the movant.  Is there

13   anything else that need to be said about this premotion

14   conference?

15         MR. SCHMIDT:  Thank you, your Honor.  I don't believe

16   so.  I don't believe so.

17         THE COURT:  Mr. Biss?

18         MR. BISS:  No, sir.

19         THE COURT:  All right.  Look, I thank you for the back

20   and forth.  It is an interesting case and an important one, and

21   I'm eager to see what you each bring to bear.

22         Look, what I would say is just as guidance.  I am

23   interested in the extent to which on the facts here, mileage,

24   if any, towards the actual malice requirement can be gotten

25   from the fact of an accusation allegedly false of his

L7JsKESc

1   commission of a crime and how much one goes beyond that.  I'll

2   be eager to see what you come up with from the case law.

3          Obviously, a very important issue here is going to be,

4   to the extent that we don't have much evidence -- and there may

5   be a lot or there may be zero -- about Ms. Buhl's behavior in

6   fact and because there have been no depositions taken, and

7   including of her, there may not be a lot of, you know, tactical

8   evidence about her movements and questions and diligence or

9   failure to due diligence.

10         Oftentimes, somebody's failure to ask questions would

11  be the sort of thing that you might make inferences about.  But

12  the lack of a deposition here may mean that she is a shadowy

13  figure and there isn't sort of lot of evidence reconstructing

14  all of her investigative process.  So one of the questions I

15  will be interested in is what inferences can be drawn from the

16  materials that were known to be available to her, including

17  MabVax and SEC.

18         All right.  The remaining issue I want to take up is

19  this.  I've got a fully briefed anti-SLAPP motion here, motion

20  to dismiss the counterclaim here.  The motion is brought by the

21  plaintiff.  Sort of a double negative with all the anti-SLAPP

22  stuff.  Ultimately, it is a motion by Mr. Biss.

23         Mr. Biss, just briefly, play out the scenarios here.

24  Suppose for argument sake you lose on summary judgment on

25  actual malice.  I'm going to give you the opposite hypothetical

L7JsKESc

1    later.  Assuming you lose on summary judgment, that is to say

2    the case is tossed.

3            What happens then to the anti-SLAPP counterclaim?

4    Does it have any indication for it?

5            MR. BISS:  Judge, I haven't really thought of that

6    question.  I suppose if I lose on the main claim, on the main

7    defamation claim, then the issue would still remain whether or

8    not I had a substantial basis --

9            THE COURT:  Right.

10           MR. BISS:  -- for bringing it.  So there is interplay.

11   I understand your Honor saying there is interplay.  I think,

12   ultimately, the correct analysis would be, even if the

13   plaintiff loses this case, that does not automatically mean

14   that the SLAPP fees, or whatever the correct phrase is, are to

15   be awarded because there are plenty of cases in the Southern

16   District and in New York in which the plaintiff didn't proceed,

17   but the court found that certainly just because the

18   plaintiff -- just because the case was dismissed for whatever

19   reason, that doesn't mean that the plaintiff didn't have a

20   substantial basis for bringing it in the first place.

21           THE COURT:  Understood.  Here is the question.

22           The tricky aspect of the chronology here is that you

23   brought your case before the New York anti-SLAPP statute was

24   amended to give Ms. Buhl a manner of attack.  So your pleadings

25   by definition, your complaint didn't have to be measured

L7JsKESc

against the New York anti-SLAPP statute at the time that it was

filed.

I guess the question would be, let's suppose you lose

on summary judgment, the defamation claim gets tossed.  How do

we then proceed?

In other words, it may be that, you know, can the

anti-SLAPP claim be resolved on the pleadings, or because the

pleadings preceded the broadening of the statute, which now

gives a defamation defendant more of a basis to attack

pleadings, do we almost have to get to discovery to litigate

the anti-SLAPP claim?

MR. BISS:  I think we need to get to discovery to

eliminate anti-SLAPP.

THE COURT:  Now let's suppose that you prevail on

summary judgment and this case is going to trial on defamation,

Mr. Biss.  Does that by definition mean that the anti-SLAPP

claim has to be dismissed, or can it still coexist and go

further?

MR. BISS:  Judge, I almost want to argue to your Honor

that the fact that it has proceeded past 12(b)(6) means that

the SLAPP claim has to go away.  I think there is case we cited

in one of the memos that we filed to that extent.

But yes, I mean, I think if I prevail, at least at

summary judgment, then the issue is there is a factual issue,

and I would think that that would, per se, mean that there is a

L7JsKESc

1   substantial basis in fact for the claim.

2               THE COURT:  What, though, if the evidence on which you

3   prevail substantially is evidence you didn't have on hand at

4   the time you filed the lawsuit, but came only later?

5               The anti-SLAPP provision is really focused on what you

6   had at the time you brought the case, right?

7               MR. BISS:  That's correct, but I don't know that I

8   with be foreclosed from utilizing that after that post-filing

9   evidence to still demonstrate that the case had a substantial

10  basis in fact.  It's kind of like in the substantial truth area

11  in terms of the article.

12              I mean, I've got cases, Judge, where the defendant

13  reporter, you know, made the statements that they did in the

14  article based on one interview.  And then when they argue

15  substantial truths, they do so based on an evidentiary record

16  that they didn't know existed at the time of the time that they

17  reported the article.

18              So, again, I mean, I think my point is that after

19  required evidence should be admissible in my view to oppose the

20  SLAPP motion even though it wasn't in the original filings.

21              THE COURT:  Is your argument to that effect enhanced

22  by the fact that these anti-SLAPP statutes took effect in the

23  middle of the discovery period here?

24              In other words, whatever decision you made to bring

25  the lawsuit, you didn't have to be thinking anti-SLAPP thoughts

L7JsKESc

1    at the time you brought it because there wasn't a statute that

2    applied to this area.

3            MR. BISS:  Yes, and certainly I shouldn't be

4    penalized, in my view, by the fact that the plaintiff in this

5    case could not possibly have foreseen an amendment to the

6    statute.

7            THE COURT:  All right.  Thank you.  That is helpful.

8            Mr. Schmidt, let me turn to you, and let's start with

9    that hypothetical.  Let's suppose you lose on summary judgment,

10   i.e., the defamation case is going to trial.

11           What does that mean for your anti-SLAPP counterclaim?

12           MR. SCHMIDT:  I'm not sure, your Honor.  I think

13   briefing on this would be useful.  I don't necessarily think it

14   would automatically end our claim.  On another point, I believe

15   Section 70(a), it actually talks about whether the plaintiff

16   brought and continued the case, in which the case, the

17   plaintiff is obviously continued this case even after the

18   statute was amended.

19           THE COURT:  Right.  So I guess, Mr. Schmidt, the

20   question --

21           By the way, I heard a beep on the line.  I believe

22   those are people for my four o'clock.  You should stay mum.

23   I'm finishing a three o'clock conference.

24           Mr. Schmidt, coming back to that, though, I take it

25   then that you agree that the point of reference with respect to

L7JsKESc

1    evaluating compliance with the anti-SLAPP statute is at the

2    point of continuation by Mr. Biss of the lawsuit, not at the

3    point of his bringing it, because at the point he brought it,

4    the anti-SLAPP statute hadn't been amended to cover this fact

5    pattern?

6            MR. SCHMIDT:  I would agree with that, your Honor.

7            I believe the starting period would be the enactment

8    of the law, I believe on November, sometime this November of

9    2020.

10            THE COURT:  Now, the final scenario for Mr. Schmidt.

11   Assuming that you were to prevail and secure summary judgment

12   as against the defamation claim, does that necessarily mean you

13   win your SLAPP claim, or does it require an investigation in

14   effect of what the plaintiff knew as of the time the anti-SLAPP

15   statute was passed and a decision was made or imputed to

16   continue the defamation claim?

17            MR. SCHMIDT:  Because there is really three parts of

18   Section 70(a) and that is, you know, the attorneys' fees and

19   that is compensatory damages and then there is punitive

20   damages.  So the last two really go to the intent of the

21   plaintiff, the SLAPP plaintiff.

22            To your question, your Honor, I think that, I mean, if

23   we win on this summary judgment, and it is conclusive, I would

24   say that is very strong evidence that this entire case was

25   filed without a substantial basis in fact or law.  Yes, I think

L7JsKESc

1     that would be a controlling fact.  It would be very good for

2     us.

3            THE COURT:  I don't doubt that it would be good for

4     your side.  That doesn't make it a controlling fact.

5            Look, very helpful.  Look, I'll issue an order that

6     sets out the summary judgment briefing schedule.  I think it is

7     more likely than not I will entertain oral argument in this

8     case, both to make sure that I'm as well versed in this as I

9     can in resolving the summary judgment, but it may also be that

10    we are all in a better position at that point to explore the

11    relationship between the claim and the anti-SLAPP counterclaim

12    in the case.

13           I'm not, however, going to schedule oral argument

14    until my staff and I have had a chance to review the briefs.

15    In any event, thank you for very helpful discussion.

16           I wish you both a good summer.  Look forward to seeing

17    what you submit on this, and we will be in touch for scheduling

18    oral argument.

19           I need about a ten-minute break and then I will jump

20    on the call.  Thanks.  We stand adjourned.

21           (Adjourned)

22

23

24

25