UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HARVEY J. KESNER, | |
| Plaintiff, | 20 Civ. 3454 (PAE) |
| -v- | OPINION & ORDER |
| TERI BUHL, | |
| Defendant. | |
| TERI BUHL, | |
| Counter-Claimant, | |
| -v- | |
| HARVEY J. KESNER, | |
| Counter-Defendant. | |

PAUL A. ENGELMAYER, District Judge:

This case involves libel claims arising out of blog posts about plaintiff Harvey J. Kesner ("Kesner") by defendant Teri Buhl ("Buhl"). Kesner is an attorney who represented public companies embroiled in an alleged pump-and-dump stock-selling scheme that became the subject of an investigation by the Securities and Exchange Commission ("SEC"). Kesner's role in his clients' misdeeds was the subject of various unflattering media reports. These led Kesner to bring this libel suit against Buhl, a frequent blogger and investigative journalist focused on financial reporting, Dow Jones & Company, Inc. ("Dow Jones"), and William Alpert ("Alpert"). Kesner's claims against the latter two were based on an October 2018 article Alpert wrote for the Dow Jones magazine *Barron's*.

The Court previously dismissed in its entirety Kesner's libel claims against Dow Jones and Alpert, and in principal part Kesner's libel claims against Buhl, for failure to state a claim. *See Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 158 (S.D.N.Y. 2021), *appeal dismissed* (2d Cir. Apr. 16, 2021). The Court left standing Kesner's claims only to the extent that Buhl, in three of her many blogs and tweets on the subject, had accused Kesner of criminal activity. Before the Court now is Buhl's motion for summary judgment as to the three surviving claims against her. Also before the Court is Kesner's motion to dismiss a counterclaim that Buhl brought during discovery, asserting a violation of New York Civil Rights Law § 70-a.

For the reasons that follow, the Court grants both Buhl's summary judgment motion and Kesner's motion to dismiss.

## I.    Background

### A.    Factual Background[1]

#### 1.    Parties

Kesner is an attorney and a member of the New York Bar.  Dkt. 36 ("Am. Compl.") ¶ 37; Pl. 56.1 ¶ 1.  His legal practice focused on securities law and other financial matters.  Def. 56.1 ¶ 2; Pl. 56.1 ¶ 2.  In 2018, Kesner left the law firm Sichenzia Ross Ference Kesner LLP ("SRFK").  Def. 56.1 ¶ 3; Pl. 56.1 ¶ 3.

Buhl is a blogger who styles herself an investigative journalist.  Her reporting focuses on the financial and securities industry.  Buhl Aff. ¶¶ 1–7.  Buhl is the owner of and sole reporter on the news site: "Teri Buhl Smashmouth Investigative Journalism," which today is available at www.teribuhl.com.  *Id.* ¶ 7; Pl. 56.1 ¶ 5.  At all relevant times, Buhl was the sole user of the Twitter handle @buhlreports.  Buhl Aff. ¶ 8; Pl. 56.1 ¶ 6.  Buhl also works as a contributing

---

[1] The Court draws its account of the facts from the parties' respective submissions on the motions for summary judgment, including: Buhl's Local Rule 56.1 statement, Dkt. 146 ("Pl. 56.1"); Kesner's Local Rule 56.1 counter-statement, Dkt. 150-1 ("Def. 56.1"); Buhl's reply to Kesner's 56.1 counter-statement, Dkt. 152 ("Pl. Reply 56.1"); the declaration of Wesley J. Paul, in support of Buhl's motion, Dkt. 147 ("Paul Decl."), and attached exhibits; and the affidavit of Buhl, in support of her motion, Dkt. 145 ("Buhl Aff."), and attached exhibits.  The Court disregards Kesner's 56.1 Statement, whose citations are only to the Amended Complaint, and as to various propositions contains no citations at all.  *See infra* § III.A.

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein.  When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

reporter for Cannabis Law Report, a publication based in Australia and owned by Sean Hocking. Buhl Aff. ¶ 3; Pl. 56.1 ¶ 7.

### 2.    Buhl's 2016–2018 Reporting on Kesner

On or around May 26, 2016, Buhl published on her website an article in which Kesner was mentioned for the first time.  Buhl Aff. ¶ 9.  The article was titled *Microcap Attorney Jaclin's Co-Conspirator Turned DOJ Witness in Shell Factor Scheme* ("May 2016 Article").  *Id.* The May 2016 Article mentions Kesner as the attorney for Barry Honig ("Honig"), who, the Article speculates, had been involved in a scheme by an attorney named Jaclin.  *Id.* ¶ 10; *id.*, Ex. A.  Kesner was quoted in the article opining on whether Jaclin had improperly signed opinion letters in 2011 and 2012.  *Id.* ¶ 10.

Consistent with her growing number of blogs about these subjects beginning in mid-2016, Buhl states that, over time, she learned more about Honig and his investor group, which, she asserted, engaged in questionable stock transactions, specifically, alleged "pump-and-dump" schemes relating to the stock of publicly traded companies.  *Id.* ¶ 12.  She increasingly reported about this group, which included Honig's attorney, Kesner, and which she called "Team Honig" in her reporting.  *Id.*

On November 8, 2016, Buhl published an article titled *California DOJ investigating Honig and The Frost Group* ("November 2016 Article").[2]  *Id.* ¶ 13.  The November 2016 Article reported that the DOJ was "sniffing around" the investing and trading activities of Honig and Philip Frost.  *Id.*, Ex. B.  Specifically, Buhl reported, the DOJ was investigating whether trading activity in the company Biozone Pharmaceuticals, Inc. ("Biozone") was part of an illegal pump-

---

[2] Buhl claims that her website was hacked, and the article was removed.  On February 9, 2017, Buhl republished the article on her website.  Buhl Aff. ¶ 13; *id.*, Ex. B.

and-dump scheme. *Id.* The November 2016 Article included the following passage about

Kesner:

> Rumors have been swirling around the microcap space for a while now that attorney
> Kesner's work with Honig could place him in the hot seat with the SEC but the
> Biozone investor is the first person I've interviewed who said the SEC probed him
> about Kesner's role with Honig. Kesner has not been publicly named in any SEC
> enforcement actions. Kesner was fired from big law Haynes and Boone, where he
> worked before joining SRFF [sic].

*Id.* The November 2016 Article was the subject of a separate defamation suit brought by Kesner

against Buhl that was eventually dismissed with prejudice. *Id.* ¶ 13.

Buhl explains that at some point, she became aware of a statement made by Daniel Fisher

("Fisher") challenging an aspect of her November 2016 Article. *Id.* ¶ 14.[3]  In a sworn statement,

Fisher surmised that he was the anonymous "Biozone investor" referenced in the article. Fisher

denied telling Buhl that the SEC was investigating Kesner or that Fisher had been interviewed by

the SEC about Kesner. Buhl Aff., Ex C. Fisher stated that he told Buhl only that Kesner was the

deal lawyer for a transaction he reported to the SEC, and which had resulted in a private lawsuit

brought by Fisher. *Id.*

### 3.    The SEC Action

On September 7, 2018, the SEC filed a civil complaint against Honig and certain alleged

associates, in this District, alleging numerous violations of securities laws related to three public

---

[3] Fisher's statements were made in the context of a lawsuit he filed, on July 16, 2012, alleging
fraud in connection with the Biozone transaction by Biozone Pharmaceuticals, Inc., Michael
Brauser, the Brauser Honig Frost Group, Elliot Maza, Honig, and The Frost Group LLC.
("*Fisher v. Biozone*"). *See* Def. 56.1 ¶ 19; Pl. 56.1 ¶ 19. On September 24, 2013, pursuant to a
settlement agreement, a final judgment issued and the case was closed. *See* Def. 56.1 ¶ 20; Pl.
56.1 ¶ 20. On December 16, 2016, Michael Brauser and Honig reopened the suit in an attempt to
enforce, against Fisher, the underlying settlement agreement. *See* Def. 56.1 ¶ 21; Pl. 56.1 ¶ 21.
Kesner represented Brauser and Honig in their attempt to enforce that agreement. *See* Def. 56.1
¶ 22; Pl. 56.1 ¶ 22. On August 11, 2017, Fisher signed a sworn statement containing the denials
at issue. Buhl Aff., Ex. C.

companies (the "SEC Action"). Buhl Aff. ¶ 16; *id.*, Ex. D; Pl. 56.1 ¶ 11. These three companies

are Biozone (to which the SEC's complaint referred as "Company A"); MabVax Therapeutics

("Company B") ("MabVax"); and MGT Capital ("Company C") ("MGT Capital"). Paul Decl. ¶

8; *id.*, Ex. D; Pl. 56.1 ¶ 12. Kesner was not named or referenced in the SEC's original

complaint.

Buhl states that, as of this point, her earlier reporting had confirmed the following with

respect to Kesner:

- Since at least 2007, Kesner had represented Honig, and as a condition of future
  financing by Honig, had been appointed counsel of the microcap companies;

- Kesner's representation of companies in which Honig or his business associates
  invested generally included advice as to securities law;

- Once Honig made an investment into a public company, Kesner was often
  named as securities counsel for the public company;

- For both Biozone and MabVax, Kesner was counsel to these public companies
  before the SEC Complaint was filed. Buhl also had established that Kesner was
  counsel for MuscelPharm when it merged with Biozone/CoCrystal.

- Through a confidential source, Buhl learned that Kesner's involvement with
  "Team Honig" was also being investigated by the SEC.[4]

Buhl Aff. ¶ 16(a)–(e).

On March 8, 2019, the SEC filed its First Amended Complaint. Buhl Aff. ¶ 17; *id.*, Ex. E

("SEC FAC"); Pl. 56.1 ¶ 13. The SEC FAC made allegations concerning "Issuer's Counsel,"

and "Issuer's Counsel Partner." Pl. 56.1 ¶ 14; *id.*, Ex. E; Buhl Aff. ¶ 17. Issuer's Counsel was

the law firm SRFK. Pl. 56.1 ¶ 14. Issuer's Counsel Partner was Kesner. *Id.*; Buhl Aff. ¶ 17.

The SEC FAC included the following allegations, which Buhl understood to refer to Kesner and

SRFK:

---

[4] It is unclear from the record whether the confidential source referenced is Daniel Fisher.

- After a reverse merger of Biozone, resulting in Honig's and his associates' controlling Biozone's outstanding shares and of the company, Biozone disclosed that it had retained new corporate counsel ("Issuer's Counsel")—the same firm and same partner at that firm ("Issuer's Counsel Partner") whom Honig had insisted other issuers in which he was invested retain.  SEC FAC ¶ 90.

- During 2015 and 2016, "Honig and his associates used [MabVax], once a publicly traded shell, as another vehicle for their pump-and-dump schemes. . . . As with [Biozone], [Mabvax] engaged Issuer's Counsel as company counsel." *Id.* ¶ 125.

- In or about April 2014, Honig called the CEO of MGT Capital and announced "I'm the owner of your company.  You better do what I tell you to do."  Honig demanded certain actions and changes, including the engagement of "Issuer's Counsel." *Id.* ¶ 162.

- Thereafter, Honig and his associate made it a condition of Series D financing that MGT Capital "retain Issuer's Counsel and Issuer's Counsel Partner after the closing—the law firm and partner that they had required [Biozone] to retain, and the same law firm retained by [MabVax].  Not only did Honig and [his associate] insist that Issuer's Counsel represent [MGT Capital], in a March 12, 2015 email to [MGT Capital]'s CFO, [Honig's associate] also demanded that [MGT Capital] set aside a year of prepaid legal fees as an additional condition to doing the deal." *Id.* ¶ 172.

- Kesner allegedly helped conceal Honig's name from his investment in MGT Capital: "Issuer's Counsel also understood the importance of keeping Honig's and Brauser's investment through Southern Biotech undisclosed.  Right before the closing of the Series D financing, different counsel involved in the transaction sent proposed Form 8-K language to Issuer's Counsel (which was not yet counsel to [MGT Capital] and was acting as placement agent's counsel) in which [MGT Capital]'s then-counsel named Southern Biotech as an investor in a footnote.  Immediately, on March 25, 2015, Issuer's Counsel Partner and another lawyer from Issuer's Counsel wrote back that '[n]o stockholder [investor] should be named.'  Further, at [Honig's associate's] and Honig's direction, Issuer's Counsel changed the beneficial ownership blocker requirement to 2.49% to create an artificial and deceptive 'cap' on the amount of common stock that could be held at one time.  [Honig's associate] explained in a March 24, 2015 email to [MGT Capital]'s CFO that the requirement was 'due to [Honig] being the beneficial owner of both GRQ[]and Southern Bio[tech].'  While that 2.49% cap prevented GRQ and Southern Biotech from collectively owning more than 5%, it did nothing to prevent their aggregate group ownership with other associates from exceeding 5%—the reporting threshold—even if their individual common stock ownership was kept to 2.49% or below." *Id.* ¶ 179.

- When negotiating the final terms of the Series E financing for MGT Capital, "[Honig's associate] sought reassurance from Issuer's Counsel Partner in an April 3, 2015 email, asking: 'Are you comfortable that we will get control of the board with this language?' After the financings closed, Honig attempted to further exert his control over [MGT Capital]. For example, Honig spoke with [MGT Capital]'s CEO about changing the composition of the company's Board and suggested a specific individual as a candidate. After [MGT Capital]'s CEO interviewed the candidate, Issuer's Counsel Partner sent the candidate a letter containing the signature line of [MGT Capital]'s CEO inviting him to join the Board on April 1, 2015. When [MGT Capital]'s CEO learned of the offer, he contacted Issuer's Counsel Partner in an April 14, 2015 email and instructed him to rescind the offer because it had not been authorized by the Board. Issuer's Counsel Partner agreed to do so, explaining to [MGT Capital]'s CEO that he had been following Honig's directions in sending the offer letter on behalf of [MGT Capital]'s CEO." *Id.* ¶¶ 183–84.

On July 10, 2019, Honig settled with the SEC. As part of his settlement agreement, Honig is prohibited from denying in future motions that he violated the securities laws at issue. Def. 56.1 ¶ 16. On March 27, 2019, Elliot Maza, another defendant named in the SEC Action, settled. *Id.* ¶ 17.

### 4.     The *MabVax v. Kesner Sichenzia Ross Ference LLP* Malpractice Lawsuit

On September 10, 2018, MabVax filed a civil complaint against Kesner and Kesner's former firm, now Sichenzia Ross Ference, LLP, in California Superior Court in San Diego County (the "Malpractice Action"). Def. 56.1 ¶ 24; Pl. 56.1 ¶ 24. On October 30, 2018, the Malpractice Action was removed to federal court. Def. 56.1 ¶ 25; Pl. 56.1 ¶ 25. On September 22, 2020, the Malpractice Action was settled, and voluntarily dismissed with prejudice. Def. 56.1 ¶ 26; Pl. 56.1 ¶ 26.

### 5.     The *MabVax v. Honig* Litigation

On April 8, 2019, MabVax filed a civil complaint against Honig and several other defendants in California Superior Court in San Diego (the "Fraud Action"). On May 24, 2019,

the Fraud Action was removed to federal court.  As of the filing of Buhl's motion for summary

judgment, the Fraud Action is still pending.  Def. 56.1 ¶ 26; Pl. 56.1 ¶ 26.

> **6.    Buhl's Allegedly Libelous Publications**

The three publications of Buhl's that remain at issue in this case are as follows.

> *a.   October 31, 2018 Article*

On October 31, 2018, approximately one month after the SEC Action was filed, Buhl

published an article on teribuhl.com titled *Honig Deals lead to FINRA Investigation of Laidlaw*

*& Co.* ("October 31 Article").  Buhl Aff. ¶ 20; *id.*, Ex. F.  The October 31 Article included the

following passage, which Kesner contends is libelous:

> His crew of alleged bad actors—Team Honig—has been chronicled for years here
> at TERIBUHL.com and by Chris Carey at Sharesleuth and Bill Albert at Barron's.
> It consists of biotech billionaire and philanthropist Philip Frost, his fellow co-
> investing partners Michael Brauser/John O'Rourke/Marc Groussman, John Ford—
> the promoter who wrote favorable analysis on stocks, priming them for the 'pump'
> of Honig's 'pump and dump'—and Harvey Kesner, a deal lawyer from SIRF [sic]
> LLP linked to a number of Honig[']s investments.

Def. 56.1 ¶ 28; Pl. 56.1 ¶ 28.

As the basis for so reporting, Buhl states that on September 6, 2018, she received a call

from a person ("Informant 1"), who told her he had information about Honig and his

involvement in another entity called Laidlaw & Company ("Laidlaw").  Buhl Aff. ¶ 20.  Buhl

states she also spoke to two additional people ("Informant 2" and "Informant 3").  The three

informants shared with her text messages, internal documents, and emails showing that Honig

had used Laidlaw to "dump" his stocks, in exchange for Honig referring Laidlaw to his

companies for financing deals.  *Id.* ¶¶ 21–23.  The three informants told Buhl that Laidlaw used

SRFK as its counsel, and that Kesner was Honig's personal attorney.  *Id.* ¶ 24.

>    *b.  March 27, 2019 Tweet*

On March 27, 2019, Buhl published a statement on her twitter handle, @buhlreports. ("Tweet"). Def. 56.1 ¶ 31; Pl. 56.1 ¶ 31. The Tweet incorporated a link to a March 26, 2019 article Buhl published on teribuhl.com titled *Honig's Puppet CEO Elliot Maza settles with the SEC* ("March 26 Article"). Buhl Aff. ¶ 32; *id.*, Ex. H.

> The Tweet included the following statement, which Kesner contends is libelous:

>> The illegal back room deals and intimidation Honig and attorney Harvey Kesner did with BioZone (company A in SEC lawsuit) were egregious and the SEC sat back and watched it happen.

Def. 56.1 ¶ 32; Pl. 56.1 ¶ 32. Buhl explains that the Tweet was intended to convey her opinion that Honig's deals violated federal securities laws, and that Kesner had assisted in those illegal deals, and was based on the SEC FAC. Buhl Aff. ¶ 42. Buhl contends that she did not intend to accuse Kesner of committing a crime. *Id.* ¶ 43.

>    *c.  June 7, 2019 Article*

On June 7, 2019, Buhl published on teribuhl.com an article about a piece she had published that day on the Cannabis Law Report titled *US Lawyer, Harvey Kesner, aided accused stock fraudster DeFrancesco in Canadian Cannabis Company stock deal*. Buhl Aff. ¶ 48; *id.*, Ex. M. The article blogged on June 7 was titled *New Emails show attorney Harvey Kesner aided Defrancesco [sic] in Questionable Cannabis stock Deal $APHA $SOLCF* ("June 7 Article"). *Id.* ¶ 47; *id.*, Ex. L. It included the following title and passages, which Kesner contends are libelous:

- "New Emails show attorney Harvey Kesner aided Defrancesco [sic] in Questionable Cannabis stock deal: $APHA $SOLCF."

- "[A]n insider, Andy DeFrancesco, was using Barry Honig's deal lawyer [Kesner] to move hidden shares within his family. I am reporting for Cannabis Law Report today that new emails written by attorney Harvey Kesner on behalf of the DeFrancescos could show how the insiders skirt beneficial ownership disclosure rules. I reported last week, DeFrancesco's alleged hidden stock

ownership is at the heart of a new securities fraud lawsuit filed against him and his band of sophisticated bad actors by Aphria main street investors."

- "When the U.S. broker dealer saw attorney Harvey Kesner was pushing to get the shares through the U.S. clearing system call the DTC the transaction's legitimacy was challenged."

Def. 56.1 ¶ 35; Pl. 56.1 ¶ 35. Buhl states that the basis for the June 7 Article were emails she received from an "Informant 5," which reflected correspondence between Kesner and an unnamed broker dealer. Buhl Aff. ¶ 50. Although not included in the June 7 Article, the emails had been published in their entirety earlier that day in the Cannabis Law Report article to which the June 7 Article linked. *Id.* ¶¶ 48–50; *id.*, Exs. L, M. The text of the emails, and the context for each, as provided by Buhl, are as follows:

- On July 23, 2018 at 6:13 p.m., Kesner emailed the broker dealer to express concern that Catherine DeFrancesco's shares in Scythian would not be accepted for deposit:

  "Hi I tried to call you. The DTC approval is about to go stale unless [the broker dealer] deposits the DeFrancesco shares. All legal review was done when the shares were submitted to DTC initially. Are we on track?"

- On July 24, 2018 at 8:45 a.m., the attorney for the broker dealer responded:

  "Good morning Harvey. Regulation S-P, along with corollary State privacy laws, don't allow me to acknowledge or deny any particular account or deposits. That said, I had no idea that the DTC approval occurred or when. That's not my process. In terms of process and procedure, DTC reviews and the legal reviews with respect to any particular deposits are done by different areas of the firm that have different responsibilities. So if, hypothetically, someone deposited Scythian shares that deposit will need to stand on its own through my team's process."

- On July 25, 2018 at 12:31 p.m., Kesner responded:

  "Hi, the customer has emailed that I am authorized to speak with you concerning the deposit by Catherine DeFrancesco. As I understand it a question has been asked to the effect of why didn't

Delavaco Holdings, Inc. merely purchase shares in the open market? The following reflects our understanding.

The derivation of the shares (the same info was provided to DTC in connection with processing the DTC application that was approved) is that GT Capital Inc. (seller) sold to Delavaco Holdings, Inc. (buyer) from a larger share certificate owned by GT. GT maintains its own accounts in Canada (IA Securities) that purchased in the open market. See Statement.[5]

Andrea DeFrancesco owns GT Capital Inc (seller) and Cathy DeFrancesco owns Delavaco Holdings Inc (buyer) who are sister in laws. In connection with the initial DTC application, a US brokerage account was needed ( ) and an initial deposit into DTC made by the brokerage/DTC member. Catherine DeFrancesco (Delavaco) purchased the shares from the GT entity and opened the brokerage account solely for this purpose at to deposit the split off certificate of 10,000 shares of Scythian. There was no desire to purchase additional shares by Delavaco in the Canadian open market when ample shares were owned by GT and readily transferable, no desire for Delavaco to open a Canadian account and effectuate a trade, and the goal was specifically to effectuate the US DTC deposit. The share sale was completed in contemplation of the deposit presently being made. Accordingly, the deposit and transaction was essentially for the convenience of the pares given the account requirements as understood by them and us and the desire of Delavaco (not GT) to open an account with in the US. I hope this is satisfactory.

Regards, Harvey"

Buhl Aff., Ex. M; *see also* Def. 56.1 ¶ 36 (not disputing veracity of emails). Buhl states that she "believed at the time, and still do[es], that every statement written in [her] June 7 Article is true and that [she] had a reasonable basis for writing those statements." Def. 56.1 ¶ 55. Buhl further states that she "was unaware of any contradictory facts that would cause [her] to doubt that [her] reporting in the June 7 article was true, or to make [her] doubt the veracity of [her] sources or their information." *Id.* ¶ 56.

---

[5] Notwithstanding this apparent reference to an attachment, the June 7 Article did not contain an attachment.

### B.    Procedural History

On May 31, 2019, Kesner filed his original complaint, bringing libel claims against Dow Jones, Alpert, and Buhl in federal court in the Southern District of Florida.  Dkt. 1.  On May 1, 2020, that court, finding venue improper and that the interest of justice would be best served by a transfer, transferred the case to this District.  Dkt. 76 at 4.

On January 26, 2021, this Court granted Dow Jones' and Alpert's motion to dismiss in its entirety.  The Court also granted Buhl's motion to dismiss all non-libel claims and most of Kesner's libel claims against her.  Of the seven articles and four tweets that Kesner claimed were actionable, the Court left standing Kesner's claims only as to the three publications about Kesner reviewed above, and only to the extent that these accused Kesner of criminal conduct.  *See* Dkt. 114.

On March 8, 2021, Buhl filed an answer to Kesner's complaint, asserting a counterclaim for a violation of New York Civil Rights Law § 70-a.  On March 29, 2021, Kesner moved to dismiss the counterclaim, and filed a memorandum of law in support.  Dkts. 129–30.  On April 19, 2021, Buhl opposed Kesner's motion to dismiss.  Dkt. 131.  On May 3, 2021, Kesner filed a reply.  Dkt. 133.

On August 9, 2021, Buhl moved for summary judgment on the outstanding libel claims and, in support, filed a memorandum of law, a Local Rule 56.1 Statement, the declaration of Wesley J. Paul, attaching exhibits, and an affidavit attaching exhibits.  Dkts. 143–47.  On August 30, 2021, Kesner opposed summary judgment, and filed a Local Rule 56.1 counter-statement in support.  Dkts. 150 ("Opp."), 150-1.  On September 12, 2021, Buhl filed a reply memorandum, and a reply to Kesner's Local Rule 56.1 Counter-Statement.  Dkts. 151–52.

## II.     Discussion

### A.     Buhl's Summary Judgment Motion

Buhl has moved for summary judgment on the small portion of Kesner's libel claim that survived the motion to dismiss.  As pruned, that claim rests solely on Buhl's statements in the October 31, 2018 Article; the March 27, 2019 Tweet; and the June 7, 2019 Article to the effect that Kesner had engaged in criminal conduct.  Buhl argues that Kesner has failed to adduce any evidence—let alone evidence sufficient to support a verdict—that she published these statements with actual malice.  The question for the Court, therefore, is "whether with the benefit of discovery, plaintiff has adduced sufficient evidence to prove actual malice (taking the evidence most favorably to plaintiff)."  *Palin v. New York Times Co.*, 482 F. Supp. 3d 208, 215 (S.D.N.Y.), *modified*, 510 F. Supp. 3d 21 (S.D.N.Y. 2020).

### 1.     Threshold Issue: Kesner's Local Rule 56.1 Statement

As a threshold matter, in resolving Buhl's summary judgment motion, the Court must disregard the portions of Kesner's Local Rule 56.1 Statement that dispute factual assertions in Buhl's 56.1 Statement.  That is because, for each factual assertion Kesner disputes, he cites only to the Amended Complaint—or to nothing at all.

Local Rule 56.1(d) requires that each statement in a Rule 56.1 Statement "must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]here there are no citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion." (cleaned up)); *Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79*, 691 F. Supp. 2d 372, 383 (S.D.N.Y. 2009) ("The law is clear that 'blanket denials,' wholesale evidentiary objections, and counterstatements unsupported by any citations are insufficient to create genuine issues of material fact." (quotation omitted)); *Major League*

*Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 314 (2d Cir. 2008) (responses that use the word "disputed" but do not demonstrate that the dispute is genuine cannot defeat summary judgment).

Kesner's 56.1 Statement fails this standard. For each factual assertion of Buhl's that Kesner disputes, his responses either consist of "conclusory allegations, speculation or conjecture," without citing any evidence in the record, or rely on citations to his own Amended Complaint, which, of course, is not evidence. *See, e.g.*, Def. 56.1 ¶¶ 4a, 15a, 36a, 41a; *Costello v. New York State Nurses Ass'n*, 783 F. Supp. 2d 656, 661 (S.D.N.Y. 2011) (quoting *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996)). The Court must therefore disregard each of these responses. *Morris v. Astrue*, No. 10 Civ. 2121 (PKC), 2011 WL 1346983, at *1 (S.D.N.Y. Apr. 5, 2011) (finding plaintiff's Rule 56.1 Statement deficient where it relied only on complaint allegations and exhibits attached thereto); *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) ("The nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment."); *Major League Baseball Props., Inc.*, 542 F.3d at 310 ("A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory or based on speculation.").

Others of Kesner's responses contain legal argument suitable for a memorandum of law, *see, e.g.*, Def. 56.1 ¶ 41a. *Risco v. McHugh*, 869 F. Supp. 2d 75, 86 n.2 (S.D.N.Y. 2012) ("[T]he [Rule 56.1] Statement improperly interjects arguments and/or immaterial facts in response to facts asserted by Defendant, without specifically controverting those facts."). The portions of Kesner's 56.1 Statement that contain legal argument bereft of factual matter, too, are set aside.

To be sure, that Kesner's 56.1 Statement is deficient does not mean that facts set out in Buhl's 56.1 Statement are established. Rather, a district court must assure itself that there is admissible evidence supporting an unopposed Rule 56.1 statement for it to be accepted as true. *See Dervin Corp. v. Banco Bilbao Vizcaya Argentaria, S.A.*, No. 03 Civ. 9141 (PKL), 2004 WL 1933621, at *8 (S.D.N.Y. Aug. 30, 2004) (citing *Giannullo v. City of New York*, 322 F.3d 139, 140–43 (2d Cir. 2003)); *see also Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion."); *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) ("If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied *even if no opposing evidentiary matter is presented.*" (emphasis in original) (quoting *Vt. Teddy Bear Co.*, 373 F.3d at 244)).

Accordingly, although Buhl's 56.1 Statement and proffered exhibits form the entirety of the summary judgment record, in evaluating Buhl's summary judgment motion, the Court has independently assessed whether there is admissible evidence supporting the propositions in that statement.

### 2. Applicable Legal Standards

#### a. Summary judgment motions

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. The

16

movant may do so by either (1) pointing to evidence that negates her opponent's claims; or (2) identifying portions of her opponent's evidence that demonstrate the absence of a genuine issue of material fact, *i.e.*, identifying evidentiary insufficiency. *Salahuddin*, 467 F.3d at 272–73; *Celotex Corp.*, 477 U.S. at 325. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). Summary judgment will be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322–23.

### b. *Libel claims*[6]

To sustain a claim for libel under New York law, a plaintiff must establish the following elements: "(1) a written defamatory statement of fact concerning the plaintiff; (2) publication to a third party; (3) fault (either negligence or actual malice depending on the status of the libeled party); (4) falsity of the defamatory statement; and (5) special damages or *per se* actionability." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000); *Conti v. Doe*, 535 F. Supp. 3d 257, 266 (S.D.N.Y. 2021). Buhl moves for summary judgment on the ground that the evidence cannot establish the third element, fault, which the parties agree is judged by the standard of "actual malice," based on a recent revision to New York's anti-SLAPP statute.

### i. New York's anti-SLAPP statute

In November 2020, New York expanded its anti-strategic litigation against public participation ("anti-SLAPP") statute—which applies to communications on matters of public interest. N.Y. Civ. Rights Law § 76-a; *Coleman v. Grand*, No. 18 Civ. 5663 (ENV) (RLM), 2021 WL 768167, at *7 (E.D.N.Y. Feb. 26, 2021); *Palin v. New York Times Co.*, 510 F. Supp. 3d 21, 25 (S.D.N.Y. 2020). Relevant here, the amendment to § 76-a of the statute broadened the reach of the "actual malice" standard to include:

> (1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or
>
> (2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition.

N.Y. Civ. Rights Law § 76-a(1)(a); *Coleman*, 2021 WL 768167, at *7.

---

[6] "Libel is a method of defamation expressed in writing or print." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000). Accordingly, the Court uses the terms "libel" and "defamation" interchangeably in this decision.

The amendment further provides that the term "public interest" is to "be construed broadly, and shall mean any subject other than a purely private matter." N.Y. Civ. Rights Law § 76-a(1)(d); *see Lindberg v. Dow Jones & Co., Inc.*, No. 20 Civ. 8231 (LAK), 2021 WL 3605621, at *7 (S.D.N.Y. Aug. 11, 2021); *Sweigert v. Goodman*, No. 18 Civ. 8653 (VEC) (SDA), 2021 WL 1578097, at *2 (S.D.N.Y. Apr. 22, 2021). Matters of "public concern" include "matter[s] of political, social, or other concern to the community," even those that do not "affect the general population." *Abbott v. Harris Publ'ns, Inc.*, No. 97 Civ. 7648 (JSM), 2000 WL 913953, at *7 (S.D.N.Y. July 7, 2000). "In light of the extremely broad interpretation [of what qualifies as public interest] by New York courts," cases where "the subject matter was not a matter of legitimate public concern are extremely rare." *Lindberg*, 2021 WL 3605621, at *8. Significant here, such matters have been held to encompass "reports of improper business practices, particularly where such conduct may result in loss to stakeholders." *Id.* Kesner does not dispute that New York's broad definition reaches each of the remaining statements on which his libel claims are based, all of which accuse him of participating or aiding in financial fraud.

Courts have uniformly found the anti-SLAPP amendment both to apply to diversity actions and to have retroactive effect. *See Palin*, 510 F. Supp. 3d at 27 (finding law "a substantive, rather than a procedural, provision" and to have retroactive effect); *Coleman*, 2021 WL 768167, at *7 (agreeing with analysis in *Palin*); *see also Sackler v. Am. Broad. Cos., Inc.*, 144 N.Y.S.3d 529, 532 (N.Y. Sup. Ct. 2021) (finding statute to have retroactive effect); *Sweigert*, 2021 WL 1578097, at *2. Neither party here takes issue with these holdings or contends that § 76-a is inapplicable.

ii.    Actual malice

"Actual malice" requires a plaintiff to establish by clear and convincing evidence that the communication on which the action was based "was made with knowledge of its falsity or with

reckless disregard of whether it was false." N.Y. Civ. Rights Law § 76-a(2); *Coleman*, 2021 WL 768167, at *9. "Reckless disregard as to falsity means that the statement is made with a high degree of awareness of the publication's probable falsity or while the defendant in fact entertained serious doubts as to the publication's truth." *Albert v. Loksen*, 239 F.3d 256, 272 (2d Cir. 2001) (cleaned up); *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013). "Actual malice, even by way of recklessness, is . . . a difficult standard to meet, and quite purposefully so[.]" *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 277 (S.D.N.Y. 2013) (*Biro II*), *aff'd*, 807 F.3d 541 (2d Cir. 2015); *see also McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 185 (S.D.N.Y. 2020) ("Actual malice is a high bar.").

"Despite its name, the actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication." *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001) (citing *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991) (explaining that actual malice "should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will")). In recognition of the fact that "a defendant in a defamation action will rarely admit that she published the statements with actual malice," *Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015), proof of actual malice rests on objective facts, such as "the defendant's own actions or statements, the dubious nature of [her] sources, [and] the inherent improbability of the story," *Coleman*, 2021 WL 768167, at *9 (quoting *Celle*, 209 F.3d at 183); *Biro II*, 963 F. Supp. 2d at 277; *Dongguk*, 734 F.3d at 123.

Generally, "mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 332 (1974); *Dongguk*, 734 F.3d at 124. But "evidence of an intent to avoid the truth . . . [can be] sufficient to satisfy the

[actual malice standard]." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 693

(1989). Although "a publisher who does not already have 'obvious reasons to doubt' the

accuracy of a story is not required to initiate an investigation that might plant such doubt[,]

[o]nce doubt exists, . . . the publisher must act reasonably in dispelling it." *Dongguk*, 734 F.3d at

124 (quoting *Masson v. New Yorker Mag., Inc.*, 960 F.2d 896, 901 (9th Cir. 1992)).

### 3.    Application to Buhl's Posts About Kesner

#### a.   *The absence of evidence of actual malice*

At trial, Kesner would bear the burden of proving, by clear and convincing evidence, that

Buhl acted with actual malice. *Anderson*, 477 U.S. at 257.  Accordingly, to defeat Buhl's

summary judgment motion on the issue of actual malice, the Court must find evidence that

would permit a rational juror to find, by clear and convincing evidence, that Buhl knowingly or

recklessly made false statements. *Coleman*, 2021 WL 768167, at *9 (citing *Anderson*, 477 U.S.

at 254).

##### i.    "Evidence" of actual malice

Kesner does not appear to have taken any discovery or, after the dismissal of his claims

against *Barron's* and Alpert, engaged in any active litigation in this case.  Nor, as noted, did he

submit a compliant Rule 56.1 statement.  Instead, in opposing Buhl's summary judgment motion,

he argues that a jury could find active malice based on inferences drawn from Buhl's posts

and/or from witness statements Buhl has adduced.

Kesner is mistaken.  Viewed in combination and in the light most favorable to Kesner,

this evidence could not support a finding of actual malice. *See Anderson*, 477 U.S. at 254

("[T]here is no genuine issue if the evidence presented in the opposing affidavits is of

insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and

convincing evidence."); *Roche v. Hearst Corp.*, 53 N.Y.2d 767, 769 (1981) (granting summary

judgment where plaintiff failed to take discovery to develop evidence of actual malice and offered only an attorney affidavit offering an interpretation of defendant's evidence); *Suozzi v. Parente*, 616 N.Y.S.2d 355, 359–60 (1994) (same).

**The statement of Daniel Fisher**: In a written sworn statement submitted in a separate litigation, Fisher surmised that he was the anonymous "Biozone investor" referenced in Buhl's November 2016 Article—an article which is not at issue here. Fisher distanced himself from the statements contained in that article, stating that he had not told Buhl the SEC was investigating Kesner or that Fisher had been interviewed by the SEC about Kesner. Buhl Aff., Ex C. Fisher stated that he had told Buhl only that Kesner was the deal lawyer for a transaction he reported to the SEC, and which had resulted in a private litigation brought by him. *Id.*

Kesner argues that, based on Fisher's statement, Buhl knew that Kesner had not engaged in any illegal conduct, backroom deals, or aided anyone in violating the securities laws. Opp. at 14. On that basis, Kesner argues, the statements in Buhl's two blogs and Tweet that Kesner had violated these laws could be found to have been made with actual malice.

For multiple reasons, Fisher's statement does not establish Buhl's actual malice, or come close.

To begin, Kesner has not adduced any evidence that Fisher was ever a source of Buhl's for any of the articles at issue in this litigation. Fisher's statement does not state that he was. And because Kesner did not depose Fisher or Buhl or pursue document discovery, Kesner's premise that Fisher was a source for those articles is not established. Indeed, even as to Buhl's November 2016 article, Fisher does not state that he was a source whom Buhl quoted there, only that he assumed, having spoken to Buhl, that he was the anonymous "Biozone investor" to whom that article referred.

Even assuming that Fisher were the anonymous "Biozone investor" quoted in that article, his statement would not support a finding that the statements at issue in this litigation were made with actual malice. Fisher stated only that *he* had not told Buhl, when they spoke sometime in 2016, that Kesner was under investigation by the SEC in connection to the Biozone matter. His statement does not say anything about Buhl's other sources of information—either as of his conversation with Buhl in 2016 or as of the dates of publication (in 2018 and 2019) at issue in this lawsuit. Buhl's one conversation with Fisher in 2016 is thus no measure of the information Buhl had acquired by the date of these publications of Kesner's involvement in Honig's pump-and-dump schemes. Kesner's theory also ignores the highly significant events that followed Fisher's conversation with Buhl and statement about it. Most salient, these include the SEC FAC, which includes pungent allegations about—and plausibly indicative of complicity by—the person it identified as "Issuer's Counsel" and "Issuer's Counsel's Partner."

In any event, even if Fisher's statement that he had not told Buhl in 2016 that Kesner was under investigation by the SEC had been made immediately before Buhl's 2018 posts at issue, that statement would not factually undermine the statements in those posts that remain at issue in Kesner's lawsuit here. Buhl did not represent in those statements that Kesner was a subject of an SEC investigation. Her statements instead describe Kesner's underlying violations of law. Her blogs termed him a "bad actor" and a member of "Team Honig"; alleged that he had been involved in "backroom deals"; and alleged that he had helped DeFrancesco skirt disclosure requirements in a separate transaction. *See supra* § I.A.6. Violations of the securities laws assuredly often occur without an SEC investigation's ever opening as to them. Whether or not the SEC had been alerted to these misdeeds does not bear on whether Buhl's statements

describing them were true, let alone whether Buhl appreciated at the time that her accounts of Kesner's knavery were false.

**The DeFrancesco emails**:  Kesner also points to emails that Buhl states she received from a source before posting the blogs at issue.  These were between Kesner and an attorney for a broker-dealer regarding an off-market transfer of shares.  In these, Kesner, apparently on behalf of Catherine DeFrancesco, who appears to have been either a Kesner client or the spouse of one, advocates for a transfer of shares held in DeFrancesco's name.  Buhl Aff. ¶¶ 48–50; *id.*, Exs. L, M. Kesner urges that the emails demonstrate that Buhl knew that he had not engaged in illegal conduct, backroom deals, or aided any other person in violating the securities laws.  Opp. at 14.

The emails do not demonstrate any such thing.  To be sure, on their own terms, they do not establish illegal conduct.  Depending on the surrounding facts, the off-market transfer of shares that they describe might, or might not be, part and parcel of an unlawful scheme.  But nor do the emails—at all—affirmatively prove the legality of Kesner's actions.  The context needed to enable such a determination is lacking.  Critical here, Kesner does not point to any aspect of the emails that would put Buhl on notice that Kesner's conduct was other than illegal, so as to support his claim that the blog posts were written with actual malice.  And the text of the emails privately arranging off-market securities trades is facially consistent with Buhl's summary of them—that the emails "could show how the insiders skirt beneficial ownership disclosure rules" or that Kesner "aided Defrancesco in Questionable Cannabis stock deal."

**Failure to investigate**:  Kesner next argues that Buhl "failed to investigate known and obvious facts, such as why the SEC never named Kesner in any Wells Notice or any complaint or any amended complaint in the SEC Action, or why Biozone and Fisher never took any legal action against Kesner as a result of the 'egregious' '[i]llegal' acts." *Id.* at 16.

As a basis for opposing summary judgment, this argument fails, too.  Having foregone

discovery, Kesner has not adduced any evidence establishing the investigative steps Buhl took;

the investigative steps she did not take; the manner in which her investigation proceeded; or her

reasons for taking—or foregoing—particular steps.  Moreover, even had Kesner established—

say, through a deposition of Buhl—that she had not investigated a particular point, that, without

more, would not establish actual malice.  "[T]he operative question is whether a defendant failed

to investigate in the face of 'actual, subjective doubts as to the accuracy of the story.'"  *BYD Co.*

*Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 827 (S.D.N.Y. 2021) (quoting *Biro II*, 963 F.

Supp. 2d at 278).  Kesner has not adduced any evidence that Buhl "entertained serious doubts as

to the truth" of any statement she published, *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968),

or that, in foregoing an investigative avenue, she was engaged in "the purposeful avoidance of

the truth," *Harte–Hanks*, 491 U.S. at 692.  *See also Dongguk*, 734 F.3d at 126.

**_Kesner's "clean record" and the absence of SEC charges_**:  Kesner next argues that his

ostensibly "clean record"—and the fact that he was not named by the SEC in either its original or

amended complaint—make Buhl's assertions to the effect that he had broken the law "inherently

improbable."  Opp. at 14.  For two reasons, that conclusion does not follow, and thus does not

establish a basis for denying summary judgment.

First, as to whether Kesner had engaged in illegal conduct, the SEC's enforcement or

litigation decisions are not a decisive measure, as any lawyer or journalist in this space would

appreciate.  Kesner could easily have engaged in the illegal conduct posited by Buhl, with the

SEC deciding to forego action against him for reasons other than an internal determination that

he was in fact not culpable.  For example, it could have had doubts about the admissibility of

evidence, it could have viewed its admissible evidence as insufficiently conclusive to justify

pursuing a lawsuit, it could have viewed the special challenge of bringing a case against a lawyer in a case involving a client's misconduct—with the proof hurdles created by the privilege—as daunting, or it could have viewed its enforcement resources as better trained on other perceived bad actors. That Kesner had not been charged or convicted as of the date of Buhl's blogs is not inconsistent with the proposition that he had, in fact, broken the law.

Second, on the issue of actual malice, the SEC's charging documents against Kesner's client, Honig, far from exonerating Kesner, gave an analyst such as Buhl solid ground on which to infer Kesner's knowing culpability in Honig's violations of law. Kesner, tellingly, does not dispute that the "Issuer's Counsel" and "Issuer's Counsel's Partner" as used in the SEC FAC described, respectively, Kesner's then-law firm and Kesner himself. And the irregular conduct attributed to that pseudonymous lawyer in the FAC was fairly viewed as sketchy. It supported, not refuted, the inference that, although uncharged, the lawyer had colluded with his client Honig in the pump-and-dump schemes with which Honig was charged. *See* SEC FAC ¶¶ 90 (describing Honig as having insisted that issuers that he was invested in retain Kesner); 125 (alleging that MabVax was a vehicle for Honig's pump-and-dump schemes, and that SRFK had been engaged as its counsel); 162 (alleging Honig called CEO of MGT Capital to induce him to retain SRFK), 172 (alleging that Honig made it a condition of financing for MGT Capital that it retain Kesner and set aside one year's worth of prepaid legal fees); 179 (alleging that Kesner helped to conceal Honig's name from his investment in MGT Capital); 183–84 (alleging that Kesner sent a Honig-favored candidate an offer letter for a position on the MGT Capital Board, using the MGT Capital CEO's signature line without permission from the MGT Capital CEO). Further support for the inference of illegality was a separate malpractice litigation against Kesner, known to Buhl, arising from his involvement in one of Honig's alleged pump-and-dump

schemes. *See* Def. 56.1 ¶ 24. The assembled evidence, far from putting Buhl on notice that an

accusation of illegality against Kesner would be false, lent substantial support to that conclusion.

*ii.*      Unsupported assertions

Kesner's remaining arguments are based on unsupported claims about what Buhl knew or

did. Kesner asserts:

- That "Buhl made up facts of whole cloth and fabricated the claims that Kesner was a 'bad actor'; and that he engaged in 'illegal' 'backroom deals' and 'intimidation of Biozone.'" Opp. at 12.

- That "the words chosen by Buhl coupled with the complete lack of evidentiary support evince an ill-will and intent to harm Kesner through falsehoods." *Id.* at 15.

- That Buhl "abandoned all journalistic standards in blogging and tweeting about Kesner" and that she engaged in "[n]o newsgathering, no research, no interviews, no meetings, no editing and no rounds of review" before publishing the statements at issue. *Id.* at 16.

Kesner does not cite any record support for these claims to the effect that Buhl's methodology

was shoddy and that she was driven by retributive motives. And, on its independent review, the

Court has not found record support for these claims. This case is thus far afield from cases in

which malice could be inferred based on evidence of this nature. *See, e.g., Celle*, 209 F.3d at

186 (finding ill will based on evidence that a misleading article had been published as in-kind

retribution for misleading commentary about the defendant's daughter). On the contrary, the

only evidence about Buhl's journalistic practices comes from Buhl herself: she attests that, for

each of her articles, she conducted extensive research and interviews. Buhl Aff. ¶¶ 21–31; 33–

40; 50–56. The Court accordingly puts aside Kesner's factually baseless arguments.

Kesner's final contention in opposition to summary judgment is that Buhl "excessively

republished her false statements out of a desire to injure Kesner." Opp. at 16. Buhl's

republication could be relevant had Kesner established that Buhl "continued to publish [the

statements] notwithstanding their falsity." *See Kotowski v. Hadley*, 833 N.Y.S.2d 103, 106

27

(2007). But, for the reasons discussed, Kesner has not established that, at any point, Buhl believed or had good reason to believe her statements about Kesner's illegal conduct to be false. *Celle*, 209 F.3d at 181 (burden of proving falsity is on plaintiff).

In sum, there is literally no evidence on which a rational juror could conclude that Buhl published the statements at issue with actual malice. *See Suozzi*, 616 N.Y.S.2d at 359–60 (affirming summary judgment against plaintiff where he relied solely on attorney argument to prove actual malice). Summary judgment for Buhl on Kesner's libel claims is thus required.

### b.  *Evidence refuting a finding of actual malice*

Although the summary judgment inquiry turns on whether the plaintiff has adduced sufficient to reach a jury on a required element—and Kesner has not—it is noteworthy that Buhl has come forward with competent evidence refuting that claim. Specifically, her sworn affidavit—undisturbed by any record evidence—explains the investigative process she undertook that led her to conclude that her statements about Kesner were true.

***October 31, 2018 Article***:  Buhl attests that she received a tip from "Informant 1," who claimed to have information for her about Laidlaw and Honig. Buhl Aff. ¶ 21. Buhl also spoke to Informants 2 and 3, who each provided documents, emails and text messages demonstrating "how Honig used Laidlaw's retail clients to get out of his security investments before the stock price crashed in the pump and dump scheme." *Id.* ¶ 22. Those informants also told Buhl that Laidlaw used SRFK, and specifically, Kesner, as its counsel. *Id.* ¶ 24. Buhl also states that in August 2018, she learned that MabVax had sent a demand letter to Kesner and his firm seeking restitution for malpractice. *Id.* ¶ 46; *id.* Ex. K. Buhl also states that she was aware, based on information from a confidential source, that the SEC was investigating Kesner's activities. *Id.* ¶ 16(e). Buhl states that, today, she still believes the statements in the Article are true, and is not aware of any contradictory facts. *Id.* ¶¶ 30–31.

*March 27, 2019 Tweet*: Buhl attests that she relied on the allegations in the SEC FAC regarding "Team Honig," which pseudonymously reference Kesner. *Id.* ¶¶ 33–34. Buhl also attests that she relied on earlier research that confirmed Kesner's involvement with the three companies referenced in the SEC FAC. *Id.* ¶ 34. Buhl states that the March 27, 2019 Tweet was intended to express her belief, based on the SEC FAC, that Kesner had been involved in the deals referenced there. *Id.* ¶ 42.

*June 7, 2019 Article*: Buhl attests that she received the emails contained in the Cannabis Law Report article from "Informant 5." *Id.* ¶ 50. Buhl attests that she had "a reasonable belief that Informant 5 was credible since the source had direct knowledge of the emails and the emails showed that they were sent from Kesner's email address." *Id.* Informant 5 provided her with additional documentation that formed the basis for Buhl's June 7, 2019 Article. *Id.* Buhl also relied on information from Informants 4, 6, and 7, on public filings in *Jakobsen v. Aphria Inc.*, 18 Civ. 11367 (GBD) (S.D.N.Y. Dec. 5, 2018) and on SEC filings that showed that Kesner was the reporting lawyer for Scythian. Buhl Aff. ¶¶ 51–54. Buhl states that today she still believes the statements in the Article are true, and that she is unaware of contradictory facts. *Id.* ¶¶ 55–56.

*Buhl's general reporting practices*: Finally, Buhl attests that in general, for any article, she "rel[ies] on a number of different sources and/or informants, both confidential and non-confidential, public and non-public, to verify and collaborate my reporting and the sources' information or statements" and she has "not used any information from any anonymous sources or any source that was unverified to [her]." *Id.* ¶ 58. To the extent Buhl relied on sources, she attests, her informants provide her with letters, emails, and other collaborating documents. *Id.* ¶ 59.

For all of the above reasons, the Court enters summary judgment for Buhl on Kesner's libel claims.

## B.    Kesner's Motion to Dismiss Buhl's Anti-SLAPP Counterclaim

Buhl's counterclaim posits that, provided she prevails on her summary judgment motion as she now has, she will be entitled to costs and attorney's fees under New York's anti-SLAPP statute. *See* Dkt. 127 at 15.  In November 2020, New York amended its existing anti-SLAPP law "to broaden the scope of the law and provide greater protections to defendants," *Sweigert*, 2021 WL 1578097, at *1, as discussed *supra* § II.A.2.b.i.  Salient here, that amendment included a provision, §70-a, that permits a SLAPP defendant to recover "damages, including costs and attorney's fees," by bringing a special motion to dismiss pursuant to N.Y. C.P.L.R. § 3211(g).  Such a motion to dismiss "shall be granted" unless the plaintiff demonstrates "that the cause of action has a substantial basis in law or is supported by a substantial argument for an extension, modification or reversal of existing law."  N.Y. Civ. Rights Law § 70-a (incorporating N.Y. C.P.L.R. § 3211(g)).

In moving to dismiss Buhl's counterclaim for damages based on § 70-a, Kesner argues, *inter alia*, that § 70-a cannot be applied in a diversity action in federal court.  That is because, he contends, the law's "substantial basis" standard conflicts with Federal Rule of Civil Procedure 12(b)(6).  On that discrete point, Kesner is correct.

Under the familiar *Erie* doctrine, a federal court sitting in diversity must determine whether "a Federal Rule of Civil Procedure 'answer[s] the same question' as" a state or local anti-SLAPP statute.  If so, the Federal Rule governs unless it violates the Rules Enabling Act, and the federal court cannot apply the anti-SLAPP statute if that statute makes it easier for a defendant to obtain dismissal of a case before trial "than the more plaintiff-friendly" Federal Rules of Civil Procedure 12 and 56.  *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1333

(D.C. Cir. 2015) (alteration in original) (holding that, under *Erie*, Washington, D.C.'s anti-SLAPP statute could not be applied in federal court) (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398–99 (2010)).

The Second Circuit recently applied those principles in *La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020), in which it held that a comparable provision of California's anti-SLAPP statute conflicted with Federal Rules of Civil Procedure 12 and 56. Relevant here, the Circuit noted that, under Rule 12(b)(6), a plaintiff need only plead facts sufficient to "to state a claim to relief that is plausible on its face." *Id.* at 87 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). However, the California anti-SLAPP statute "abrogated that entitlement by requiring the plaintiff to establish that success is not merely plausible but probable." *Id.* (cleaned up). Thus, the Circuit explained, the statute sought to "establish the circumstances under which a court must dismiss a plaintiff's claim before trial"—"a question that is already answered (differently) by Federal Rules 12 and 56." *Id.* Because the California statute's probability-of-success standard conflicted with Rule 12 (and similarly with Rule 56), it could not be applied in federal court. *Id.*

Since *Reid*, a court in this District has applied the same doctrine to the provision of the New York anti-SLAPP statute at issue here: § 70-a. The Hon. Valerie E. Caproni, United States District Judge, held that *Reid* "all but resolves the question presented[.]" *Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*, No. 20 Civ. 7269 (VEC), 2021 WL 3271829, at *13 (S.D.N.Y. July 30, 2021) ("*Nat'l Academy*"). The "substantial basis" standard of the New York anti-SLAPP law, Judge Caproni held, squarely conflicted with the standards of Rules 12 and 56. She explained:

> As noted . . . under New York's law, a motion to dismiss must be granted unless, at the pleading stage, the plaintiff can "demonstrate[] that the cause of action has a

substantial basis in law or is supported by a substantial argument for an extension, modification or reversal of existing law." CPLR 3211(g). Under Federal Rule of Civil Procedure 12, however, a plaintiff at the pleadings stage need only allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Put differently, New York's anti-SLAPP law imposes a different, and higher, burden on the plaintiff at the pleading stage than the Federal Rules of Civil Procedure.

*Id.* This Court finds Judge Caproni's analysis as to why the § 70-a standard cannot be applied in diversity actions to be well-reasoned and clearly correct, and adopts it here.

Buhl counters that § 70-a can be squared with Rule 12(b)(6), because the New York statute does not require a court to use the pleading standard articulated in New York C.P.L.R. § 3211(g). Buhl emphasizes that, by its terms, the statute only "includes" CPLR § 3211(g):

> [C]osts and attorney's fees shall be recovered upon a demonstration, *including* an adjudication pursuant to subdivision (g) of rule thirty-two hundred eleven or subdivision (h) of rule thirty-two hundred twelve of the civil practice law and rules, that the action involving public petition and participation was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law[.]

N.Y. Civ. Rights Law § 70-a(1)(a) (emphasis added). Buhl argues that under §70-a, a court evaluating a defamation defendant's "demonstration" need not apply the CPLR, but instead, may treat that state procedural rule as just one potential method of such adjudication.

That argument is unpersuasive. Even assuming that § 70-a gave a federal court the latitude whether to apply New State procedural law such as CPLR § 3211(g), the statute itself would still embed a less plaintiff-friendly standard than Rule 12 (and Rule 56). Its requirement that a claim lacking "a substantial basis in fact and law" be dismissed is distinct from—and more demanding than—the Rule 12(b)(6) standard, which requires a plaintiff only to "state a claim to relief that is plausible on its face.'" *See also Carbone v. Cable News Network, Inc.*, 910 F.3d 1345 (11th Cir. 2018) (holding Georgia anti-SLAPP statute conflicted with Federal Rules);

*Klocke v. Watson*, 936 F.3d 240 (5th Cir. 2019), *as revised*, (Aug. 29, 2019) (holding same for Texas statute).

The Court accordingly grants Kesner's motion to dismiss Buhl's counterclaim based on § 70-a, because, as in *Abbas, Reid*, and *Nat'l Academy*, granting relief under § 70-a would require the Court to apply a state procedural standard that conflicts with the Federal Rules of Civil Procedure. For avoidance of doubt, this ruling does not call into question decisions substantively construing the substantive standards of § 70-a, *e.g.*, its "actual malice" standard. *See Reid*, 966 F.3d at 86 n.3 (distinguishing between applicability in federal court of substantive and procedural elements of state anti-SLAPP laws); *Sweigert*, 2021 WL 1578097, at *2 (same).[7]

## CONCLUSION

For the foregoing reasons, the Court grants Buhl's motion for summary judgment and grants Kesner's motion to dismiss Buhl's counterclaim.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 128 and 143, and to close the case.

---

[7] Two courts presented with § 70-a's applicability in federal court have reserved on that question. *See Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*, No. 20 Civ. 7670 (CM), 2021 WL 3173804, at *9–10 (S.D.N.Y. July 27, 2021) (expressing skepticism that, after *Reid*, an anti-SLAPP fee award could be granted in federal court under § 70-a); *Palin*, 510 F. Supp. 3d at 25 n.2 (noting that defendants did not "contend that [§ 70-a] would even apply in federal court"). To the extent other courts have applied § 70-a in diversity actions, they did not consider whether the statute conflicted with a Federal Rule, or considered that question only in the context of granting a SLAPP defendant leave to file a counterclaim. *See Harris v. Am. Acct. Ass'n*, No. 20 Civ. 1057 (MAD) (ATB), 2021 WL 5505515, at *13–14 (N.D.N.Y. Nov. 24, 2021) (applying § 70-a where "Plaintiff d[id] not dispute the applicability"); *Goldman v. Reddington*, No. 18 Civ. 3662 (RPK) (ARL), 2021 WL 4099462, at *4–5 (E.D.N.Y. Sept. 9, 2021) (finding no error where magistrate judge permitted the defendant to amend her pleadings to include an anti-SLAPP counterclaim).

SO ORDERED.

_Paul A. Engelmayer_

PAUL A. ENGELMAYER
United States District Judge

Dated: March 10, 2022
New York, New York